ORAL ARGUMENT NOT YET SCHEDULED
No. 22-5328

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

ATTORNEY GENERAL OF THE UNITED STATES,

*Plaintiff-Appellant,*

v.

STEPHEN A. WYNN,

*Defendant-Appellee.*

————————————

On Appeal from the United States District Court
for the District of Columbia

————————————

APPENDIX

————————————

MATTHEW G. OLSEN
Assistant Attorney General for
National Security

JEFFREY M. SMITH
JOSEPH P. MINTA
Attorneys, Appellate Unit
National Security Division
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530
Tel.: 202-353-9055
joseph.minta@usdoj.gov

# APPENDIX

## TABLE OF CONTENTS

Page

District Court Docket Entries ...................................................... Ai

Complaint (ECF No. 3, May 19, 2022)....................................... A1

Defendant's Motion to Dismiss and Attachments
    (ECF No. 11, July 18, 2022).............................................. A14

Plaintiff's Opposition to Defendant's Motion to Dismiss
    (ECF No. 14, Aug. 17, 2022) ............................................ A99

Reply in Support of Motion to Dismiss
    (ECF No. 15, Aug. 29, 2022) .......................................... A149

Dismissal Order (ECF No. 20, Oct. 12, 2022) ................................... A181

Memorandum Opinion (ECF No. 21, Oct. 12, 2022) ......................... A182

Notice of Appeal (ECF No. 22, Dec. 9, 2022) .................................... A202

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:22–cv–01372–JEB

ATTORNEY GENERAL OF THE UNITED STATES OF
AMERICA v. WYNN
Assigned to: Chief Judge James E. Boasberg
Case in other court:  USCA for the DC Circuit, 22–05328
Cause: 28:2201 Injunction

Date Filed: 05/17/2022
Date Terminated: 10/12/2022
Jury Demand: None
Nature of Suit: 890 Other Statutory
Actions
Jurisdiction: U.S. Government Plaintiff

| Date Filed | # | Docket Text |
|---|---|---|
| 05/17/2022 | 1 | COMPLAINT *for Declaratory and Injunctive Relief* against STEPHEN A WYNN (Fee Status:Filing Fee Waived) filed by ATTORNEY GENERAL OF THE UNITED STATES OF AMERICA. (Attachments: # 1 Civil Cover Sheet)(Swinton, Nathan) (Attachment 1 replaced on 5/18/2022) (znmg). Modified on 5/18/2022 to replace fillable civil cover sheet (znmg). (Entered: 05/17/2022) |
| 05/17/2022 | 2 | WAIVER OF SERVICE. STEPHEN A WYNN waiver sent on 5/17/2022, answer due 7/16/2022. (Swinton, Nathan) (Entered: 05/17/2022) |
| 05/18/2022 | | NOTICE OF ERROR re 1 Complaint; emailed to nathan.m.swinton@usdoj.gov, cc'd 0 associated attorneys –– The PDF file you docketed contained errors: 1. Noncompliance with LCvR 5.1(c). Please file an errata correcting the initiating pleading to include the name & full residence address of each party using the event Errata., 2. Blank or missing coversheet. Please use the cover sheet at https://www.dcd.uscourts.gov/new–case–forms & file using the event Civil Cover Sheet., 3. **COMPLIANCE DEADLINE is by close of business today. This case will not proceed any further until all errors are satisfied.** (znmg, ) (Entered: 05/18/2022) |
| 05/19/2022 | 3 | ERRATA by ATTORNEY GENERAL OF THE UNITED STATES OF AMERICA re 1 Complaint, filed by ATTORNEY GENERAL OF THE UNITED STATES OF AMERICA. (Attachments: # 1 Civil Cover Sheet)(Swinton, Nathan) (Entered: 05/19/2022) |
| 05/19/2022 | 4 | SEALED MOTION filed by ATTORNEY GENERAL OF THE UNITED STATES OF AMERICA (Attachments: # 1 Exhibit)(Swinton, Nathan) (Entered: 05/19/2022) |
| 05/20/2022 | | Case Assigned to Judge James E. Boasberg. (znmg) (Entered: 05/20/2022) |
| 05/20/2022 | | SUMMONS Not Issued as to STEPHEN A. WYNN (znmg) (Entered: 05/20/2022) |
| 05/23/2022 | 5 | NOTICE of Appearance by Reid Henry Weingarten on behalf of STEPHEN A. WYNN (Weingarten, Reid) (Entered: 05/23/2022) |
| 05/23/2022 | 6 | NOTICE of Appearance by Brian Matthew Heberlig on behalf of STEPHEN A. WYNN (Heberlig, Brian) (Entered: 05/23/2022) |
| 05/23/2022 | 7 | NOTICE of Appearance by Emma Dinan Ellenrieder on behalf of ATTORNEY GENERAL OF THE UNITED STATES OF AMERICA (Ellenrieder, Emma) (Entered: 05/23/2022) |
| 06/06/2022 | 8 | NOTICE of Appearance by Nicholas Paul Silverman on behalf of STEPHEN A. WYNN (Silverman, Nicholas) (Entered: 06/06/2022) |
| 07/08/2022 | 9 | Joint MOTION for Briefing Schedule *& Partial Stay of Discovery* by STEPHEN A. WYNN. (Attachments: # 1 Text of Proposed Order)(Heberlig, Brian). Added MOTION to Stay on 7/8/2022 (znmw). (Entered: 07/08/2022) |
| 07/08/2022 | | MINUTE ORDER GRANTING Joint 9 Motion for Briefing Schedule. The Court ORDERS that: 1) Defendant shall file his Motion to Dismiss by July 18, 2022; 2) Plaintiff shall file its Response by August 15, 2022; 3) Defendant shall file his Reply by August 29, 2022; 4) Discovery shall be stayed pending resolution of Defendant's |

| | | |
|---|---|---|
| | | Motion to Dismiss and all other deadlines shall be held in abeyance, except that 5) The parties will hold their Rule 26(f) conference on September 6, 2022; 6) Initial disclosures shall be due by September 27, 2022; and 7) The parties shall file their Rule 26(f) report by September 27, 2022. So ORDERED by Judge James E. Boasberg on 7/8/2022. (lcjeb3) (Entered: 07/08/2022) |
| 07/08/2022 | | Set/Reset Deadlines: Motions due by 7/18/2022. Responses due by 8/15/2022 Replies due by 8/29/2022. Initial Disclosure due by 9/27/2022. Rule 26 Meeting Report due by 9/27/2022. (nbn) (Entered: 07/11/2022) |
| 07/15/2022 | 10 | NOTICE of Appearance by Robert David Luskin on behalf of STEPHEN A. WYNN (Luskin, Robert) (Entered: 07/15/2022) |
| 07/18/2022 | 11 | MOTION to Dismiss *Complaint* by STEPHEN A. WYNN. (Attachments: # 1 Memorandum in Support, # 2 Declaration, # 3 Exhibit A, # 4 Exhibit B, # 5 Text of Proposed Order)(Heberlig, Brian) (Entered: 07/18/2022) |
| 07/19/2022 | 12 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Leo R. Tsao, Filing fee $ 100, receipt number ADCDC−9381097. Fee Status: Fee Paid. by STEPHEN A. WYNN. (Attachments: # 1 Declaration of Leo R. Tsao, # 2 Certificate of Good Standing for Leo R. Tsao)(Luskin, Robert) (Entered: 07/19/2022) |
| 07/19/2022 | | MINUTE ORDER GRANTING 12 Motion for Admission *Pro Hac Vice* of LEO R. TSAO. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. So ORDERED by Judge James E. Boasberg on 07/19/2022. (lcjeb1) (Entered: 07/19/2022) |
| 08/15/2022 | 13 | STRICKEN PURSUANT TO THE MINUTE ORDER FILED ON 8/16/2022.....Memorandum in opposition to re 11 Motion to Dismiss filed by ATTORNEY GENERAL OF THE UNITED STATES OF AMERICA. (Swinton, Nathan) Modified on 8/16/2022 (nbn). (Entered: 08/15/2022) |
| 08/16/2022 | | MINUTE ORDER: The Court ORDERS that Plaintiff's 13 Memorandum is STRICKEN for violating the Local Rule on excessive footnotes; the footnotes here, furthermore, appear as an attempt to circumvent page limits. Plaintiff shall file by August 17, 2022, a compliant Memorandum containing no more than 10 footnotes with no more than 50 aggregate lines of text. So ORDERED by Judge James E. Boasberg on 08/16/2022. (lcjeb3) (Entered: 08/16/2022) |
| 08/16/2022 | | Set/Reset Deadlines: Plaintiff shall file by August 17, 2022, a compliant Memorandum containing no more than 10 footnotes with no more than 50 aggregate lines of text. (nbn) (Entered: 08/16/2022) |
| 08/17/2022 | 14 | RESPONSE re 11 MOTION to Dismiss *Complaint* filed by ATTORNEY GENERAL OF THE UNITED STATES OF AMERICA. (Swinton, Nathan) (Entered: 08/17/2022) |
| 08/29/2022 | 15 | REPLY to opposition to motion re 11 MOTION to Dismiss *Complaint* filed by STEPHEN A. WYNN. (Heberlig, Brian) (Entered: 08/29/2022) |
| 09/14/2022 | 16 | NOTICE OF SUPPLEMENTAL AUTHORITY by ATTORNEY GENERAL OF THE UNITED STATES OF AMERICA (Attachments: # 1 Exhibit Omnibus Memorandum Opinion and Order in United States v. Michel)(Swinton, Nathan) (Entered: 09/14/2022) |
| 09/25/2022 | 17 | Joint MOTION for Protective Order *and Federal Rule of Evidence 502(d) Order* by ATTORNEY GENERAL OF THE UNITED STATES OF AMERICA. (Attachments: # 1 Text of Proposed Order Stipulated Protective Order, # 2 Text of Proposed Order Federal Rule of Evidence 502(d) Order)(Swinton, Nathan) (Entered: 09/25/2022) |
| 09/26/2022 | 18 | ORDER: The Court ORDERS that the Joint 17 Motion for Protective Order and Federal Rule of Evidence 502(d) Order is GRANTED, and the signed Protective Order and 502(d) Orders are attached. Signed by Judge James E. Boasberg on 9/26/2022. (lcjeb2) (Entered: 09/26/2022) |
| 09/27/2022 | 19 | MEET AND CONFER STATEMENT. (Attachments: # 1 Text of Proposed Order Plaintiff's proposed scheduling order, # 2 Text of Proposed Order Defendant's proposed scheduling order)(Swinton, Nathan) (Entered: 09/27/2022) |

| | | |
|---|---|---|
| 10/12/2022 | 20 | ORDER: The Court ORDERS that: (1) Defendant's 11 Motion to Dismiss is GRANTED; and (2) The case is DISMISSED WITHOUT PREJUDICE. Signed by Judge James E. Boasberg on 10/12/2022. (lcjeb2) (Entered: 10/12/2022) |
| 10/12/2022 | 21 | MEMORANDUM OPINION re 20 Order on Motion to Dismiss. Signed by Judge James E. Boasberg on 10/12/2022. (lcjeb2) (Entered: 10/12/2022) |
| 12/09/2022 | 22 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 20 Order on Motion to Dismiss by ATTORNEY GENERAL OF THE UNITED STATES OF AMERICA. Fee Status: No Fee Paid. Parties have been notified. (Swinton, Nathan) (Entered: 12/09/2022) |
| 12/12/2022 | 23 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 22 Notice of Appeal to DC Circuit Court. (ztth) (Entered: 12/12/2022) |
| 12/13/2022 | | USCA Case Number 22–5328 for 22 Notice of Appeal to DC Circuit Court filed by ATTORNEY GENERAL OF THE UNITED STATES OF AMERICA. (ztth) (Entered: 12/13/2022) |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ATTORNEY GENERAL OF THE | ) | |
| UNITED STATES OF AMERICA, | ) | |
| 950 Pennsylvania Ave NW | ) | |
| Washington, DC 20530, | ) | |
| | ) | Civil Action No. 1:22-cv-01372 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STEPHEN A. WYNN, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

The Attorney General of the United States of America, by and through the undersigned

attorneys, brings this civil action for declaratory and injunctive relief, and alleges as follows:

## INTRODUCTION

1.      This statutory injunction action is brought under the Foreign Agents Registration

Act of 1938, as amended, 22 U.S.C. §§ 611-621 ("FARA" or "the Act"), to compel the

Defendant, Stephen A. Wynn, pursuant to 22 U.S.C. § 618(f), to submit a true and complete

registration statement, and supplements thereto, to the Attorney General, as required by 22

U.S.C. § 612(a)-(b).  Defendant is obligated to file these materials by virtue of his acting as an

agent of two foreign principals:  Sun Lijun ("Sun"), the former Vice Minister for Public Security

in the People's Republic of China ("PRC"), and the PRC itself.

2.      Specifically, at the request of Sun, and on behalf of the PRC, the Defendant

conveyed to former President Donald J. Trump and his Administration ("the Trump

Administration") the PRC's request to remove from the country a PRC national who had sought

political asylum in the United States.  In so doing, from at least June 2017 through at least

August 2017, the Defendant acted as an agent for foreign principals Sun and the PRC and

engaged in political activities on their behalf in the United States.

      3.     The Defendant therefore has an obligation under FARA to register with the

Attorney General.  22 U.S.C. § 612(a).

      4.     Nevertheless, after having been informed by the U.S. Department of Justice of

this obligation in letters dated May 16, 2018, October 27, 2021, and April 13, 2022, the

Defendant refused to register.  Because his failure to file constitutes an ongoing violation of

FARA and given the likelihood that this violation will continue in the absence of court action, a

permanent injunction is necessary.

<b><u>JURISDICTION AND VENUE</u></b>

      5.     This Court has jurisdiction over the subject matter and all parties to this action

under 28 U.S.C. §§ 1331 and 1345, and also under 22 U.S.C. § 618(f).

      6.     Venue in this district is proper under 28 U.S.C. § 1391(b)(2) because a substantial

part of the acts or omissions giving rise to this action arose from events occurring within this

judicial district.

<b><u>THE PARTIES</u></b>

      7.     Plaintiff is the Attorney General of the United States.  The Attorney General is the

nation's chief law enforcement officer and the head of the U.S. Department of Justice, an

Executive Agency of the United States, and is entrusted with administering FARA.  Pursuant to

his statutory authority, *see* 22 U.S.C. § 620, the Attorney General has promulgated regulations

delegating the responsibility for administering and enforcing the Act to the Assistant Attorney

General for National Security, 28 C.F.R. § 5.1(a).

<b>APP. 002</b>

8.      The Defendant is a U.S. citizen, real estate developer, and businessperson who owned multiple casinos and resorts.  In 2006, the Defendant opened the first of three casino properties located in Macau, which is a special administrative region of the PRC.

## FARA STATUTORY PROVISIONS

9.      Among the chief purposes of FARA is to inform the American public of the activities of agents in the United States working for foreign principals to influence U.S. Government officials or the American public with reference to the domestic or foreign policies of the United States, or with reference to the political or public interests, policies, or relations of a foreign country or a foreign political party.  U.S. agents of foreign principals must register with the Attorney General and make certain disclosures in the registration filings concerning their agency relationships and activities undertaken within the United States on behalf of their respective foreign principals.  22 U.S.C. § 612(a).

10.     Under FARA, the term "foreign principal" includes "a government of a foreign country" and "a person outside of the United States," except in circumstances not applicable here.  22 U.S.C. § 611(b)(1)-(2).

11.     FARA's "agency" determination is a two-part inquiry that considers both (1) the relationship between the agent and the foreign principal and (2) the activities that the agent performs in the principal's interests.  Agency relationships for purposes of FARA include situations where there is an indirect relationship between an agent and a foreign principal through an intermediary.  22 U.S.C. § 611(c)(1).

12.     As relevant here, the term "agent of a foreign principal" under FARA means:

> [A]ny person who acts as an agent, representative, employee, or servant, or any person who acts in any other capacity *at the order*, *request*, or under the direction or control, of a foreign principal or of a person any of whose activities are directly or indirectly supervised,

3

> directed, controlled, financed, or subsidized in whole or in major part by a foreign principal, and who directly or through any other person . . . engages within the United States in political activities for or in the interests of such foreign principal [or] within the United States represents the interests of such foreign principal before any agency or official of the Government of the United States.

22 U.S.C. § 611(c)(1)(i), (iv) (emphasis added).

13.    FARA defines the term "political activities" as "any activity that the person engaging in believes will, or that the person intends to, in any way influence any agency or official of the Government of the United States or any section of the public within the United States with reference to formulating, adopting, or changing the domestic or foreign policies of the United States or with reference to the political or public interests, policies, or relations of a government of a foreign country or foreign political party." 22 U.S.C. § 611(o).

14.    FARA does not limit the speech or political activities of its registrants, who are free to advance whatever message they wish, provided that they disclose their relationship to their foreign principal and adhere to the recordkeeping and other requirements of the statute.

15.    Pursuant to FARA, a person or entity who has a registration obligation has a continuing duty to register, even if the FARA-registrable conduct has ceased. 22 U.S.C. §§ 612(a), 618(e). Termination of the agency relationship does not relieve an agent of the obligation to file a registration statement. *Id*. § 612(a).

## FACTUAL ALLEGATIONS

16.    In approximately May 2017, during a meeting coordinated by foreign national Low Taek Jho, Sun asked businessperson and former finance chair of the Republican National Committee ("RNC") Elliot Broidy, hip-hop artist Prakazrel Michel, and businessperson Nickie Lum Davis to lobby then-President Trump and the Trump Administration to convey the PRC's request to cancel the visa of or otherwise remove from the United States a PRC businessperson

4

**APP. 004**

who left China in 2014, was later charged with corruption by the PRC, and sought political asylum in the United States (hereinafter "the PRC national").

17.    In approximately June 2017, Broidy, on behalf of Sun, elicited the Defendant's help in the lobbying effort.  Defendant served as the RNC finance chair from January 2017 through January 2018 and met Broidy through that work.  Broidy believed that the Defendant's RNC experience, combined with the Defendant's business dealings in the PRC and friendship with then-President Trump, would be helpful in getting access to Trump Administration officials.

18.    Broidy told the Defendant that the PRC national was a criminal wanted by the PRC who was hiding in the United States, that the PRC wanted him arrested, and that his visa was due to expire soon.  Broidy informed the Defendant that Broidy had received this information from Sun of the PRC's Ministry of Public Security and that Sun requested the Defendant's help in bringing the issue to the attention of the Trump Administration.

19.    Broidy provided the Defendant with the PRC national's passport photos, an Interpol red notice, and links to various news articles about the PRC national.

20.    In or around June 2017, Sun spoke by telephone with the Defendant and requested the Defendant's assistance with seeking the removal of the PRC national.  The Defendant agreed to raise the matter with then-President Trump and Trump Administration officials.  Defendant had no prior connection to the PRC national or independent interest in his removal.

21.    Also in or around June 2017, Sun, through Broidy, sought the Defendant's assistance in having the PRC national placed on the No Fly List and having his new visa application denied.

    a.    By text message dated June 27, 2017 to the Defendant's wife, Broidy noted that the PRC national's visa was due to expire on June 30, 2017, and asserted that "[i]t

**APP. 005**

is critically [*sic*] that his new visa application he [*sic*] immediately denied" and that the PRC national be placed on the No Fly List.

b. The Defendant's wife received and sent text messages on behalf of the Defendant, including the above text message and others discussed throughout this Complaint. The Defendant's wife informed the Defendant of the contents of messages received and also sent text messages to Broidy and other individuals at the direction of the Defendant.

c. Broidy sent to the Defendant, through the Defendant's wife, a second message on June 27, 2017, stating that

> President Xi Jinping mentioned to President Trump at Mar-A-Lago that he would like [the PRC national] returned. Vice Minister [Sun] met with me and requested help with regard to [the PRC national]. The Vice Minister told me this is a matter of upmost importance to President Jinping. He promised to return certain US citizens held hostage by China and would accept a very large number of Chinese illegal immigrants for deportation back to China. Finally, he offered new assistance with regard to North Korea.

22. During a dinner on or about June 27, 2017 with then-President Trump and other Administration officials in Washington, D.C., the Defendant conveyed to then-President Trump the PRC's desire to have the PRC national removed from the United States and provided the PRC national's passport photos to then-President Trump's secretary.

a. After the dinner, Broidy informed the Defendant by text (through Defendant's wife) that Sun was "extremely pleased and said that President Xi Jinping appreciates [the Defendant's] assistance."

b. On or about the following day, June 28, 2017, Broidy inquired by text with the Defendant (through Defendant's wife) about the status of the PRC national's visa and whether he had been placed on the No Fly List. Broidy's message added that

**APP. 006**

"[Sun] says they are grateful for your help."  In response, the Defendant (through

Defendant's wife) texted Broidy that "This is with the highest levels of the state

department and defense department.  They are working on this."

23.     From approximately June 2017 through at least August 2017, the Defendant had

several telephone calls with Sun.

    a.   On these telephone calls, the Defendant was connected to Sun via Lum Davis, and

      the discussions were conducted via a translator.

    b.   During these telephone calls, the Defendant believed Lum Davis to be Sun's

      assistant.

    c.   The Defendant participated in at least eight of these calls with Sun.  The calls

      varied in length but lasted approximately thirty minutes on average.

    d.   In these discussions, Sun described the PRC national and stated that it would be

      very important to the PRC if the PRC national's visa was not renewed.  Sun also

      stated that he would appreciate the Defendant's help.

    e.   The Defendant mentioned his business interests in Macau to Sun on multiple

      phone calls.

24.     On or about July 26, 2017, Defendant's wife sent to Broidy a text message asking

Broidy to send to her again the documentation about the PRC national.

25.     Between approximately July 2017 and August 2017, the Defendant attempted to

organize meetings with senior officials on the National Security Council ("NSC") and at the

White House.

a.  In or around late July and August 2017, the Defendant had contact with multiple Trump Administration officials, including two former White House chiefs of staff and two senior officials on the NSC, regarding the PRC national.

b.  The Defendant contacted the White House Chief of Staff on multiple occasions about the PRC national during June and July 2017 and requested a meeting with then-President Trump to discuss the same.

c.  During a late July 2017 meeting with the White House Chief of Staff and two senior NSC officials, the Defendant stated that PRC officials had contacted him and advised him that "they were very interested in having" the PRC national returned to China as soon as possible.

d.  In or around August 2017, the Defendant on multiple occasions visited the White House in person to have what appeared to be unscheduled meetings with then-President Trump.  Some of these discussions, including a meeting on August 25, 2017, concerned the PRC national.

e.  In late August 2017, Broidy took Defendant and Defendant's wife on a trip off the coast of Italy on a yacht belonging to Broidy and his wife.  On August 19, 2017, Broidy and the Defendant called then-President Trump from the yacht.  During that call, the Defendant asked then-President Trump about the PRC national's status, and then-President Trump responded that he would look into the matter.

26.    The efforts to have the PRC national removed ultimately were unsuccessful.

27.    Sun continued to contact the Defendant through approximately October 2017, at which point the Defendant informed Sun that he had made U.S. Government officials aware of the request, that the Defendant was not able to provide any more assistance, and that Sun should

8

**APP. 008**

stop contacting him.  Defendant wanted to exit the situation gracefully, preserve his business

interests in China, and avoid offending anyone.

28.    Defendant's conduct was motivated by his desire to protect his business interests

in the PRC.  In an undated text message, the Defendant told Lum Davis to advise a PRC official

to have the PRC ambassador in Washington, D.C. contact two senior-level NSC officials

directly.  Defendant wrote in the message that he had spoken with both individuals and received

assurances "that all parties in the White House were fully sensitive to the timing of this issue and

the relevant USA procedural law involved."  Defendant went on to state that

> [a]t this point, as a private citizen, I believe I have exhausted the advantages of my
> position.  If there is any other aspect of this situation may occur to you going
> forward, I would of course be anxious to help.  I remain grateful for the privilege
> of being part of the Macau and PRC business community.

29.    According to public reporting, in 2016, shortly before the conduct described

above occurred, the Macau government restricted the number of gaming tables and machines that

the Defendant's casino could operate.[1]  Also according to public reporting, Defendant was

scheduled to renegotiate his licenses to operate casinos in Macau in 2019, subsequent to the

conduct described above.[2]

---

[1] *See* James Detar, "Wynn resorts falls as Macau restricts tables at new casino," Investor's
Business Daily (Aug. 12, 2016).

[2] *See* Linette Lopez, "And now it's clear how China will exploit Steve Wynn's moment of
weakness," Business Insider (Jan. 29, 2018).

APP. 009

## LEGAL ALLEGATIONS

**I.**   **Then-Vice Minister of Public Security Sun Lijun and the PRC are foreign principals under FARA**

30.     As a Vice Minister for the PRC during the time period discussed above who is believed to reside in China, Sun is a foreign principal within the meaning of FARA.  22 U.S.C. § 611(b)(2).

31.     The PRC is a foreign principal within the meaning of FARA because it constitutes the government of a foreign country.  22 U.S.C. § 611(b)(1).

**II.**   **The Defendant acted as an agent of then-Vice Minister of Public Security Sun and the PRC**

32.     Sun, on behalf of the PRC, requested that the Defendant assist in the effort to lobby the U.S. Government, including then-President Trump and the Trump Administration, to have the PRC national removed.

33.     Broidy, on behalf of Sun, also requested that the Defendant assist in the effort to lobby the U.S. Government, including then-President Trump and the Trump Administration, to have the PRC national removed.

34.     Accordingly, the Defendant acted as an agent of Sun and the PRC when he engaged in political activities on their behalf.  22 U.S.C. § 611(c)(1).

**III.**   **The Defendant is obligated to register under FARA because he engaged in political activities at the request of then-Vice Minister Sun and the PRC**

35.     The Defendant is obligated to register under FARA because, through his communications with and lobbying efforts directed at then-President Trump and the Trump Administration, he engaged in political activities by seeking to influence U.S. Government officials "with reference to formulating, adopting, or changing the domestic or foreign policies of

10

**APP. 010**

the United States, or with reference to the political or public interests, policies, or relations" of

the PRC, for or in the interests of the PRC.  22 U.S.C. § 611(o).

36.     The Defendant lobbied multiple people in the Trump Administration, including

then-President Trump, on at least three separate occasions, to have the PRC national removed,

and he did so at the request of at least one PRC official, Sun.  As such, he acted as an agent of a

foreign principal under FARA.  22 U.S.C. § 611(c)(1)(i).

**IV.     The Defendant has failed to register under FARA**

37.     By letter dated May 16, 2018, the U.S. Department of Justice ("the Department")

advised the Defendant of his obligation to register under FARA as an agent of Sun and the PRC

and gave him thirty days to effect the registration.  The Defendant, through counsel, sent to the

Department a letter dated June 8, 2018, disputing the Department's analysis and requesting that

the Department reconsider its determination.  By letter dated October 27, 2021, the Department

advised the Defendant that he remained obligated to register under FARA and that further

investigation into the matter had strengthened the Department's determination in this regard.

Defendant, through counsel, responded by letter dated December 10, 2021.  By letter dated April

13, 2022, the Department reiterated its conclusion that Defendant has an obligation to register

and gave the Defendant thirty days to do so.

38.     To date, the Defendant has failed to register as required.

**APP. 011**

## COUNT I

### (Violation of 22 U.S.C. § 612(a))

39.     Plaintiff realleges and incorporates by reference the allegations in paragraphs 1 through 38 of this Complaint as if fully set forth herein.

40.     By virtue of the acts described above, the Defendant acted as an agent of two foreign principals under 22 U.S.C. § 611(c)(1), that is, he lobbied the U.S. Government for the removal of the PRC national at the request of Sun and on behalf of the PRC.

41.     By virtue of the acts described above, the Defendant has an obligation to register as an agent of foreign principals pursuant to 22 U.S.C. § 612(a).  The Department on multiple occasions has informed the Defendant of this obligation, but he has declined to register.

42.     Plaintiff is entitled to a permanent injunction pursuant to 22 U.S.C. § 618(f) requiring the Defendant to register as an agent of a foreign principal under FARA and, by doing so, to submit a true and complete registration statement, and any supplements thereto, as required by 22 U.S.C. § 612(a)-(b).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, the Attorney General of the United States of America, respectfully requests that this Court enter:

a.   A declaratory judgment stating that Defendant has an obligation to register pursuant to 22 U.S.C. § 612(a) for conduct undertaken on behalf of foreign principals Sun Lijun and the PRC;

b.   A permanent injunction requiring the Defendant to submit a true and complete registration statement, and supplements thereto, as required pursuant to Sections 2(a) and 2(b) of the Foreign Agents Registration Act, 22 U.S.C. § 612(a)-(b);

**APP. 012**

c.  Any and all other relief necessary to effectuate fully the injunction against the

Defendant; and

d.  Such other and further relief as the Court may deem just and proper.


Dated:  May 19, 2022                              Respectfully submitted,

                                                  MATTHEW G. OLSEN
                                                  Assistant Attorney General
                                                  National Security Division
                                                  U.S. Department of Justice

                                                  JENNIFER KENNEDY GELLIE
                                                  Chief, FARA Unit
                                                  National Security Division
                                                  U.S. Department of Justice

                                                  /s/ Nathan M. Swinton
                                                  Nathan M. Swinton
                                                  Trial Attorney
                                                  U.S. Department of Justice
                                                  National Security Division
                                                  Counterintelligence and Export Control Section
                                                  950 Pennsylvania Ave NW, Room 7700D
                                                  Washington, D.C. 20530
                                                  Telephone: (202) 353-0267
                                                  Email: Nathan.Swinton@usdoj.gov

**APP. 013**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ATTORNEY GENERAL OF THE UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> STEPHEN A. WYNN, <br><br> Defendant. | Case No. 1:22-cv-01372-JEB |

## DEFENDANT STEPHEN A. WYNN'S
## MOTION TO DISMISS THE COMPLAINT

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, and for the reasons set forth in the accompanying memorandum of law, Defendant Stephen A. Wynn, by and through his undersigned counsel, hereby moves this Court for an order dismissing with prejudice the Complaint for Declaratory and Injunctive Relief for failure to state a claim upon which relief can be granted.

Defendant respectfully requests oral argument on his motion pursuant to Local Civil Rule 7(f).

Respectfully submitted,


/s/_____
Reid H. Weingarten (D.C. Bar No. 365893)
Brian M. Heberlig (D.C. Bar No. 455381)
Nicholas P. Silverman (D.C. Bar No.1014377)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, DC  20036
Tel: (202) 429-3000
Fax: (202) 429-3902
rweingarten@steptoe.com
bheberlig@steptoe.com
nsilverman@steptoe.com


/s/_____
Robert D. Luskin (D.C. Bar No. 293621)
Leo R. Tsao (*pro hac vice to be filed*)
PAUL HASTINGS LLP
2050 M Street, N.W.
Washington, DC  20036
Tel: (202) 551-1700
Fax: (202) 551-0410
robertluskin@paulhastings.com
leotsao@paulhastings.com

*Counsel for Defendant Stephen A. Wynn*

Dated: July 18, 2022

2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ATTORNEY GENERAL OF THE
UNITED STATES OF AMERICA,

Plaintiff,

v.

STEPHEN A. WYNN,

Defendant.

Case No. 1: 22-cv-01372-JEB

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION TO DISMISS THE COMPLAINT

Reid H. Weingarten (D.C. Bar No. 365893)
Brian M. Heberlig (D.C. Bar No. 455381)
Nicholas P. Silverman (D.C. Bar No.1014377)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, DC  20036
Tel: (202) 429-3000
Fax: (202) 429-3902
rweingarten@steptoe.com
bheberlig@steptoe.com
nsilverman@steptoe.com

Robert D. Luskin (D.C. Bar No. 293621)
Leo R. Tsao (*pro hac vice to be filed*)
PAUL HASTINGS LLP
2050 M Street, N.W.
Washington, DC  20036
Tel: (202) 551-1700
Fax: (202) 551-0410
robertluskin@paulhastings.com
leotsao@paulhastings.com

*Counsel for Defendant Stephen A. Wynn*

Dated: July 18, 2022

APP. 016

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................... 4

LEGAL STANDARD ...................................................................................................... 8

ARGUMENT .................................................................................................................... 8

I.     FARA Does Not Require Registration After an Agency Relationship Ends ..................... 8

     A.     Under *McGoff*, There Is No Continuing Obligation to Register After the Agent Ceases Acting on Behalf of the Foreign Principal ................................................. 9

            1.     *McGoff*'s Analysis of FARA's Text ............................................................ 9

            2.     *McGoff's* Analysis of Legislative Intent .................................................. 11

            3.     *McGoff* Precludes Injunctive Relief After an Agency Relationship Has Concluded ................................................................................................... 11

     B.     *McGoff*'s Holding Is Consistent with FARA's Purpose to Allow Contemporaneous Evaluation of Political Speech and Activities ........................ 12

     C.     *McGoff*'s Holding Is Consistent with the Limited Purpose of Injunctive Relief .. 13

II.     Compelling Wynn to Swear that He Was an Agent of Foreign Principals Would Violate His Fifth and First Amendment Rights ................................................................. 14

     A.     Compelling Wynn to Contradict His Past Testimony and Statements Would Violate the Fifth Amendment ............................................................................. 15

     B.     Compelling Wynn to Speak a Government-Dictated Message Would Violate the First Amendment ................................................................................................ 17

            1.     Compelling Wynn to Speak a Government-Dictated Message Is a Content-Based Restriction Subject to Strict Scrutiny ............................... 18

            2.     FARA's Content-Based Restriction Fails Strict Scrutiny as Applied in This Case .................................................................................................... 19

            3.     Exacting Scrutiny Does Not Apply, But Even If It Did, the Requested Relief Is Unconstitutional .......................................................................... 20

                  a.     Exacting Scrutiny Does Not Apply to Statements of Opinion or Ideological Belief ............................................................................... 21

                  b.     Exacting Scrutiny Does Not Permit the Government to Compel Statements of Controversial Information that the Speaker Believes to Be False .......................................................................................... 22

                  c.     Compelling Wynn to Speak the Requested Government-Dictated Message Fails Even Exacting Scrutiny ............................................ 26

III.   The Complaint Fails to Sufficiently Allege That Wynn Acted as an Agent of a Foreign
       Principal ............................................................................................................. 29

       A.   The Complaint Fails to Allege That Wynn Had an Agency Relationship With a
            Foreign Principal .................................................................................... 29

            1.   A Person Acting on a Mere Request, Absent Orders, Direction, or
                 Control, Is Not an Agent of a Foreign Principal ..................................... 30

            2.   The Government's Arguments for a Broad Interpretation of "Request"
                 Are Without Merit .................................................................................... 33

            3.   FARA's Legislative History Confirms that "Request" Was Not Intended
                 to Materially Expand the Statute's Scope ................................................ 36

       B.   The Complaint Fails to Allege That Wynn Engaged in Political Activities......... 38

            1.   The Complaint's Factual Allegations Support Only That Wynn
                 Delivered a Message to the President and Administration Officials, and
                 Not That He Engaged in Any Lobbying or Other Efforts to Influence on
                 the PRC's Behalf ....................................................................................... 39

            2.   Merely Conveying a Message From the PRC Without Any Attempt to
                 Influence Administration Officials on the PRC's Behalf Does Not
                 Qualify as a "Political Activity" Under FARA ........................................ 41

       **CONCLUSION** .............................................................................................................. **43**

**APP. 018**

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*ACLU v. Jennings*,
   366 F. Supp. 1041 (D.D.C. 1973), *vacated as moot sub nom. Staats v. ACLU*,
   422 U.S. 1030 (1975) ..........................................................................27

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l*,
   570 U.S. 205 (2013) ...........................................................................21

*Am. Lithotripsy Soc. v. Thompson*,
   215 F. Supp. 2d 23 (D.D.C. 2002) .......................................................37

*Ams. for Prosperity Found. v. Bonta*,
   141 S. Ct. 2373 (2021) .............................................................20, 26, 28

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .............................................................................8

*Assoc. Builders & Contractors of Se. Tex. v. Rung*,
   No 16-cv-425, 2016 WL 8188655 (E.D. Tex. Oct. 24, 2016) ................24

*Att'y Gen. v. Irish N. Aid Comm.*,
   530 F. Supp. 241 (S.D.N.Y. 1981), *aff'd* 668 F.2d 159 (2d Cir. 1982) (per curiam) ........33, 34

*Att'y Gen. v. Irish N. Aid Comm.*,
   668 F.2d 159 (2d Cir. 1982) (per curiam) .......................................33, 34

*BedRoc Ltd. v. United States*,
   541 U.S. 176 (2004) ...........................................................................36

*Block v. Meese*,
   793 F.2d 1303 (D.C. Cir. 1986) ......................................................20, 21

*Brady v. Assoc. Press Telecomm.*,
   No. 16-cv-2693, 2017 WL 111783 (S.D.N.Y. Jan. 11, 2017), *aff'd*, 714 F. App'x 62
   (2d Cir. 2018) ...................................................................................15

*Brody v. Bruner*,
   No. 19-cv-01091, 2021 WL 4264055 (D. Colo. Sept. 20, 2021) .............41

*Buckley v. Valeo*,
   424 U.S. 1 (1976) ..............................................................................21

*Burns v. Martuscello*,
   890 F.3d 77 (2d Cir. 2018) .................................................................25

iv

*Calzone v. Summers,*
    942 F.3d 415 (8th Cir. 2019) (en banc) ...........................................26, 27

*Canyon Ferry Rd. Baptist Church v. Unsworth,*
    556 F.3d 1021 (9th Cir. 2009) ...........................................................26

*Citizens United v. FEC,*
    558 U.S. 310 (2010)...........................................................................21

*Cressman v. Thompson,*
    798 F.3d 938 (10th Cir. 2015) ...........................................................19

*CREW v. Pompeo,*
    19-cv-3324 (JEB), 2020 WL 5748105 (D.D.C. Sept. 25, 2020) ..........8, 29

*Fla. Bar v. Went For It, Inc.,*
    515 U.S. 618 (1995)...........................................................................23

*Fritz v. Gorton,*
    517 P.2d 911 (Wash. 1974)................................................................26

*FTC v. Facebook, Inc.,*
    No. 20-cv-3590 (JEB), 2022 WL 103308 (D.D.C. Jan. 11, 2022) ...........4

*Gooding v. United States,*
    416 U.S. 430 (1974)...........................................................................37

*Gustafson v. Alloyd Co.,*
    513 U.S. 561 (1995)...........................................................................32

*Hoffman v. United States,*
    341 U.S. 479 (1951)...........................................................................15

*Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston,*
    515 U.S. 557 (1995)...........................................................................18

*Jackler v. Byrne,*
    658 F.3d 225 (2d Cir. 2011)...............................................................25

*Janus v. Am. Fed'n of State, Cnty., & Mun. Empls.,*
    138 S. Ct. 2448 (2018).......................................................................18

*Johnson v. Fabian,*
    735 N.W.2d 295 (Minn. 2007)............................................................16

*Kaempe v. Myers,*
    367 F.3d 958 (D.C. Cir. 2004) .............................................................8

APP. 020

*Kang v. Cooper*,
No. 95-cv-5508, 1999 WL 412437 (N.D. Ill. June 9, 1999)...................................................17

*McCarthy v. Bronson*,
500 U.S. 136 (1991)...........................................................................................................30

*McCullen v. Coakley*,
573 U.S. 464 (2014)...........................................................................................................20

*McDonnell v. United States*,
136 S. Ct. 2355 (2016)..................................................................................................31, 32

*Meese v. Keene*,
481 U.S. 465 (1987).............................................................................1, 12, 19, 20, 24

*Mia. Herald Publ'g Co. v. Tornillo*,
418 U.S. 241 (1974).....................................................................................................22, 23

*N.J. State Chamber of Comm. v. N.J. Elec. Law Enforcement Comm'n*,
82 N.J. 57 (N.J. 1980)........................................................................................................26

*Nat'l Ass'n of Mfrs. v. Taylor*,
582 F.3d 1 (D.C. Cir. 2009)..............................................................................................26

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
138 S. Ct. 2361 (2018)..................................................................................................18, 19

*Nat'l Ass'n of Mfrs. v. SEC*,
800 F.3d 518 (D.C. Cir. 2015).....................................................................................23, 24, 25

*Neilson v. United States*,
674 F. Supp. 2d 248 (D.D.C. 2009) ..................................................................................15

*Papasan v. Allain*,
478 U.S. 265 (1986)...........................................................................................................29

*Ratzlaf v. United States*,
510 U.S. 135 (1994)...........................................................................................................36

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015)...........................................................................................................19

*Riley v. Nat'l Fed'n of the Blind*,
487 U.S. 781 (1988)................................................................................17, 19, 23, 28

*Robinson v. Shell Oil Co.*,
519 U.S. 337 (1997)...........................................................................................................36

**APP. 021**

*Scott v. Dist. Hosp. Partners*,
    60 F. Supp. 3d 156 (D.D.C. 2014) ....................................................................4

*SEC v. C. M. Joiner Leasing Corp.*,
    320 U.S. 344 (1943) ...........................................................................................2

*SEC v. Steadman*,
    967 F.2d 636 (D.C. Cir. 1992) ........................................................................13

*Seminole Tribe of Fla. v. Florida*,
    517 U.S. 44 (1996) ............................................................................................9

*Sullivan v. Evans*,
    No. 13-cv-595, 2013 WL 6383033 (D. Md. Dec. 4, 2013) ..............................15

*United States v. Bahadar*,
    954 F.2d 821 (2d Cir. 1992) ............................................................................16

*United States v. Broidy*,
    No. 20-cr-210 (D.D.C.) ......................................................................................5

*United States v. Chriswell*,
    401 F.3d 459 (6th Cir. 2005) ..........................................................................42

*United States v. Craig*,
    401 F. Supp. 3d 49 (D.D.C. 2019) ........................................................1, 12, 42

*United States v. Davis*,
    No. 20-cr-68 (D. Hawaii) ...................................................................................5

*United States v. Fortin*,
    685 F.2d 1297 (11th Cir. 1982) (per curiam) ..................................................16

*United States v. Hasan*,
    609 F.3d 1121 (10th Cir. 2010) ......................................................................17

*United States v. Higginbotham*,
    No. 18-cr-343 (D.D.C.) ......................................................................................5

*United States v. Lumpkin*,
    192 F.3d 280 (2d Cir. 1999) ............................................................................16

* *United States v. McGoff*,
    831 F.2d 1071 (D.C. Cir. 1987) .............................................................. *passim*

*United States v. Michel*,
    No. 19-cr-148 (D.D.C.) ......................................................................................5

APP. 022

*United States v. Nat'l Comm. for Impeachment,*
   469 F.2d 1135 (2d Cir. 1972) ............................................................26

*United States v. Playboy Entm't Grp.,*
   529 U.S. 803 (2000) ........................................................................20

*United States v. Sindel,*
   53 F.3d 874 (8th Cir. 1995) ...............................................................25

*United States v. W. T. Grant Co.,*
   345 U.S. 629 (1953) ........................................................................13

*Viereck v. United States,*
   318 U.S. 236 (1943) ................................................................1, 12, 19

*W. Va. Bd. of Educ. v. Barnett,*
   319 U.S. 624 (1943) ....................................................................18, 22

*Wooley v. Maynard,*
   430 U.S. 705 (1977) ........................................................18, 21, 22, 23

*Yates v. United States,*
   574 U.S. 528 (2015) ....................................................................30, 32

*Zauderer v. Off. of Disciplinary Couns.,*
   471 U.S. 626 (1985) ........................................................18, 21, 22, 23

**Constitution, Legislation, Rules, and Regulations**

18 U.S.C. § 1001 ..............................................................................16

18 U.S.C. § 1621 ..............................................................................16

22 U.S.C. § 611 ........................................................................ *passim*

22 U.S.C. § 612 ..........................................................1, 9, 10, 11, 14

22 U.S.C. § 618 ...........................................................................9, 16

28 C.F.R. § 5.200 .............................................................................14

28 C.F.R. § 5.201 .............................................................................14

Fed. R. Civ. P. 12(b)(6) .................................................................1, 8

U.S. CONST., amend. I .............................................................. *passim*

U.S. CONST. amend. V ..............................................2, 14, 15, 16

**APP. 023**

## Other Authorities

Antonin Scalia and Bryan Garner, *Reading Law: The Interpretation of Legal Texts* (2012)........32

DOJ FARA Unit, *The Scope of Agency Under FARA* (May 2020), https://www.justice
  .gov/nsd-fara/page/file/1279836/download ....................................................................35, 42

Eugene Volokh, *The Law of Compelled Speech*, 97 Tex. L. Rev. 355 (2018) .............................22

Genevieve Lakier, *Not Such a Fixed Star After All*, 13 F.I.U. L. Rev. 741, 750 (2019) ...............23

H.R. Rep. 1775, 81st Cong., 2d Sess. (1950) ...............................................................................11

H.R. Rep. 89-1470, 89th Cong., 2d Sess. (1966), as reprinted in 1966 U.S.C.C.A.N. 2397....37, 38

*Inquiry Into the Matter of Billy Carter and Libya: Hearings Before the Subcomm. to
  Investigate the Activities of Foreign Governments of the Senate Comm. On the Judiciary*,
  96th Cong. (1980) ..................................................................................................................34, 35

Office of Inspector General, DOJ, *Audit of the National Security Division's Enforcement and
  Administration of the Foreign Agents Registration Act* (Sept. 2016),
  https://oig.justice.gov/reports/2016/a1624.pdf ........................................................................36

T. Hazen, *The Law of Securities Regulation* (2d ed. 1990) ........................................................13

APP. 024

Defendant Stephen A. Wynn respectfully submits this memorandum of law in support of his Motion to Dismiss the Complaint with prejudice under Fed. R. Civ. P. 12(b)(6).

## INTRODUCTION

Steve Wynn delivered a message to President Trump and Administration officials at the request of a Chinese government official who wanted the United States to return a Chinese national he described as a fugitive. Wynn had no prior relationship with the foreign official, had no agreement or contract, received no compensation or other benefit, was transparent with Administration officials about the source of the request, and told the foreign official to stop contacting him after he delivered the message. When later approached by the Department of Justice ("DOJ"), Wynn explained, in correspondence and sworn testimony, that he believed he acted in the interests of the United States by bringing this opportunity to President Trump, not as an agent of the Chinese official or government. Nonetheless, nearly five years later, the government has sued Wynn seeking an injunction compelling him to register as a foreign agent under the Foreign Agent Registration Act, 22 U.S.C. § 612(a)-(b) ("FARA").

The alleged FARA claim is based on factual allegations at odds with the purpose of the statute. Congress enacted FARA to "prevent *covert influence* over U.S. policy by foreign principals," *United States v. Craig*, 401 F. Supp. 3d 49, 54 (D.D.C. 2019) (emphasis added), by providing "hearers and readers" of political messages with the information necessary to evaluate those messages and their veracity. *Meese v. Keene*, 481 U.S. 465, 480 & n.15 (1987) (quoting *Viereck v. United States*, 318 U.S. 236, 251 (1943) (Black, J., dissenting)). In other words, the "purpose of FARA … is to permit, promptly, evaluation of [political] activities as they are undertaken." *United States v. McGoff*, 831 F.2d 1071, 1082 (D.C. Cir. 1987). According to the factual allegations in the Complaint, Wynn's conduct was neither "covert" nor involved any attempt at foreign "influence," because Wynn fully disclosed to Administration officials that he

1

**APP. 025**

was delivering a message from the Chinese government, and in delivering that message, he did not lobby or otherwise attempt to influence any Administration officials on China's behalf.  A basic canon of statutory construction requires courts to "construe the details of an act in conformity with its dominating general purpose."  *SEC v. C. M. Joiner Leasing Corp.*, 320 U.S. 344, 350-51 (1943).  That canon should guide the Court's analysis in this case, where the government has sought to stretch the application of FARA to alleged conduct that does not implicate the statute's purpose.

The Complaint should be dismissed on three independent grounds.  First, under binding D.C. Circuit precedent, the obligation to file a FARA registration statement expires on "the last day that an individual acts as an agent of a foreign principal."  *McGoff*, 831 F.2d at 1096.  Here, even assuming Wynn acted as an agent of a foreign principal—which Wynn disputes—any agency relationship ended no later than October 2017.  Compl. ¶¶ 2, 27.  As a result, any obligation that Wynn had to register has long since passed.

Second, requiring Wynn to register under FARA would violate his Fifth and First Amendment rights under the U.S. Constitution.  The government asks the Court to order Wynn to affirm under oath that he acted as an agent of foreign principals.  Such an order would violate his rights under the Fifth Amendment because it would compel Wynn to directly contradict prior sworn testimony and statements to DOJ, thereby exposing him to the risk of prosecution for perjury or false statements.  Such an order would also violate his rights under the First Amendment, as applied, because it would compel Wynn to engage in government-dictated speech affirming an opinion or ideological belief he does not hold.  Courts have repeatedly applied strict scrutiny to strike down similar government attempts to dictate the content of an individual's speech.  As applied to this case, however, the government cannot satisfy even lesser

2

**APP. 026**

scrutiny.  All material facts about the 2017 events have already been disclosed, and the government may disseminate its version of those facts without infringing on Wynn's constitutional rights.

Third, the Complaint fails to sufficiently allege that Wynn acted as an agent of a foreign principal.  To be a FARA "agent," an individual must (1) have a sufficient relationship with a foreign principal, and (2) engage in political activities in the foreign principal's interests.  Neither statutory requirement is sufficiently alleged in the Complaint.

The Complaint fails the first prong because a person acting at the mere "request" of a foreign principal, absent any alleged orders, direction or control, is not an agent.  The term "request" must be interpreted in context, in relation to the other surrounding terms in the statute, all of which require the principal to exercise direction, control, or authority over the agent.  Here, the Complaint alleges that Wynn acted pursuant to a mere request from a foreign official, and does not allege that he was ordered to act or directed or controlled by the official in any way.  Indeed, as alleged in the Complaint, Wynn told the foreign official to "stop contacting him" after he delivered the message and suffered no consequences whatsoever.

The Complaint fails the second prong because a person engages in "political activities" only if he believes he would, or intends to, "influence" U.S. government officials with reference to foreign interests or policy.  The Complaint alleges only that a foreign official asked Wynn to deliver a message to the Trump Administration, and that Wynn agreed to do so.  Wynn delivered the message while transparently conveying where the message came from.  The Complaint does not allege that Wynn advocated on behalf of the foreign official in a way that he believed would, or intended to, influence U.S. government officials in making policy decisions in the foreign country's interests.

3

**APP. 027**

## BACKGROUND[1]

Wynn spent more than five decades founding, building, and running casinos.  He created the Mirage, Treasure Island, the Bellagio, Wynn Las Vegas, and Wynn Encore on the Las Vegas strip, and also developed casino properties in Macau, a Special Administrative Region of China. Ex. A, at 3.  In his business dealings in Macau, Wynn dealt extensively with Macau's former Chief Executive, but had far fewer contacts and no significant business dealings with government officials from mainland China.  *Id.*

Wynn and Donald Trump historically were business competitors who were not close friends.  *Id.*  Wynn had no formal role in the 2016 presidential campaign, but he had a cordial relationship with Mr. Trump and they spoke periodically.  *Id.*  After the election, at President Trump's request, Wynn agreed to serve as Finance Chairman of the Republican National Committee, a position he held from January 2017 through January 2018.  Compl. ¶ 17.  In 2017, President Trump and Wynn spoke periodically and dined together on a few occasions in the White House.  Ex. A, at 3.

In May 2017, in a meeting coordinated by Low Taek Jho ("Low"), former Chinese Vice Minister for Public Security Sun Lijun ("Sun") asked Elliot Broidy (former finance chair of the RNC), Prakazrel Michel (hip-hop artist), and Nickie Lum Davis (businessperson), to lobby

---

[1] All statements accompanied by citations to the Complaint are assumed for the purposes of this Motion.  Information unaccompanied by a citation to the Complaint is set forth in Wynn's June 8, 2018 letter to DOJ, *see* Heberlig Decl. Ex. A (Letter from Steptoe & Johnson LLP to the Department of Justice, Jun. 8, 2018), which is incorporated by reference in paragraph 37 of the Complaint.  *See FTC v. Facebook, Inc.,* No. 20-cv-3590 (JEB), 2022 WL 103308, at *3 (D.D.C. Jan. 11, 2022) (noting that in deciding a motion to dismiss, the court may consider both "the facts alleged in the complaint," and "any documents either attached to or incorporated in the complaint[,] and matters of which [courts] may take judicial notice"); *Scott v. Dist. Hosp. Partners,* 60 F. Supp. 3d 156, 161 (D.D.C. 2014) (noting that the "attached to or incorporated [in]" standard "includ[es] documents referenced or cited to in a complaint").

President Trump and the Trump Administration to cancel the visa or remove from the United

States a Chinese businessperson who had been charged with corruption by the People's Republic

of China ("PRC") and who was seeking political asylum in the United States.  Compl. ¶ 16.

Broidy, Michel, and Davis each had a financial interest in helping Low facilitate this request

from Sun.  *See, e.g.*, Statement of Offense ¶ 31, *United States v. Broidy*, No. 20-cr-210, Dkt. 7

(D.D.C. Oct. 20, 2020).  Broidy and Davis have since pled guilty to crimes related to their work

for Low, as has Michel's co-conspirator George Higginbotham, and Michel is awaiting trial on

his criminal indictment.  *See id.*; *United States v. Davis*, No. 20-cr-68 (D. Hawaii); *United States

v. Higginbotham*, No. 18-cr-343 (D.D.C.); *United States v. Michel*, No. 19-cr-148 (D.D.C.).

Wynn was not present at or aware of this meeting, and was not aware of any related financial

arrangement.

      In June 2017, Broidy told Wynn that a Chinese national, alleged to be a criminal fugitive,

was hiding in the United States and that Sun and the PRC wanted him arrested.  *See* Compl.

¶¶ 17-18.  Broidy informed Wynn that PRC President Xi Jinping had spoken with President

Trump about the removal of the PRC national, and had promised that in return, China would

"return certain U.S. citizens held hostage by China," "accept a very large number of Chinese

illegal immigrants for deportation back to China," and "offer[] new assistance with regard to

North Korea."  *Id.* ¶ 21.c.  Broidy elicited Wynn's help because he believed Wynn could "get[]

access to Trump Administration officials."  *Id.* ¶ 17.  Broidy did not disclose that he had a

financial interest in assisting the Chinese in this endeavor or disclose the involvement of Davis,

Higginbotham, or Michel.  Although Broidy *told* Wynn that Sun had requested Wynn's help with

the Trump Administration, *id.* ¶ 18, the Complaint does not allege that Sun in fact asked for

Wynn's help or even knew who Wynn was before Broidy identified him.

**APP. 029**

In June 2017, after Broidy gave Wynn passport photos, an Interpol red notice, and media articles about the PRC national, *id.* ¶ 19, Sun spoke to Wynn by phone and asked for help securing the removal of the PRC national. *Id.* ¶ 20. Wynn "agreed to raise the matter with then-President Trump and Trump Administration officials." *Id.* ¶ 20. As Wynn informed DOJ, "[h]e did not agree to lobby the President or advocate on Sun's or the PRC's behalf." Ex. A, at 4.

On June 27, 2017, during a dinner with President Trump and other Administration officials, Wynn "conveyed to then-President Trump the PRC's desire to have the PRC national removed from the United States." Compl. ¶ 22; *compare* Ex. A, at 4 ("During a social dinner with President Trump in the White House, Wynn delivered Sun's message to President Trump, fully disclosing the whole story and the source of the information. Wynn did not advocate for or against Sun's request. He told President Trump that this seemed like an important issue to the PRC and might be a good opportunity for President Trump to do a favor for Chinese President Xi and develop their relationship."). During July and August 2017, Wynn spoke with Sun by phone about this issue on approximately eight occasions, Compl. ¶ 23.c, and attempted to organize meetings with White House and National Security Council (NSC) officials. *Id.* ¶ 25. During a late July 2017 meeting with the White House Chief of Staff and NSC officials, Wynn "stated that PRC officials had contacted him and advised him that 'they were very interested in having' the PRC national returned to China as soon as possible." *Id.* ¶ 25.c.

The Complaint does not allege that Wynn had any contract or agreement with Sun or the PRC; sought or received any compensation or benefit from Sun or the PRC in exchange for his assistance; was coerced, ordered, directed, or otherwise subject to the control, authority, or power of Sun or the PRC; or was threatened with any consequences by Sun or the PRC if he declined to take any action or did not succeed. According to "public reporting," the Complaint

6

**APP. 030**

alleges (a) in August 2016, roughly a year before the relevant events, the Macau government restricted the number of gaming tables and machines that Wynn's casino could operate, and (b) in 2019, more than a year and a half after the relevant events, Wynn was scheduled to renegotiate his licenses to operate casinos in Macau. *Id.* ¶ 29. Although Wynn disputes these claims, the Complaint does not allege that Sun ever mentioned them to Wynn.

In October 2017, Wynn told Sun "that he had made U.S. Government officials aware of the request, that [he] was not able to provide any more assistance, and that Sun should stop contacting him." *Id.* ¶ 27; *id.* ¶ 28 (alleging that Wynn told Sun that U.S. Government officials were now aware of the timing nuances related to the issue); *compare* Ex. A, at 4 ("In the fall of 2017, … Sun continued to contact Wynn by telephone, seeking more information.  These calls became repetitive and annoying.  In October 2017, Wynn told Sun that he had made U.S. government officials aware of Sun's request, and that Sun should stop contacting Wynn because there was nothing more he could or would do.  Wynn has had no further communications with Sun since this time.").  The Complaint does not allege that Sun or the PRC took any adverse action against Wynn or his business interests, even though the efforts to remove the PRC national "ultimately were unsuccessful."  Compl. ¶ 26.

On May 16, 2018, the DOJ advised Wynn by letter that it believed he was obligated to register under FARA as an agent of Sun and the PRC.  *Id.* ¶ 37.  On June 8, 2018, Wynn, through counsel, sent the DOJ a letter disputing that he was obligated to register.  *See* Ex. A.  The parties exchanged additional letters, Compl. ¶ 37, and discussed the matter during in-person meetings. In addition, in August 2020, Wynn provided an interview and sworn testimony during the criminal investigation of Broidy and others, in which he stated that he believed he was acting in the interests of the United States, and not as an agent of Sun or the PRC.

**APP. 031**

## **LEGAL STANDARD**

Under Rule 12(b)(6), a defendant may challenge the sufficiency of a complaint on the ground that it "fail[s] to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  Although the Court assumes the veracity of "well-pleaded factual allegations," *id.* at 679, "[t]he Court need not accept as true … 'a legal conclusion couched as a factual allegation,' nor an inference unsupported by the facts set forth in the Complaint."  *CREW v. Pompeo*, 19-cv-3324 (JEB), 2020 WL 5748105, at *4 (D.D.C. Sept. 25, 2020) (quoting *Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006)).  The Court need not "accept as true the complaint's factual allegations insofar as they contradict exhibits to the complaint or matters subject to judicial notice."  *Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004).

## **ARGUMENT**

### I.    **FARA Does Not Require Registration After an Agency Relationship Ends**

The D.C. Circuit has squarely held that FARA's registration obligation ends when an individual stops acting as an agent of the foreign principal.  *See United States v. McGoff*, 831 F.2d 1071 (D.C. Cir. 1987).  The Complaint alleges that Wynn's last contact with Sun was in approximately October 2017, when Wynn told Sun to "stop contacting him" in order to "exit the situation."  Compl. ¶ 27.  Elsewhere, the Complaint alleges that Wynn acted as an agent for foreign principals "from at least June 2017 through at least August 2017."  *Id.* ¶ 2.  Thus, even assuming Wynn previously acted as Sun's and the PRC's agent—which Wynn disputes, *see infra* § III—any registration obligation has long since ended.  As a result, the Complaint fails to state a claim for injunctive relief under FARA and must be dismissed.

**APP. 032**

### A.  Under *McGoff*, There Is No Continuing Obligation to Register After the Agent Ceases Acting on Behalf of the Foreign Principal

In *McGoff*, the D.C. Circuit considered the prosecution of John McGoff, a U.S. citizen and newspaper publisher who allegedly acted as an agent for the government of South Africa from 1974 through 1979.  831 F.2d at 1072.  The parties stipulated that McGoff's activities concluded in 1979, and that he never registered as a foreign agent.  *Id.* at 1073.  In 1986, McGoff was charged with willfully failing to register under FARA (22 U.S.C. §§ 612, 618).  *Id.*  Seven years had elapsed since McGoff stopped acting as a foreign agent and the applicable statute of limitations was five years.  Thus, the question presented was when the statute of limitations began running for failure to register under FARA.  Because the statute of limitations began to run "from the last day of the continuing offense" of failure to register, the court concluded that it was "necessary" to "identify with specificity" the precise moment at which the failure to register "is complete."  *Id.* at 1079.  This "necessary" analysis is a binding part of the holding and not dicta.  *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996).

The D.C. Circuit then held that the obligation to register ends on "the last day that an individual acts as an agent of a foreign principal," at which point the statute of limitations begins running.  *McGoff*, 831 F.2d at 1096.  *McGoff* is binding authority that compels the dismissal of the Complaint.

### 1.  *McGoff*'s Analysis of FARA's Text

To determine when the obligation to register ends, the court began with 22 U.S.C. § 612(a):

> The obligation of an agent of a foreign principal to file a registration statement shall, after the tenth day of his becoming an agent, continue from day to day, and *termination of such status shall not relieve such agent from his obligation to file a registration statement for the period during which he was an agent of a foreign principal.*

**APP. 033**

*Id.* at 1082 (emphasis in original).

The court observed that the italicized portion of the statute directly addresses the duration of an agent's obligation to register: "[I]t appears that the statutory obligation to file expires when the agent ceases activities on behalf of a foreign principal. … [O]nce an individual has ceased his activities, he is no longer an 'agent of a foreign principal' within the meaning of FARA." *Id.* Under § 611(c), an "agent of a foreign principal" is defined as an agent who is *acting*, not an agent who *previously acted*. *See id.* (citing 22 U.S.C. § 611(c)(1) ("[A]ny person *who acts* as an agent…at the order, request, or under the direction or control, of a foreign principal…") (emphasis added)). Similarly, the statute's description of registration statements "focus[es] on *ongoing* relationships between agents and principals" not past, terminated relationships. *Id.* (citing 22 U.S.C. §§ 612(a)(1)-(11), (b)). For example, the registration statement must include "copies of each written agreement … by reason of which the registrant *is* an agent of a foreign principal" and a "comprehensive statement … of the *existing and proposed activity or activities engaged in or to be engaged in* by the registrant …." 22 U.S.C. § 612(a)(4) (emphasis added).

The court disagreed with the government's claim that McGoff's obligation to register continued even after he stopped acting on the foreign principal's behalf, an interpretation that would have effectively eliminated the statute of limitations. *McGoff*, 831 F.2d at 1079, 1093 (the government maintained that FARA "creates an offense that continues until actual registration" and "virtually eliminate[s] the statute of limitations for failure to file"). The court reasoned in part that this interpretation "r[a]n afoul of the well-established principle of interpretation that condemning statutory language to the rubbish heap of surplusage is much to be avoided." *Id.* at 1083. In other words, interpreting Section 612(a) to require registration after the individual stops acting as an agent would render the phrase "for the period during which he was an agent of a

10

**APP. 034**

foreign principal" redundant.  "A FARA-required registration statement can in logic, relate to no period other than 'the period during which' the individual acted as an agent."  *Id.*  Instead, it is the "obligation to file" that exists only during the period in which a person acts as an agent of a foreign principal.  *Id.*

### 2.  *McGoff's* Analysis of Legislative Intent

The court also found support for its interpretation of Section 612(a) in legislative history.  The 1950 House Committee Report stated: "'The statute of limitations will begin to run only from the last day on which an unregistered agent has acted as such.'  That, of course, is the day on which the agency relationship terminates."  *Id.* at 1087 (quoting H.R. Rep. No. 1775, 81st Cong., 2d Sess. 1 (1950)).  Moreover, the court continued, the virtual elimination of the statute of limitations—a consequence of interpreting FARA's registration obligation to continue after a person stops acting on behalf of a foreign principal, as noted *supra*—is a "draconian" step that Congress would not have taken without a plain statement of intent, or at least discussion or debate.  *Id.* at 1090.  Because Congress did not indicate any such clear intent, the court declined to adopt such a radical interpretation.  *See generally id.* at 1084-94 (legislative history analysis).

### 3.  *McGoff* Precludes Injunctive Relief After an Agency Relationship Has Concluded

As the dissent in *McGoff* correctly observed, under the majority's holding, "the civil injunctive remedy" sought in this case is "unavailable to compel anyone to file a registration statement once his agency has ended."  *Id.* at 1103 (Bork, J., dissenting); *see also id.* (after "the termination of the agency relationship, … the United States will be unable to use an injunction to compel registration, since the [former] agent is no longer under any obligation to register.").  The majority acknowledged the dissent's argument and assumed that "injunctive remedies would not lie once the individual's agency status has terminated."  *Id.* at 1094 n.32.  Nonetheless, the

11

**APP. 035**

majority concluded, the government was "far from powerless" because it still had five years

"from the termination of the agency relationship to secure an indictment for the agent's willful

failure to register under the Act."  *Id.*

> **B.**   ***McGoff*'s Holding Is Consistent with FARA's Purpose to Allow
> Contemporaneous Evaluation of Political Speech and Activities**

*McGoff* is consistent with FARA's purpose.  FARA is intended to prevent covert

influence by facilitating an audience's ability to evaluate an agent's political speech and

activities contemporaneously in their proper context.  "Resting on the fundamental constitutional

principle that our people, adequately informed, may be trusted to distinguish between the true

and the false, the bill is intended to label information of foreign origin so that *hearers* and

*readers* may not be deceived by the belief that the information comes from a disinterested

source."  *Keene*, 481 U.S. at 480 n.15 (1987) (quoting *Viereck*, 318 U.S. at 251 (Black J.,

dissenting)) (emphasis added); *id.* at 480 (opining that Congress intended FARA to "better

enable the public to evaluate the import" of political speech targeting the public); *Craig*, 401 F.

Supp. 3d at 54 ("[FARA] ensures that the public is informed of the true source or sponsor behind

the information being disseminated for its consideration.").  FARA aims "to permit, promptly,

evaluation of these activities as they are undertaken. … FARA does not evince an antiquarian

interest on Congress' part; FARA's focus is on the here and now."  *McGoff*, 831 F.2d at 1074.

Although Wynn denies that he acted as a foreign agent, it is undisputed that Wynn

contemporaneously disclosed to U.S. government officials that he was conveying a message

from the PRC, allowing the U.S. officials to evaluate his activities in their proper context.  *See*

Compl. ¶ 22 (Wynn "conveyed to then-President Trump the PRC's desire …."); ¶ 25.c (Wynn

"stated that PRC officials had contacted him and advised him that 'they were very interested in

having' the PRC national returned to China").  Accepting *arguendo* the government's position

**APP. 036**

on agency, Wynn's relationship with the foreign principal has ended, and there is no benefit in requiring registration months, or, as in this case, years later.

### C.   *McGoff*'s Holding Is Consistent with the Limited Purpose of Injunctive Relief

*McGoff* is also consistent with the limited purpose of injunctive relief, which is typically available only "to prevent *future* violations." *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953) (emphasis added). Injunctive relief is "'a drastic remedy' and should not be granted lightly, especially when the conduct has ceased." *SEC v. Steadman*, 967 F.2d 636, 648 (D.C. Cir. 1992) (quoting T. Hazen, 1 *The Law of Securities Regulation* § 9.5, at 400 (2d ed. 1990)). While a court's power to grant injunctive relief "survives discontinuance of the illegal conduct … the moving party must satisfy the court that relief is needed." *W. T. Grant*, 345 U.S. at 633. "The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive." *Id.* "Injunctive relief is reserved for willful lawbreakers or those whose operations are so extremely or persistently sloppy as to pose a continuing danger …." *Steadman*, 967 F.2d at 648.

*McGoff*'s holding that FARA requires registration only while a person is acting as an agent of a foreign principal is consistent with these well-established principles. If an agent of a foreign principal is advocating for a foreign government's position to the U.S. government or publicly spreading foreign propaganda, the government should be able to make that agent register to allow those messages to be considered contemporaneously in their proper context. But here, where Wynn told Sun that the message had been transmitted and to "stop contacting him" nearly half a decade ago, and there is no allegation or threat of ongoing activity or recurrent harm, injunctive relief is unnecessary and unwarranted.

**APP. 037**

## II.   Compelling Wynn to Swear that He Was an Agent of Foreign Principals Would Violate His Fifth and First Amendment Rights

The government asks the Court to declare that 22 U.S.C. § 612(a) imposes on Wynn an "obligation to register … for conduct undertaken on behalf of foreign principals Sun Lijun and the PRC," and issue an injunction requiring Wynn to fulfill that obligation.  Compl. at page 12 (Prayer for Relief).  Granting the government's requested relief would compel Wynn to act as a witness against himself and to state an opinion he does not hold, in violation of his Fifth Amendment privilege against self-incrimination and the First Amendment protection against compelled speech.

Ordering Wynn to register would compel him to make a sworn public declaration, under penalty of perjury, that he acted as an agent of foreign principals Sun and the PRC.  The registration form and exhibits, required to be filed under 28 C.F.R. §§ 5.200, 5.201, include the following statement on each execution page:

> In accordance with 28 U.S.C. § 1746, and subject to the penalties of 18 U.S.C. § 1001 and 22 U.S.C. § 618, the undersigned swears or affirms under penalty of perjury that he/she has read the information set forth in this Registration Statement, that he/she is familiar with the contents thereof, and that such contents are in their entirety true and accurate to the best of his/her knowledge and belief.

DOJ, Form OMB No. 1124-0001, *Registration Statement* at page 6 (Heberlig Decl. Ex. B, at 8);

DOJ, Form OMB No. 1124-0006, *Exhibit A to Registration Statement* at page 3, (Ex. B, at 11);

DOJ, Form OMB No. 1124-0004, *Exhibit B to Registration Statement* at page 4 (Ex. B, at 15).

Wynn would be forced to swear or affirm that he is an "agent[]" of a "foreign principal"; agree that he has a "foreign principal[] for whom [he] is acting or has agreed to act"; and "furnish … a full statement of all the circumstance by reason of which [he] is acting as an agent of a foreign principal." *Registration Statement* at Instrs., page 3, nn.2, 4-9 (Ex. B, at 2, 5, nn.2, 4-9); *Exhibit B to Registration Statement* at pages 1-3 & nn.2-4 (Ex. B, at 12-14 & nn.2-4).  Wynn's

statements would be posted on the FARA Unit's webpage, available for in-person public consumption, and transmitted to Congress as part of periodic reports. *Id.* Those sworn statements would directly contradict Wynn's prior sworn testimony and representations in his correspondence with DOJ. *See, e.g.*, Ex. A; Compl. ¶ 37 (confirming that Wynn "disput[ed] the Department's analysis" in his June 8, 2018 letter).

The government is free to disagree with Wynn's statements—and it can state that disagreement publicly—but it cannot force Wynn to (1) provide evidence that could be used to prosecute him for perjury or false statements; and (2) state his agreement with a government message he disputes. To do so would violate Wynn's Fifth and First Amendment rights, respectively. Because the Court cannot grant the government's requested relief without violating Wynn's constitutional rights, it should dismiss the Complaint. *See, e.g.*, *Brady v. Assoc. Press Telecomm.*, No. 16-cv-2693, 2017 WL 111783, at *3-4 (S.D.N.Y. Jan. 11, 2017) (dismissing complaint for injunctive relief with prejudice in part because "granting the equitable remedy of a mandatory injunction 'compelling defendants to publish what they prefer to withhold would run afoul of Defendants' First Amendment rights'"), *aff'd*, 714 F. App'x 62 (2d Cir. 2018); *Neilson v. United States*, 674 F. Supp. 2d 248, 253 (D.D.C. 2009) (granting motion to dismiss complaint for injunctive relief because statute barred relief sought); *Sullivan v. Evans*, No. 13-cv-595, 2013 WL 6383033, at *2 (D. Md. Dec. 4, 2013) (same).

### A.    Compelling Wynn to Contradict His Past Testimony and Statements Would Violate the Fifth Amendment

The Fifth Amendment protects an individual's right not to provide a "link in the chain of evidence" that could be used to prosecute him. *See Hoffman v. United States*, 341 U.S. 479, 486 (1951). Courts have repeatedly held that a witness can invoke the Fifth Amendment to avoid giving testimony that would contradict previous statements and thereby expose the witness to

**APP. 039**

criminal liability or increased punishment.  *See United States v. Lumpkin*, 192 F.3d 280, 286 (2d

Cir. 1999) (affirming right of witness to invoke Fifth Amendment based on fear of perjury where

anticipated testimony ran counter to sworn plea colloquy); *United States v. Bahadar*, 954 F.2d

821, 826 (2d Cir. 1992) ("[The witness]'s invocation of his Fifth Amendment privilege was

proper because, to exculpate Bahadar, [the witness] would have had to contradict his prior

statements to government agents, thereby exposing himself to further criminal liability."); *United

States v. Fortin*, 685 F.2d 1297, 1298 (11th Cir. 1982) (per curiam) (holding that witnesses can

invoke Fifth Amendment to avoid testifying when testimony would necessarily contradict

previous sworn statements); *Johnson v. Fabian*, 735 N.W.2d 295, 310-11 (Minn. 2007) (holding

that state could not compel defendant to admit sexual contact with victim because defendant

previously testified he had no such contact, observing "[i]t is well-established in federal courts

that the privilege against self-incrimination can properly be invoked based on fear of a perjury

prosecution arising out of conflict between statements sought to be compelled and prior sworn

testimony").

   Here, Wynn has testified and repeatedly told the DOJ in correspondence that he did not

act as a foreign agent and that Sun and the PRC were not his foreign principals.  In its

Complaint, the government maintains the exact opposite—that Wynn acted as an agent for Sun

and the PRC, Compl. ¶¶ 30-36—and asks the Court to compel Wynn to affirm under penalty of

perjury, "subject to penalties under 18 U.S.C. § 1001 and 22 U.S.C. § 618," that it is "true and

accurate to the best of his knowledge and belief" that he acted as an agent of foreign principals

Sun and the PRC.  Wynn's sworn statements would be directly contradictory and would expose

him to potential liability, however unfounded it may be, for perjury or false statements, under 18

U.S.C. § 1621 (perjury); 18 U.S.C. § 1001 (false statements); and 22 U.S.C. § 618(a)(2) (false

**APP. 040**

statement in a FARA registration statement).  Given the direct contradiction, the government might not even need to prove which statement was true and which statement was false.  *See, e.g., United States v. Hasan*, 609 F.3d 1121, 1135-37 (10th Cir. 2010) (affirming grand jury perjury convictions based on statements that were "irreconcilably contradictory"); *Kang v. Cooper*, No. 95-cv-5508, 1999 WL 412437, at *11 (N.D. Ill. June 9, 1999) (holding that state prosecution could prove knowledge of falsity by proving "defendant knew he was making contradictory statements").  The government can opine that Wynn's prior statements were false, but it cannot force Wynn to make contradictory statements in support of that opinion.

**B.    Compelling Wynn to Speak a Government-Dictated Message Would Violate the First Amendment**

The Complaint asks the Court to order Wynn to speak a particular government-dictated message—that Wynn agreed to act as an agent for foreign principals Sun and the PRC—even though he does not believe that message is true.  The government's attempt to dictate Wynn's statement is a content-based regulation subject to strict scrutiny, a test it cannot possibly pass. The compelled statement is not a disclosure of purely factual, uncontroversial information like those compelled under regimes applicable to charities, electoral campaigns, and professional lobbyists, each of which is subject to "exacting First Amendment scrutiny" rather than strict scrutiny.  *See, e.g.*, *Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 795 (1988).  Regardless of the level of scrutiny, the requested relief would be unconstitutional as applied.  As applied to Wynn, the government's interest is not compelling (as required by strict scrutiny) or substantial (as required exacting scrutiny), and its requested relief is not narrowly tailored to that interest (as required by both levels of scrutiny).  Granting the government's requested relief would therefore violate the First Amendment.

17

**APP. 041**

**1. Compelling Wynn to Speak a Government-Dictated Message Is a Content-Based Restriction Subject to Strict Scrutiny**

The First Amendment protects "both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). "Although the State may at times 'prescribe what shall be orthodox in commercial advertising' by requiring the dissemination of 'purely factual and uncontroversial information,' outside that context it may not compel affirmance of a belief with which the speaker disagrees." *Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995) (quoting *Zauderer v. Off. of Disciplinary Couns.*, 471 U.S. 626, 651 (1985)). "[T]his general rule … applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid." *Id.* "Compelling individuals to mouth support for views they find objectionable violates that cardinal constitutional command, and in most contexts, any such effort would be universally condemned." *Janus v. Am. Fed'n of State, Cnty., & Mun. Empls.*, 138 S. Ct. 2448, 2463 (2018) (noting that compelling individuals "to voice ideas with which they disagree" undermines the First Amendment's purpose). Thus, "a law commanding 'involuntary affirmation' of objected-to beliefs would require 'even more immediate and urgent grounds' than a law demanding silence." *Id.* (quoting *W. Va. Bd. of Educ. v. Barnett*, 319 U.S. 624, 633 (1943)).

Compelling a speaker to involuntarily affirm a government-dictated message is a content-based restriction on speech. "[M]andating speech that a speaker would not otherwise make necessarily alters the content of the speech" and is therefore "a content-based regulation of speech." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2372 (2018) (holding that compelled statement of available abortion services was subject to strict scrutiny because "[b]y requiring petitioners to inform women how they can obtain state-subsidized abortions—at

**APP. 042**

the same time petitioners try to dissuade women from choosing that option—the licensed notice plainly 'alters the content' of petitioners' speech."); *see also Riley*, 487 U.S. at 795 (holding that compelled statement of percentage of charitable donations retained as fees violated First Amendment); *Cressman v. Thompson*, 798 F.3d 938, 951 (10th Cir. 2015) ("[T]o make out a valid compelled-speech claim, a party must establish (1) speech; (2) to which he objects; that is (3) compelled by some governmental action.").

Content-based restrictions of speech are subject to strict scrutiny. *Becerra*, 138 S. Ct. at 2371-72; *accord Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015). Because the government's application of FARA constitutes a content-based restriction of speech, the government bears the burden of satisfying strict scrutiny.

### 2. FARA's Content-Based Restriction Fails Strict Scrutiny as Applied in This Case

Strict scrutiny dictates that a law is "presumptively unconstitutional" and requires the government to prove that its requirement furthers a compelling interest and is narrowly tailored to achieve that interest. *Reed*, 576 U.S. at 171. Strict scrutiny is demanding and its standard is rarely met. This case is no exception.

The government has no compelling interest as applied. As summarized above in the introduction and § I.B, FARA's purpose is to prevent covert influence by ensuring the audience of political speech and activities is aware of the message's source. That interest is wholly irrelevant in this as-applied challenge. As applied to Wynn, the government has no interest in assisting "hearers and readers" of Wynn's speech in "evaluating its import." *See Keene*, 481 U.S. at 480 n.15 (1987) (quoting *Viereck*, 318 U.S. at 251 (Black J., dissenting)). Wynn transmitted a message to U.S. government officials with full transparency about where the message came from. Compl. ¶¶ 22, 25.c. No audience member was deceived, and all material

facts have since been disclosed to the public, ensuring that even non-audience members have full disclosure.  There is no remaining interest in compelling Wynn to register and state that he was a foreign agent of Sun and the PRC, much less a compelling interest.

Even if the government's desire for public disclosure constituted a compelling interest, its requested relief is not narrowly tailored to achieving that interest.  To be narrowly tailored under strict scrutiny, the requirement "must be the least restrictive means" of achieving that compelling interest.  *McCullen v. Coakley*, 573 U.S. 464, 478 (2014); *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 813 (2000) ("If a less restrictive alternative would serve the Government's purpose, [it] must use that alternative.").  "When a plausible, less restrictive alternative is offered to a content-based speech restriction, it is the Government's obligation to prove that the alternative will be ineffective to achieve its goals." *Playboy*, 529 U.S. at 816.  Here, the government is free to speak itself and to publicize its opinion that Wynn acted as a foreign agent of the PRC.  *See Keene*, 481 U.S. at 467, 484-85 (affirming government's right to opine that film was political propaganda); *Block v. Meese*, 793 F.2d 1303, 1315 (D.C. Cir. 1986) (same). Indeed, the government has already done so by issuing a press release that received widespread media coverage.  Because the government can achieve its ends without intruding on Wynn's right to remain silent or disagree, forcing Wynn to state a disputed opinion against his will is not narrowly tailored.

### 3.  Exacting Scrutiny Does Not Apply, But Even If It Did, the Requested Relief Is Unconstitutional

The government may argue that the Court should apply "exacting scrutiny," a standard that requires a substantial relationship between a compelled factual disclosure and a sufficiently important governmental interest, and narrow tailoring.  *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383 (2021).  Exacting scrutiny has historically been invoked for compelled speech

APP. 044

that threatens the freedom of association, rather than the freedom from compelled speech:

(1) disclaimers required to be included with electoral advertisements, *see Citizens United v. FEC*,

558 U.S. 310, 366 (2010); (2) public reports disclosing basic factual information like donors or

members' names, addresses, and contributions, *Buckley v. Valeo*, 424 U.S. 1, 66-67 (1976); and

(3) the government's ability to make FARA information about non-registrants available for

public inspection.  *Block*, 793 F.2d at 1315.  It has also, in limited circumstances, been invoked

in the freedom of speech context, most commonly when considering compelled disclosure of

"purely factual and uncontroversial [commercial] information."  *Zauderer*, 471 U.S. at 651.

Exacting scrutiny does not, however, apply to controversial statements of opinion or

ideological belief, *e.g.*, that the speaker agrees he acted as a foreign agent on behalf of a foreign

principal.  Wynn has already cooperated with the government and answered factual questions.

*See, e.g.*, Compl. ¶ 37; Ex. A.  The only "disclosure" left is the affirmation under oath that Wynn

acted as a foreign agent on behalf of foreign principals Sun and the PRC.  That disclosure is a

statement of opinion and ideological belief with which Wynn emphatically disagrees.  Moreover,

even if the statement is one of fact (thereby potentially subject to exacting scrutiny), it would be

both controversial and a statement Wynn believes to be false.  The government cannot compel a

speaker to make controversial statements or statements he believes to be false.  Finally, even if

the exacting scrutiny test were applied, the requested relief fails that test.

###### a.  Exacting Scrutiny Does Not Apply to Statements of Opinion or Ideological Belief

"[F]reedom of speech prohibits the government from telling people what they must say."

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l*, 570 U.S. 205, 213 (2013) (citation

omitted) (holding that government cannot compel funding applicants to state their opposition to

prostitution); *Wooley*, 430 U.S. at 715 (prohibiting compulsion to display license plate bearing

21

**APP. 045**

state motto "Live Free or Die" because it converted the plaintiff into "an instrument for fostering

public adherence to an ideological point of view he finds unacceptable").  Courts have

recognized the application of exacting scrutiny to "pure compulsions to convey facts … unlike

pure compulsions to convey ideas."  *See* Eugene Volokh, *The Law of Compelled Speech*, 97 Tex.

L. Rev. 355, 380 (2018) (noting that courts have distinguished between compelling a statement

of adherence to an ideological point of view and mandating the reporting of information).

Compelling Wynn to classify Sun and the PRC as his "foreign principal[s]" on whose behalf he

acted as a "foreign agent" is a statement of opinion and ideological belief, not a mere factual

disclosure.

> **b.    Exacting Scrutiny Does Not Permit the Government to Compel
> Statements of Controversial Information that the Speaker
> Believes to Be False**

Even if the compelled speech in this case were a factual disclosure, it would be prohibited

because it would be a *controversial* disclosure.  The Supreme Court has affirmed the state's

ability to compel an attorney to disclose "purely factual and uncontroversial information" about

the contingent fees he charged.  *Zauderer*, 471 U.S. at 651.  Such disclosures of purely factual

and uncontroversial information are permissible because "the interests at stake … are not of the

same order as those discussed in *Wooley*, *Tornillo*, and *Barnette*."  *Id.*  The degree to which an

individual is controlled by a foreign principal and is thereby an agent is similar to the

controversial compelled speech deemed unconstitutional in *Wooley*, *Tornillo*, and *Barnette* and

unlike the uncontroversial compelled disclosure of attorney fees in *Zauderer*.  *See Barnette*, 319

U.S. at 631 (unconstitutional to compel students to recite the pledge of allegiance and

emphasizing the protected "right of self-determination in matters that touch individual opinion

and personal attitude"); *Mia. Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 256 (1974)

(unconstitutional to compel newspapers who advocate against a candidate to run the candidate's

**APP. 046**

reply); *Wooley*, 430 U.S. at 715 (unconstitutional to compel Jehovah's Witnesses to display

license plate reading "Live Free or Die").

      While *Zauderer* discussed the constitutional protection accorded to commercial speakers,

the Supreme Court has dictated that non-commercial speakers, like Wynn, are entitled to *equal*

*or more* protection than commercial speakers, not less.  *Riley*, 487 U.S. at 796 n.9 (citing

*Zauderer* and stating "[p]urely commercial speech is more susceptible to compelled disclosure

requirements."); *see, e.g.*, *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 623 (1995) ("Commercial

speech enjoys a limited measure of protection, commensurate with its subordinate position in the

scale of First Amendment values, and is subject to modes of regulation that might be

impermissible in the realm of noncommercial expression.") (quoting *Bd. of Trustees v. Fox*, 492

U.S. 469, 477 (1989)); Genevieve Lakier, *Not Such a Fixed Star After All*, 13 F.I.U. L. Rev. 741,

750 (2019) ("Today, the idea that the government acts in a presumptively unconstitutional

manner—outside the commercial speech context at least—both when it compels speakers to take

a position on matters of opinion and when it compels speakers to assert true facts is a widely

accepted, if not universally embraced, principle of free speech jurisprudence.").  If a commercial

speaker cannot be compelled to make controversial statements, certainly a non-commercial

speaker is entitled to the same or greater protection.  Because the terms "foreign agent" and

"foreign principal," are controversial, compelling an individual to agree that they apply is

prohibited by the First Amendment.

      The fact that "foreign principal" and "foreign agent" are subject to statutory definitions

does not make them "purely factual and uncontroversial" labels.  In *National Association of*

*Manufacturers v. SEC*, 800 F.3d 518 (D.C. Cir. 2015) ("*NAM*"), the SEC argued that it could

force publicly traded companies to report to the SEC and disclose on their websites that their

23

**APP. 047**

products were not "conflict free" because "conflict free" was a "statutorily defined term of art." *Id.* at 531.  The D.C. Circuit disagreed, holding that the SEC's statutory definition of "conflict free" did not justify forcing private entities to speak that message.  *Id.* at 530.  The D.C. Circuit deemed the SEC's contrary argument akin to unconstitutionally forcing speakers to state that their products were not "sustainable" or "fair trade" "even if the companies vehemently disagreed that their products were 'unsustainable' or 'unfair.'"  *Id.* at 530.  "By compelling an issuer to confess blood on its hands," the statute violated the issuer's right to "convey [its chosen] 'message' through 'silence.'"  *Id.* (quoting *Hurley*, 515 U.S. at 573).  Accordingly, the court held that the SEC regulation violated the First Amendment.

Importantly, the SEC contended in *NAM* that a FARA precedent, the Supreme Court's decision in *Keene*, had determined that a statutory definition cured the controversial nature of a compelled statement.  The D.C. Circuit disagreed, concluding, "*Keene* was not a compelled speech case," but rather dealt with the government's ability to opine that films were "political propaganda"—an opinion that the litigant was free to reject and avoid affirming.  *Id.* at 529 (noting that the litigant had "no disclosure obligations" and was "free to remove" the government's label).  *Keene* "did not suggest, much less hold, that it would be constitutionally permissible for Congress to force filmmakers to label their own films as 'political propaganda' … however the term was defined."  *Id.*  Thus, it remains an open question in the D.C. Circuit whether FARA unconstitutionally compels speech.

Similarly, in *Associated Builders & Contractors of Southeast Texas v. Rung*, a Department of Labor rule obligated government contractors and subcontractors to "report for public disclosure on [the government's website] any 'violations of the federal labor laws,'" defined by rule to include any complaint filed by the NLRB even if the complaint had not been

APP. 048

adjudicated.  No. 16-cv-425, 2016 WL 8188655, at *2-3 (E.D. Tex. Oct. 24, 2016).  The court

granted a preliminary injunction, holding that the Department's rule violated the First

Amendment by "compel[ling the] contractors to engage in public speech on matters of

considerable controversy adversely affecting their public reputations …."  *Id.* at *9 (by requiring

the contractors to include even alleged violations that they contested, the rule "compel[led]

government contractors to 'publicly condemn' themselves").  Just as in *NAM* and *Associated

Builders*, the First Amendment prohibits the government from forcing a private individual to

adopt a controversial government message.

Even if the Court deems the compelled statements factual and non-controversial,

however, they would still be unconstitutional because Wynn believes the statements are false,

*i.e.*, Wynn does not believe that he acted as an agent of Sun or the PRC.  "[A] citizen has a First

Amendment right to decide what to say and what not to say, and, accordingly, the right to reject

governmental efforts to require him to make statements he believes are false."  *Jackler v. Byrne*,

658 F.3d 225, 241 (2d Cir. 2011); *see also Burns v. Martuscello*, 890 F.3d 77, 89 (2d Cir. 2018)

(holding that the First Amendment prohibits the government from forcing inmates to provide

either false or truthful information); *cf. United States v. Sindel*, 53 F.3d 874, 878 (8th Cir. 1995)

(rejecting compelled speech challenge to law that required taxpayer to disclose information about

his clients to the Internal Revenue Service because the law did not require the taxpayer "to

disseminate publicly a message with which he disagrees.").  The government seeks to force

Wynn to publicly affirm information he believes to be untrue and with which he disagrees, an

unconstitutional compulsion.

**APP. 049**

c.      **Compelling Wynn to Speak the Requested Government-Dictated Message Fails Even Exacting Scrutiny**

Compelling Wynn to affirm that he was a foreign agent who acted on behalf of foreign principals Sun and the PRC would fail even exacting scrutiny.  When applied in the freedom of speech context, exacting scrutiny has two prongs: (1) a substantial relationship between the compelled disclosure and a sufficiently important governmental interest, and (2) narrow tailoring.  *Bonta*, 141 S. Ct. at 2383.  Compelling a FARA registration from Wynn—years after Wynn's activities have ceased, the policy choice has been made, and his audience has left office—lacks both a substantial relationship to that interest and narrow tailoring.

Ordering Wynn to register under FARA lacks a substantial relationship to a sufficiently important government interest, as applied in this case.  Regardless of whether FARA may be constitutional in other instances, the government bears the burden of establishing "the constitutionality of the law in light of the particular facts of [Wynn's] case."  *Calzone v. Summers*, 942 F.3d 415, 420 (8th Cir. 2019) (en banc).  Thus, while courts have upheld lobbyist disclosure statutes requiring registration for compensated advocacy, *see, e.g., Nat'l Ass'n of Mfrs. v. Taylor*, 582 F.3d 1, 16 (D.C. Cir. 2009), they have declared unconstitutional broader statutes requiring individuals or entities to register who were not paid for their services or disclose activity unrelated to lobbying.[2]  In *Calzone*, the en banc Eighth Circuit held that a

---

[2] *See Calzone v. Summers*, 942 F.3d 415, 420 (8th Cir. 2019) (en banc); *Canyon Ferry Rd. Baptist Church v. Unsworth*, 556 F.3d 1021, 1031 (9th Cir. 2009) (holding that state reporting requirements reaching entities that made de minimis in-kind expenditures to support campaigns violated the First Amendment); *N.J. State Chamber of Comm. v. N.J. Elec. Law Enforcement Comm'n*, 82 N.J. 57 (N.J. 1980) (holding that lobbying reporting act was constitutional under First Amendment as long as reporting threshold was raised to reflect interest only in disclosures from those who seek to influence legislation while "receiving and expending significant sums of money to that end"); *Fritz v. Gorton*, 517 P.2d 911, 930 (Wash. 1974) (upholding Washington State's lobbyist regulation, but noting that an explicit carve-out for uncompensated activism demonstrated that the law was drafted "to avoid impingement upon First Amendment guarantees"); *see also United States v. Nat'l Comm. for Impeachment*, 469

lobbying disclosure statute that passed exacting scrutiny on a facial challenge was

unconstitutional as applied to a purported "lobbyist" who did not receive or expend any money

during the course of his advocacy.  942 F.3d at 420.  The court held that the First Amendment

prohibited the state from compelling Calzone "to pay a fee and publicly disclose his political

activities" because the disclosure obligations bore an insufficient relationship to the

government's interest in transparency and preventing corruption.  *Id.* at 423-25.  The court

explained that the interest in knowing who was speaking to legislators was insufficient to justify

the burdens of registration, particularly in light of the "respected tradition of anonymity in the

advocacy of political causes."  *Id.* at 425 (quoting *McIntyre v. Ohio Elections Comm'n*, 514 U.S.

334, 342-43 (1995)).  This is because "when money changes hands, the nature of [the state]'s

transparency interest changes too…."  *Id.*

As with the plaintiff in *Calzone*, Wynn received no compensation and spent no money.

He transmitted a message to U.S. government officials with full transparency about where the

message came from.  Compl. ¶¶ 22, 25.c.  Under the circumstances, particularly when

considering that all material facts have already been disclosed, compelling Wynn to register and

state that he was a foreign agent of Sun and the PRC serves no remaining interest in

transparency.  Because the government has no interest in compelling such speech, much less an

important or compelling interest, granting the government's request for relief would violate the

First Amendment as applied to Wynn.

---

F.2d 1135, 1141 (2d Cir. 1972) (construing law requiring registration of entities that make expenditures for the purpose of influencing an election not to include an organization that does so only once); *ACLU v. Jennings*, 366 F. Supp. 1041, 1057 (D.D.C. 1973) (same), *vacated as moot sub nom. Staats v. ACLU*, 422 U.S. 1030 (1975).

Even if the government could satisfy the substantial relationship prong, however, it cannot satisfy narrow tailoring.  "[A] reasonable assessment of the burdens imposed by disclosure should begin with an understanding of the extent to which the burdens are unnecessary, and that requires narrow tailoring." *Bonta*, 141 S. Ct. at 2385.  Narrow tailoring requires that the government demonstrate that its regulation was "precisely tailored" to "compelling necessity." *Riley*, 487 U.S. at 800 (describing the "exacting First Amendment scrutiny" applicable to disclosure of factual information).  In *Bonta*, the Court considered a statute requiring disclosure of donors in order to prevent and detect charitable fraud and self-dealing.  141 S. Ct. at 2385.  The challenged portion of the reporting obligation required charities to list the names, addresses, and contributions of the charity's top donors. *Id.* at 2386.  The Court held that while the goal was valid, the state cannot choose a disclosure regime as a matter of convenience; "[i]t must instead demonstrate its need for universal production in light of any less intrusive alternatives." *Id.*  The Court concluded that a less intrusive alternative (targeted requests seeking only relevant information) was available, and that the state's overbroad compelled disclosure was therefore unconstitutional. *Id.*; *accord Riley*, 487 U.S. at 799-800 & n.11 (holding that statute requiring disclosure of percentage of charitable contributions paid as fees failed strict scrutiny because "more benign and narrowly tailored options are available," but that a statute merely requiring disclosure of "professional status" would be lawful).

Here, the government has no shortage of alternative methods to distribute the information it claims is necessary for Wynn's audience to evaluate his 2017 conduct.  Most importantly, as explained above, the government is free to speak for itself, which it has already done.  Alternatively, the government could allow individuals to disclose solely the external facts of past events or discussions and leave readers to draw their own conclusions.  Either of these

28

alternatives would accomplish the government's goals and decrease the burden on First

Amendment rights.  Because the government can achieve its ends without intruding on Wynn's

right to remain silent or disagree, forcing Wynn to speak a government-dictated message with

which he disagrees is not narrowly tailored.

## III.    The Complaint Fails to Sufficiently Allege That Wynn Acted as an Agent of a Foreign Principal

The Complaint fails to sufficiently allege that Wynn acted as an agent of a foreign

principal.  To be an agent required to register under FARA, an individual must (a) have a

sufficient relationship with a foreign principal, and (b) engage in "political activities" in the

foreign principal's interests.  Specifically, FARA defines "agent of a foreign principal" in

relevant part as:

> [A]ny person who acts as an *agent*, *representative*, *employee*, or *servant*, or any
> person who acts in any other capacity at the *order*, *request*, or *under the direction*
> or *control*, of a foreign principal … and who directly or through any other person
> … engages within the United States in political activities for or in the interests of
> such foreign principal …

22 U.S.C. § 611(c)(1)(i), (iv) (emphases added).  The Complaint fails to sufficiently allege either

statutory requirement.

### A.    The Complaint Fails to Allege That Wynn Had an Agency Relationship With a Foreign Principal

The Complaint fails to allege facts sufficient to establish that Wynn had an agency

relationship with a foreign principal.  The Complaint alleges that Wynn acted "at the request of

at least one PRC official, Sun," and "[a]s such, he acted as an agent of a foreign principal under

FARA."  Compl. ¶ 36; *accord id.* ¶¶ 2, 12, 40.  The Court, however, "need not accept as true …

'a legal conclusion couched as a factual allegation,' nor an inference unsupported by the facts set

forth in the Complaint."  *CREW*, 2020 WL 5748105, at *4 (quoting *Trudeau*, 456 F.3d at 193));

*see Papasan v. Allain*, 478 U.S. 265, 286 (1986) (holding that allegation that funding disparities

**APP. 053**

had deprived petitioners of a "minimally adequate education" was a legal conclusion undeserving of acceptance). The Complaint lacks the facts necessary to state a cognizable "request" under FARA, *i.e.*, that Wynn was ordered to act by Sun or the PRC, or that he was subject to their direction, control, or authority. Because the Complaint fails to allege the basic facts necessary to create an obligation to register, it fails to state a claim and must be dismissed.

## 1. A Person Acting on a Mere Request, Absent Orders, Direction, or Control, Is Not an Agent of a Foreign Principal

FARA defines "agent of a foreign principal" in relevant part as "any person who acts as an *agent*, *representative*, *employee*, or *servant*, or any person who acts in any other capacity at the *order*, *request*, or *under the direction* or *control*, of a foreign principal …." 22 U.S.C. § 611(c)(1) (emphases added). The term "request" must be interpreted consistently with the other italicized terms, each of which connotes direction, control, or authority of a principal over an agent. The allegation that Wynn acted at the mere "request" of Sun—without any allegation that Sun ordered, directed, or controlled Wynn—is insufficient to make Wynn an agent of a foreign principal.

"In ascertaining the plain meaning of [a] statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *McCarthy v. Bronson*, 500 U.S. 136, 139 (1991) (quoting *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988)). "Whether a statutory term is unambiguous … does not turn solely on dictionary definitions of its component words," but rather must take into account "the specific context in which that language is used, and the broader context of the statute as a whole." *Yates v. United States*, 574 U.S. 528, 537 (2015).

The Supreme Court has repeatedly cautioned against interpreting a statute expansively based on a literal or dictionary definition of one broad term within in a list of narrower terms.

APP. 054

For instance, in the honest services bribery trial of Virginia Governor Bob McDonnell, the question was whether the governor's arranging meetings with state officials, calling those officials to urge them to meet or to consider conducting studies of a product, and hosting promotional events, constituted "official acts" under applicable bribery law.  *McDonnell v. United States*, 136 S. Ct. 2355, 2367-68 (2016); *see id.* at 2362-66 (describing charged acts). The statute defined "official act" as "any *decision or action* on any *question, matter, cause, suit, proceeding or controversy,* which may at any time be pending, or which may by law be brought before any public official" in his official capacity.  *Id.* at 2367 (quoting 18 U.S.C. § 201(a)(3)) (emphasis added).  The Court observed that "the last four words in that list—'cause,' 'suit,' 'proceeding,' and 'controversy'—connote a formal exercise of governmental power, such as a lawsuit, hearing, or administrative determination," which was missing in the case.  *Id.* at 2368. The government argued, as it may here, that the remaining terms in the list—there, "question" and "matter"; here, "request"—had broader meaning, and because they were listed in the disjunctive, the plain meaning of the statute included *any* decision or action on *any* issue falling within those broad terms.  *See id.* at 2368.

The Supreme Court rejected that simplistic analysis, and instead "look[ed] to the context in which the words appear," employing "the familiar interpretive canon *noscitur a sociis*, 'a word is known by the company it keeps.'"  *Id.* (quoting *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961)).  To avoid "giving … unintended breadth to" Congress's enactment, the Court did not read "question" or "matter" in their broadest or even their plainest meaning.  Instead, it interpreted the words as meaning something similar to the other terms in the statutory list—"a formal exercise of governmental power that is similar in nature to a 'cause, suit, proceeding or controversy,' but that does not necessarily fall into one of those prescribed categories."  *Id.* at

31

**APP. 055**

2369; *accord id.* at 2371-72.  The Court found such interpretation a better indicator of

congressional intent, as well as a way to avoid rendering the other statutory terms superfluous (as

they would become if they fell within the broad definition of the outlying term).  *See id.* at 2368-

69; Antonin Scalia and Bryan Garner, *Reading Law: The Interpretation of Legal Texts*, Canon 31

(2012) (Associated-Words Canon).

Similarly, in *Yates*, a commercial fisherman suspected of harvesting undersized fish, who

directed a crew member to toss the suspect fish overboard, was charged with destruction of

records in a federal investigation, under a statute that prohibited "destroy[ing,] … conceal[ing],

[or] cover[ing] up … any record, document, or tangible object with intent to impede, obstruct, or

influence" a federal investigation.  *Id.* at 531 (quoting 18 U.S.C. § 1519).  Despite the fact that a

fish is a "tangible object" by dictionary definition, the Supreme Court ruled that it was not a

"tangible object" within the meaning of the statute, which was directed at the destruction of

records, not wildlife.  *See id.* at 540-47 (plurality); *id.* at 549-52 (Alito, J., concurring).  The

Court applied the *noscitur a sociis* canon, *id.*, as well as the related canon of *ejusdem generis*:

"[w]here general words follow specific words in a statutory enumeration, the general words are

[usually] construed to embrace only objects similar in nature to those objects enumerated by the

preceding specific words." *Id.* at 545 (plurality) (citation omitted); *accord id.* at 549-51 (Alito, J.,

concurring) (citation omitted); *see also Gustafson v. Alloyd Co.*, 513 U.S. 561, 575, 578 (1995)

(where a statute defined "prospectus" as a "prospectus, notice, circular, advertisement, letter, or

communication," the term "communication" did not apply to "every casual communication

between buyer and seller."); Scalia and Garner, *supra*, Canon 32 (*Ejusdem Generis* Canon).

Here, both canons apply.  The term "request" appears among the associated terms "at the

order" and "under the direction or control," which give it meaning.  22 U.S.C. § 611(c)(1).

**APP. 056**

Moreover, that list itself modifies the residual catch-all "any person who acts in any other capacity," which follows a list of specific terms ("agent, representative, employee, or servant"). *Id.* Not only does "request" in this context connote something similar to "order," "direction," or "control," but it also defines the kind of person to whom the statute applies—a person who acts similarly to an "agent, representative, employee, or servant."

Thus, "request" is not, by its breadth, an escape valve that allows an end-run around the statute's otherwise clear terms. Instead, it must be interpreted similar to those surrounding terms, as connoting a request from someone who exercises some degree of direction, control, or authority over a person who acts in a capacity similar to an "agent, representative, employee, or servant." The Complaint does not allege that Wynn acted in such a capacity.

## 2. The Government's Arguments for a Broad Interpretation of "Request" Are Without Merit

The government's pre-litigation arguments for a broad interpretation of "request," which it presumably will repeat here, are without merit. In its correspondence to Wynn (Compl. ¶ 37), the government has disputed Wynn's statutory interpretation, relying on an out-of-circuit case and DOJ's own interpretive guidance on FARA released in 2020. Neither source is persuasive or saves the Complaint from dismissal.

The government has previously argued that *Att'y Gen. v. Irish N. Aid Comm.*, 668 F.2d 159 (2d Cir. 1982) (per curiam) (*INAC*) justifies ignoring the statutory context and interpreting "request" to extend to the allegations in the Complaint. In *INAC*, before the district court, the defendant maintained that the FARA agency relationship was "defined only by control," as set forth in the Restatement of Agency. *Att'y Gen. v. Irish N. Aid Comm.*, 530 F. Supp. 241, 256 (S.D.N.Y. 1981). The district court rejected this argument, holding that the use of the

**APP. 057**

"disjunctive" in "any other capacity at the order, request, or under the direction or control" was

"dispositive."  530 F. Supp. at 256.

The Second Circuit affirmed, but it issued an opinion "to express a note of caution

concerning the statute's coverage of those who act at the 'request' of a foreign principal."  668

F.2d at 160-61.  The court warned that "this word [request] is not to be understood in its most

precatory sense.  Such an interpretation would sweep within the statute's scope many forms of

conduct that Congress did not intend to regulate."  *Id.* at 161.  The Second Circuit held that a

court should normally look to "the surrounding circumstances," with the precise definition of

"request" being "somewhere between a command and a plea."  *Id.*  As an example, the Second

Circuit quoted with approval the congressional testimony of former DOJ Assistant Attorney

General Phillip B. Heymann:

> For instance, a congressman visits Turkey and during his trip he meets with
> government officials.  The government officials urge the case for foreign policies
> favorable to Turkey, and he supports these when he returns to Washington.  If that
> is considered a 'request' under the statute, the congressman is an unregistered
> foreign agent, even though he has taken no orders, is under no one's direction or
> control, and is not anyone's agent.

*Id.* at 161 n.6 (quoting *Inquiry Into the Matter of Billy Carter and Libya: Hearings Before the*

*Subcomm. to Investigate the Activities of Foreign Governments of the Senate Comm. On the*

*Judiciary*, 96th Cong. 701 (1980) (hereinafter, "Heymann Statement")).  Although not quoted by

the Second Circuit, AAG Heymann's testimony continued:

> Because of possible results like this one, we do not read or apply the statute
> instances of persuasion or the mere urging of a viewpoint.  Instead, we focus on
> the other language in the statute's definition of agent.  *As we read the statute, in*
> *other words, a person is a foreign agent, and must register with the Department,*
> *if he engages in the activities specified in the statute and if he does so at the order*
> *of a foreign principal, or under the direction or control of a foreign principal.*

Heymann Statement at 701 (emphasis added).  *INAC* did not involve a scenario like Wynn's

where a foreign principal made a mere request, with no ability to order Wynn to act or to direct

**APP. 058**

or control Wynn's actions.  In contrast, AAG Heymann's testimony makes clear that a person in

Wynn's position, who does not act at the order of a foreign principal, or under his direction or

control, is not obligated to register.

Any effort to rely on DOJ's own interpretive guidance would be equally unpersuasive.  In

May 2020, DOJ issued a non-binding memorandum entitled "The Scope of Agency Under

FARA," DOJ FARA Unit, *The Scope of Agency Under FARA* (May 2020), https://www.justice

.gov/nsd-fara/page/file/1279836/download, containing a list of non-exhaustive factors that DOJ

may deem relevant to considering whether an agency relationship exists.  Far from cutting in

DOJ's favor, however, the key takeaway from the memorandum is that "the term 'request' …

must be read to connote some form of authority by the principal over the agent."  *Id.* at 2 (citing

*McDonnell*'s *noscitur a sociis* analysis; *accord id.* at 3 ("Accordingly, these circumstances must

evince some level of power by the principal over the agent or some sense of obligation on the

part of the agent to achieve the principal's request.").

The 2020 memorandum was not the first time DOJ made clear that a mere request is not

enough to trigger FARA's registration obligation.  In AAG Heymann's 1982 testimony, he

stated:

> We emphasize, we have emphasized and I think must, to make sense of the
> statute, require something stronger than persuasion, *something stronger than a*
> *mere request*, something that suggests the legal concept of agency or in the words
> of this statute *'direction, control, order,' working for a foreign government*.  This
> requirement of direction, control—working under the order of a foreign
> government, something that establishes a substantial and continuing relationship
> and a sense of direction—that requirement applies, of course, to the civil
> obligations of the act and to criminal prosecutions.

Heymann Statement, at 685 (emphases added).  Likewise, in a 2016 report by DOJ's Office of

Inspector General, multiple DOJ officials confirmed that FARA's agency relationship requires

the agent to have acted at the direction or control of the foreign principal.  *See* Office of

35

**APP. 059**

Inspector General, DOJ, *Audit of the National Security Division's Enforcement and Administration of the Foreign Agents Registration Act*, at 9 (Sept. 2016), https://oig.justice.gov/reports/2016/a1624.pdf (quoting the FARA Unit Chief as saying that even if a foreign government is trying to influence U.S. policy, "if it is done in a way that does not create a statutory agency relationship on the part of the agent acting within the United States at the direction or control of the foreign government, then there is no agent of a foreign principal with an obligation under FARA"); *id.* at 11 (quoting other NSD officials as stating that prosecutors must prove "that the agent was directed and controlled by a foreign principal"). These 1982, 2016, and 2020 statements do not carry the force of law, but they are persuasive evidence that FARA agency does not apply to an individual who acts in response to a mere request without the foreign principal exercising direction, control, or authority over the individual.  Because the Complaint contains no such allegation, it must be dismissed.

### 3.   FARA's Legislative History Confirms that "Request" Was Not Intended to Materially Expand the Statute's Scope

"[The] first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997).  "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Id.* at 341.  Where the text and statutory structure is clear, there is "no occasion to resort to legislative history." *BedRoc Ltd. v. United States*, 541 U.S. 176, 186 (2004); *see also Ratzlaf v. United States*, 510 U.S. 135, 147-48 (1994) ("[W]e do not resort to legislative history to cloud a statutory text that is clear.").  If analysis of the statutory language and its context does not yield a plain meaning, however, courts may look to the statute's legislative history and intent. *Am. Lithotripsy Soc. v. Thompson*, 215 F. Supp. 2d

**APP. 060**

23, 32 (D.D.C. 2002).  Here, the statutory text, taken in context, has a plain meaning.  *See supra*.

Even if it did not, however, the legislative history cuts against any attempt to use "request" to

materially expand FARA's scope.

As discussed in the preceding sections, the broadest definition of "request" would take

FARA in a materially different direction from the eight terms it accompanies.  Had Congress

intended this ninth term to cause such a drastic step, it would be obvious from the legislature's

discussion and debate.  *See Gooding v. United States*, 416 U.S. 430, 457-58 (1974) ("While

congressional silence as to a particular provision of a bill during debates which give extensive

consideration to neighboring provisions is not easy to interpret, it would be unusual for such a

significant change as that proposed by petitioner to have entirely escaped notice."); *McGoff*, 831

F.2d at 1090 ("If, as the Government maintains, Congress did intend the draconian measure of

effectively eliminating the statute of limitations, the obvious question arises … why such an

unusual (indeed drastic) step did not engender any discussion or debate.").  Here, FARA's

legislative history counsels against a broad reading of "request."

The word "request" was added to FARA as part of a 1966 amendment.  The House

Judiciary Committee report for that amendment explained that the amendment "redefine[d] the

phrase 'agent of a foreign principal'" to ensure it would reach people who were "subject to the

*direction or control* of a foreign principal."  H.R. Rep. 89-1470, at 4, 89th Cong., 2d Sess., as

reprinted in 1966 U.S.C.C.A.N. 2397, 2400 (emphasis added).  The committee report further

explained that its amendment:

> will have the effect of establishing an agency relationship when a person engages
> in one of the enumerated activities and comes within either of these two
> categories: (1) is an agent, employee, representative, or servant of the foreign
> principal, or (2) *acts at the order of*, or is *under the control of*, a foreign principal.

37

**APP. 061**

*Id.* (emphasis added).  Neither the House Judiciary Committee nor the Conference Committee explained why the word "request" was included in the bill.  The broad reach of "request" asserted in the Complaint, however—making someone an "agent" in the absence of any orders, direction or control, or any agent, representative, employment, or servant relationship—would drastically expand the meaning of the statute beyond that described by the Committee report. The absence of any mention in the legislative history of such an outcome strongly suggests that no such drastic effect was intended.

### B.   The Complaint Fails to Allege That Wynn Engaged in Political Activities

In addition to failing sufficiently to allege that Wynn acted at the "request" of Sun or the PRC, the Complaint also fails to allege that he engaged in "political activities" within the scope of that request.  FARA defines "political activities" as:

> any activity that the person engaging in believes will, or that the person intends to, in any way *influence* any agency or official of the Government of the United States … with reference to formulating, adopting, or changing the domestic or foreign policies of the United States or with reference to the political or public interests, policies, or relations of a government of a foreign country or foreign political party.

22 U.S.C. § 611(o) (emphasis added); *accord* Compl. ¶ 13.  To survive a motion to dismiss, the Complaint must, therefore, allege that Wynn believed that he would, or intended to, "influence" the President or the Administration officials in connection with the PRC's or Sun's request.

In fact, however, the Complaint alleges only that Wynn was asked by Sun to deliver a message from the PRC to the Administration, and that Wynn did so while expressly disclosing that the message was coming from the PRC.  Merely delivering a message on behalf of a foreign government and checking on its status, without any accompanying efforts to influence on behalf of the foreign government, falls outside the scope of FARA.  Because the Complaint fails sufficiently to allege that Wynn engaged in political activities, and it should be dismissed.

**APP. 062**

USCA Case #22-5328   Document #1999038   Filed: 05/12/2023   Page 68 of 208

**1. The Complaint's Factual Allegations Support Only That Wynn Delivered a Message to the President and Administration Officials, and Not That He Engaged in Any Lobbying or Other Efforts to Influence on the PRC's Behalf**

The Complaint summarizes Wynn's alleged conduct as follows: "[A]t the request of Sun, and on behalf of the PRC, the Defendant *conveyed* to former President Donald J. Trump and his Administration … the PRC's request to remove from the country a PRC national who had sought political asylum in the United States."  Compl. ¶ 2 (emphasis added).  In other words, as framed by the government, Wynn's activities in this matter were limited to the mere delivery of a message on behalf of the PRC without a corollary attempt or intention to "influence" on behalf of the PRC.  As set forth below, the factual allegations of the Complaint confirm that Wynn's role was as a messenger conveying information and not as a lobbyist intending to influence decision-making on behalf of a foreign principal.  Simply put, the facts as laid out by the government fall unambiguously short of describing conduct encompassed by FARA.

*First*, the Complaint alleges only that the PRC requested Wynn's assistance in bringing the PRC's proposal to the attention of Administration officials, not influencing the Administration's ultimate decision on the proposal.  According to the Complaint, the PRC was proposing a mutually beneficial arrangement for the United States and the PRC, *id.* ¶ 21.c., but Sun wanted help in ensuring that the message was delivered.  The Complaint alleges only that "Sun requested [Wynn's] help in *bringing the issue to the attention of the Trump Administration*."  *Id.* ¶ 18 (emphasis added); *accord id.* ¶ 17 (noting Broidy identified Wynn only for potential assistance in "getting access to Trump Administration officials," not advocating to them).  In other words, Sun's request was limited to conveying the PRC's proposal to the Administration and did not include any other tasks, such as lobbying or attempting to influence the Administration officials.

**APP. 063**

*Second*, the Complaint alleges that Wynn agreed only to deliver the PRC's proposal, and not to influence the U.S. government's decision regarding the proposal.  As the Complaint alleges, when Sun sought Wynn's assistance, Wynn only "agreed to *raise the matter* with then-President Trump and Trump Administration officials."  *Id.* ¶ 20 (emphasis added).  More importantly, the factual allegations in the Complaint reflect that Wynn's conduct was limited to delivering the PRC's message and later inquiring about its status.  There are no factual allegations in the Complaint, however, that Wynn ever lobbied or otherwise attempted to influence the President or Administration officials on behalf of Sun or the PRC.

For example, with respect to the dinner between Wynn and President Trump, the Complaint alleges that "the Defendant *conveyed* to then-President Trump the PRC's desire to have the PRC national removed from the United States and provided the PRC national's passport photos to then-President Trump's secretary."  *Id.* ¶ 22 (emphasis added).  In describing Wynn's meeting with other officials, the Complaint does not allege that Wynn advocated; instead, it alleges that Wynn conveyed "that PRC officials had contacted him and advised him that 'they were very interested in having' the PRC national returned to China as soon as possible."  *Id.* ¶ 25.c.  The Complaint also alleges other occasions when Wynn raised the issue of the PRC national with President Trump, including one call where Wynn allegedly asked President Trump "about the PRC national's status," *id.* ¶¶ 25.d-25.e, but the government does not allege that during any of those occasions Wynn lobbied or attempted to influence the president on behalf of the PRC.

The absence of these necessary factual allegations sharply contrasts with Wynn's alleged statements summarizing his completion of the requested activities.  For example, in his last conversation with Sun, the Complaint alleges that Wynn informed Sun that "he had made U.S.

40

**APP. 064**

Government officials aware of the request," and that beyond that, Wynn was not able to provide any additional assistance so Sun should stop contacting Wynn.  *Id.* ¶ 27.  Similarly, in a text message discussing the end of his involvement in the matter, the Complaint alleges that Wynn stated he had "received assurances 'that all parties in the White House were fully sensitive to the timing of this issue and the relevant USA procedural law involved,'" adding that "[a]t this point, as a private citizen, I believe I have exhausted the advantages of my position."  *Id.* ¶ 28.  In both discussions, Wynn's referenced only that he informed the Administration and made them aware of the PRC's proposal because that is all Wynn was allegedly requested to do.

The government should not be permitted to argue that it is a reasonable inference from the factual allegations that Wynn was engaged in a lobbying effort on the PRC's behalf.  The question whether Wynn attempted to lobby the Administration with respect to the PRC's proposal is central to the Complaint and addresses a specific element of the statute; on an issue so fundamental to the case and to Wynn's alleged legal duties, the Court should require the government to include specific factual allegations to support its claim that he engaged in lobbying.  *See, e.g.*, *Brody v. Bruner*, No. 19-cv-01091, 2021 WL 4264055, at *2 (D. Colo. Sept. 20, 2021) (in a case alleging conspiracy, holding that "[t]he Court will not infer the necessary agreement; rather, the Complaint must allege facts showing such agreement").  Given the detailed factual allegations in the Complaint, it is fair to assume that, if the government was aware of such facts, they would have been included.  In their absence, the Court should not invent or assume their existence.

### 2.  Merely Conveying a Message From the PRC Without Any Attempt to Influence Administration Officials on the PRC's Behalf Does Not Qualify as a "Political Activity" Under FARA

For the government to state a claim that Wynn engaged in "political activities" as an agent of Sun and the PRC, the Complaint must contain sufficient factual allegations that Wynn

**APP. 065**

believed either that his actions would, or that he intended to, "in any way influence any agency or official of the Government of the United States" at the request of the PRC.  *See* 22 U.S.C. § 611(o).  As a general matter, courts have found that the definition of "influence" means to "affect the mind or action of" another.  *E.g.*, *United States v. Chriswell*, 401 F.3d 459, 469 (6th Cir. 2005) (internal quotation marks omitted).  In the context of FARA's definition of "political activities," the term "influence" thus requires the government to allege facts supporting that Wynn tried to "affect the mind or actions" of Administration officials on behalf of the PRC.  As explained above, the Complaint fails to do so.  *See* Part III.B.1 *supra*.

To find that FARA applies in the absence of such factual allegations would be inconsistent with the purpose of FARA to prevent covert foreign *influence*.  *See Craig*, 401 F. Supp. 3d at 54 ("The purpose of [FARA] is to prevent covert influence over U.S. policy by foreign principals."); *supra* § I.B (summarizing authorities on the purpose of FARA to facilitate audience's ability to evaluate a message from a foreign source).  FARA thus applies where foreign actors try to impact U.S. public policies while hiding behind secretly controlled agents. But where, as here, the Complaint alleges that Wynn delivered a proposal to Administration officials that he openly disclosed came from the PRC, yet at the same time fails to allege that Wynn lobbied or otherwise tried to influence the Administration on the PRC's behalf, there is no covert foreign influence to combat.  FARA's goal of "enabl[ing] American audiences to consider the source in evaluating the message," *The Scope of Agency Under FARA*, at 1, is nowhere implicated where the potential registrant is a mere messenger, who revealed the source of the message to his audience in real time.

Because the Complaint fails to allege that Wynn engaged in "political activities" within the scope of the PRC's request to deliver its proposal, the Complaint should be dismissed.

APP. 066

## **CONCLUSION**

For the foregoing reasons, Wynn respectfully requests that the Court dismiss the

Complaint with prejudice.

Respectfully submitted,

/s/
Reid H. Weingarten (D.C. Bar No. 365893)
Brian M. Heberlig (D.C. Bar No. 455381)
Nicholas P. Silverman (D.C. Bar No.1014377)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, DC  20036
Tel: (202) 429-3000
Fax: (202) 429-3902
rweingarten@steptoe.com
bheberlig@steptoe.com
nsilverman@steptoe.com


/s/
Robert D. Luskin (D.C. Bar No. 293621)
Leo R. Tsao (*pro hac vice to be filed*)
PAUL HASTINGS LLP
2050 M Street, N.W.
Washington, DC  20036
Tel: (202) 551-1700
Fax: (202) 551-0410
robertluskin@paulhastings.com
leotsao@paulhastings.com

*Counsel for Defendant Stephen A. Wynn*

Dated: July 18, 2022

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ATTORNEY GENERAL OF THE UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>    v.<br><br>STEPHEN A. WYNN,<br><br>            Defendant. | Case No. 1:22-cv-01372-JEB |

## DECLARATION OF BRIAN M. HEBERLIG IN SUPPORT OF DEFENDANT STEPHEN A. WYNN'S MOTION TO DISMISS THE COMPLAINT

Pursuant to 28 U.S.C. § 1746, I, Brian M. Heberlig, declare as follows:

1.   I am a partner with the law firm of Steptoe & Johnson LLP, counsel for Defendant Stephen A. Wynn.  I am an attorney admitted to practice law in the District of Columbia and am a member of the Bar of the United States District Court for the District of Columbia.  I submit this Declaration in Support of Stephen A. Wynn's Motion to Dismiss the Complaint.  I have personal knowledge of the facts set forth herein and am competent to testify thereto if called as a witness.

2.   Attached hereto as Exhibit A is a true and correct copy of a letter dated June 8, 2018 from Steptoe & Johnson LLP to the U.S. Department of Justice, referenced in paragraph 37 of the Complaint.

3.   Attached hereto as Exhibit B is a compilation of true and correct copies of OMB Form Nos. 1124-0001, 1124-0006, and 1124-0004, as downloaded from www.justice.gov and www.omb.report on or about June 21, 2022.

**APP. 068**

I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 18, 2022

/s/_____
Brian M. Heberlig (D.C. Bar No. 455381)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, DC  20036
Tel: (202) 429-3000
Fax: (202) 429-3902
bheberlig@steptoe.com

*Counsel for Defendant Stephen A. Wynn*

Reid H. Weingarten
202 429 6238
rweingar@steptoe.com

Brian M. Heberlig
202 429 8134
bheberlig@steptoe.com

1330 Connecticut Avenue, NW
Washington, DC 20036-1795
202 429 3000 main
www.steptoe.com

**Steptoe**

STEPTOE & JOHNSON LLP

June 8, 2018

**By Electronic Mail & FedEx**

Jay I. Bratt, Esq.
Heather H. Hunt, Esq.
Robert Wallace, Esq.
U.S. Department of Justice, National Security Division
175 N Street, NE
Constitution Square, Building 3 – Room 1.300
Washington, DC 20002

Re:     **Stephen A. Wynn**

Dear Counsel:

We write in response to your May 16, 2018 letter, in which you conclude that our client Stephen A. Wynn has an obligation to register under the Foreign Agents Registration Act ("FARA").  For the reasons explained below, we disagree that Wynn has acted as an agent of a foreign principal, or is obligated to register under FARA.  We appreciate this opportunity to expand on the issues we raised during our initial proffer and to more formally set forth our views.[1]  We are hopeful that this submission will convince you to close this matter.  However, in the event you still believe Wynn is obligated to register under FARA, we respectfully request an opportunity to seek review of this decision with your supervisors within the Department of Justice before any enforcement action.

---

[1] As was the case with our initial proffer, this letter and any related communications are in the nature of an attorney proffer, seeking informal resolution of this matter through negotiation and compromise.  Its contents are not admissible in any subsequent proceeding under Federal Rule of Evidence 408.

**Steptoe**
STEPTOE & JOHNSON LLP

Jay I. Bratt, Esq.
Heather H. Hunt, Esq.
Robert Wallace, Esq.
June 8, 2018
Page 2

## I.   INTRODUCTION

In 2017, Wynn received an unsolicited request from an individual identified as "Mr. Soon" (ph), who was described as a senior Chinese security official, to deliver a message to President Trump. We have concluded that the individual was Sun Lijun, Vice Minister of Ministry of Public Security of the People's Republic of China (PRC), which you have corroborated. Sun asked Wynn if he could speak to President Trump about China's interest in the repatriation of Guo Wengui, whom he described as a Chinese "criminal" living in New York whose visa was up for renewal. Wynn said he would raise the issue with President Trump if he got the chance, and subsequently delivered the message, fully disclosing the entire sequence of events to the President. Wynn did so because he believed it was in the interests of the United States to consider the request. Wynn had no agreement with Sun, received no compensation or benefits, was not threatened or extorted to act, and did not lobby or try to influence the President. Wynn never met Sun in person and eventually cut off further communications when Sun's phone calls became repetitive and annoying. On these facts, Wynn was not Sun's or the PRC's agent and had no obligation to register under FARA.

Your contrary determination that Wynn was an agent of Sun and the PRC is based exclusively on Sun's *request* that Wynn convey a message to President Trump regarding the PRC's desire to repatriate Guo. You state that FARA "identifies 'request' as one of three independent, disjunctive prerequisites that can give rise to an agency relationship with a foreign principal." Letter at 4. This broad interpretation of the term "request" in isolation, as alone sufficient to create a foreign agency relationship, is counter to the terms of the statute as a whole. In context, FARA requires a greater degree of direction or control by the principal than an individual's mere delivery of a requested message, with no consideration, direction, relationship, or agreement to represent the foreign principal's interests. The requirement is confirmed by (1) the authority cited in your May 16 letter, *Attorney General v. Irish Northern Aid Committee*, 668 F.2d 159 (2d Cir. 1982) ("*INAC*"); (2) the terms of the statute, read under established canons of construction endorsed by the Supreme Court; (3) FARA's legislative history; and (4) statements by Department of Justice officials responsible for FARA administration and enforcement.

Further, Wynn did not act "for or in the interests" of Sun or the PRC, nor did he "represent" their interests to President Trump, as is required to be an agent of a foreign principal under FARA. Wynn acted as a messenger, not a representative or advocate. He was transparent about the circumstances of the unsolicited request he had received, and he passed along the information without endorsement or advocacy. By reporting such information, and adding his view that a response might be in *the United States' interests* in its relations with the PRC, Wynn was not representing the PRC, nor acting for or in the PRC's interests.

**Steptoe**
STEPTOE & JOHNSON LLP

Jay I. Bratt, Esq.
Heather H. Hunt, Esq.
Robert Wallace, Esq.
June 8, 2018
Page 3

Finally, even if, *arguendo*, Wynn was obligated to register at one time, that obligation
ceased when Wynn cut off communication with Sun in October 2017 and took no further action
on this matter. FARA's registration obligation expires when the agent stops acting on behalf of
the foreign principal. *United States v. McGoff*, 831 F.3d 1071, 1082 (D.C. Cir. 1987).

For all of these reasons, Mr. Wynn was not an agent of a foreign principal and has no
obligation to register under FARA.

## II.    FACTUAL BACKGROUND

### A.    Stephen Wynn's Background

Wynn has been a leader in the casino resort industry since the 1970s, and he was
responsible for creating the Mirage, Treasure Island, and the Bellagio in Las Vegas. In the
2000s, he took Wynn Resorts Limited public and created Wynn Las Vegas and Wynn Encore on
the Las Vegas strip. During the same period, Wynn expanded to Macau, a Special
Administrative Region of China that has existed under independent local control since 1999,
under the Chinese principle of "one country, two systems." Wynn created the Wynn Macau
Resort, Encore at Wynn Macau, and, most recently, the Wynn Palace on the Cotai strip. In his
business dealings in Macau, Wynn dealt extensively and had a good working relationship with
Macau's former Chief Executive Edmund Ho. Wynn has had far fewer contacts and no
significant business dealings with government officials from "Mainland China."

Wynn and Donald Trump historically had been business competitors who were not close
friends. By the time of the 2016 presidential campaign, they had a cordial relationship and spoke
sporadically during campaign. Wynn had no formal role in the campaign. Following the
election, at the request of President Trump and Chief of Staff Reince Priebus, Wynn agreed to
serve as Finance Chairman of the Republican National Committee (RNC). Wynn had been an
active Republican donor and fundraiser during earlier election cycles and had gotten to know
Priebus when he was the Chairman of the RNC. In 2017, President Trump and Wynn
periodically spoke privately and dined together on a few occasions in the White House.

### B.    Wynn's Communications with Sun and the Trump Administration

In the summer of 2017, Wynn learned that a Chinese government official, Sun,[2] wanted
to speak with him about U.S. cooperation regarding a Chinese national, Guo Wengui, who was

---

[2] The official was described to Wynn as a "Mr. Soon" (ph) who was China's Vice Chair
of State Security. From the description, we identified the official as Sun Lijun, Vice Minister of
China's Ministry of Public Security. Your letter states that you have obtained information
corroborating that Sun was the official who contacted Wynn. Letter at 2 n.5.

**Steptoe**
STEPTOE & JOHNSON LLP

Jay I. Bratt, Esq.
Heather H. Hunt, Esq.
Robert Wallace, Esq.
June 8, 2018
Page 4

living in New York.  The initial contact came through an American intermediary unaffiliated
with Wynn's business, who also provided Wynn with two photo pages from Guo's passports—
one in his name and one using the name "Miles Kwok."  Wynn had never heard of Sun or Guo
but agreed to receive the call.

Thereafter, Sun contacted Wynn by telephone.  Through an interpreter, Sun conveyed his
view that Guo was a criminal whose visa should not be renewed and whom the United States
should return to China.  Sun asked Wynn if he would relay that message to President Trump.
Sun did not offer Wynn any compensation for his assistance or threaten to take adverse action if
Wynn declined.  Wynn said he would mention the issue to President Trump if he got the chance.
He did not agree to lobby the President or advocate on Sun's or the PRC's behalf.

During a subsequent visit to the White House, Wynn provided Guo's passport photo
pages to President Trump's secretary, Madeleine Westerhout.  During a social dinner with
President Trump in the White House, Wynn delivered Sun's message to President Trump, fully
disclosing the whole story and the source of the information.  Wynn did not advocate for or
against Sun's request.  He told President Trump that this seemed like an important issue to the
PRC and might be a good opportunity for President Trump to do a favor for Chinese President Xi
and develop their relationship.

Thereafter, Sun followed up with Wynn by telephone on a number of occasions seeking
status reports and more information.  Wynn, in turn, had follow up conversations with
administration officials about this issue, including Priebus, Chief of Staff General John Kelly,
and Deputy National Security Advisor Major General Ricky Wadell.  In these communications,
Wynn passed along the information about Guo, disclosing the communications he had with Sun,
and did not advocate or lobby on Sun's or the PRC's behalf.

In the fall of 2017, Wynn understands that Sun traveled to the United States and met with
senior administration officials about Guo.  When no action was taken, Sun continued to contact
Wynn by telephone, seeking more information.  These calls became repetitive and annoying.  In
October 2017, Wynn told Sun that he had made U.S. government officials aware of Sun's
request, and that Sun should stop contacting Wynn because there was nothing more he could or
would do.  Wynn has had no further communications with Sun since this time.

Wynn viewed this entire episode as an opportunity to further U.S. interests.  Wynn
believed that President Trump wanted to improve relations with China, and thought Sun's
request might provide an opportunity to do so.  Wynn had no contract, understanding, or
agreement, written or oral, with Sun or the PRC, nor was any such agreement or understanding
ever discussed.  Neither Wynn nor any of his businesses received any compensation or special
treatment in exchange for passing along Sun's message.  Moreover, neither Wynn nor his Macau

**Steptoe**
STEPTOE & JOHNSON LLP

Jay I. Bratt, Esq.
Heather H. Hunt, Esq.
Robert Wallace, Esq.
June 8, 2018
Page 5

casinos have been punished or threatened regarding his refusal to do more than transmit Sun's message.[3]

## III.   DISCUSSION

FARA's definition of "agent of a foreign principal" contains two components: one focusing on an individual's relationship to a foreign principal, 22 U.S.C. § 611(c)(1), and one focusing on forms of action in the United States on the foreign principal's behalf, *id.* § 611(c)(1)(i)-(iv). Wynn does not fall under either component: he did not have the requisite agency relationship with Sun or the PRC, and he did not represent them or act for their interests in his communication with President Trump and other administration officials.

### A.   Wynn Was Not an Agent of Sun or the PRC

The first component of FARA's definition of "agent of a foreign principal" focuses on an agency relationship with the foreign principal.[4] It defines "agent of a foreign principal" as

> any person who acts as an **agent**, **representative**, **employee**, or **servant**, or any person who acts in any other capacity at the **order**, **request**, or **under the direction** or **control**, of a foreign principal or [a person supervised, directed, controlled, financed, or subsidized by a foreign principal].

22 U.S.C. § 611(c)(1) (emphasis added).

Here, Wynn did not act as an "agent," "representative," "employee," or "servant" of Sun or the PRC, nor did he act at their "order" or "under the[ir] direction or control." Wynn had no engagement, agreement, understanding, or relationship of any kind with Sun or the PRC, either written or oral, formal or informal. Wynn received no compensation or benefit from them, had no authority to speak for them or represent them, took no instruction from them, and owed them

---

[3] Your letter notes that "Mr. Wynn's Macau operations depend heavily on good relations with the Chinese government." Letter at 3 n.8. This is an overstatement. Had Wynn been so "incentive[ized] to remain in China's good graces," as you suggest (*id.* at 2 n.3), Wynn would have advocated for Guo's deportation, not simply passed along the message. Moreover, the fact that Wynn cut off communications with Sun belies any suggestion that he acted out of concern for his business or to curry favor with the Chinese government.

[4] Wynn assumes for purposes of this letter that the PRC's Ministry of Public Security qualifies as a "foreign principal" under FARA, 22 U.S.C. § 611(b)(1), (e), and that Sun was "supervised, directed, [or] controlled" by the MPS within the meaning of 22 U.S.C. § 611(c)(1).

**Steptoe**
STEPTOE & JOHNSON LLP

Jay I. Bratt, Esq.
Heather H. Hunt, Esq.
Robert Wallace, Esq.
June 8, 2018
Page 6

no obligation of any kind, whether to work for them, speak for them, or to do anything at all. Wynn, as a social acquaintance of the President, was asked in an unsolicited telephone call to convey a message to President Trump, and did so.

Your sole basis for contending that Wynn was an "agent" of Sun and the PRC is that he acted on Sun's "request." You assert that "request" is "one of three independent, disjunctive prerequisites that *can* give rise to an agency relationship with a foreign principal." Letter at 4 (emphasis added). But the presence or motivation of a "request," in the broad colloquial sense, standing alone, is not sufficient to make one an agent of a foreign principal, and does not do so in this case. That term cannot be isolated from its statutory context to bear the weight the government gives it.

> 1. **A "request," without any direction or control, does not make Wynn an agent under *Attorney General v. Irish Northern Aid Committee***

Initially, it is notable that the Second Circuit opinion on which your letter relies was issued precisely "to express a note of caution concerning the statute's coverage of those who act at the 'request' of a foreign principal." *INAC*, 668 F.2d at 160-61. In *INAC*, the Second Circuit warned expressly that "this word ['request'] is not to be understood in its most precatory sense. Such an interpretation would sweep within the statute's scope many forms of conduct that Congress did not intend to regulate." *Id.* at 161. The court noted Congress's statement in its report on this 1966 amendment that the breadth of the language alone could reach action for which registration is "not … warranted":

> Under existing law it is possible because of the broad scope of the definitions contained in section [611(c)(1)] to find an agency relationship (and thus the possibility of registration) of persons who are not, in fact, agents of foreign principals but whose acts may incidentally be of benefit to foreign interests, even though such acts are part of the normal exercise of those persons' own rights of free speech, petition or assembly. This may have been desirable when the Foreign Agents Registration Act was amended in 1942, but does not appear warranted in present circumstances.

*Id.* (quoting H.R. Rep. 89-1470, at 6 (1966), *as reprinted in* 1966 U.S.C.C.A.N. 2397, 2401).

Your letter quotes the language that follows this passage in the *INAC* opinion, and suggests that because Sun directed his request to a specific individual (Wynn), and requested a specific action (delivery of a message to President Trump), this request makes Wynn a foreign agent. Letter at 4. But these factors, while relevant guideposts, are not dispositive. "[T]he surrounding circumstances *may* show that those 'requested are in some way authorized to act for or to represent the foreign principal," 662 F.2d at 161 (emphasis added), but that is not necessarily so—it depends on the facts of the case. Again, the Second Circuit expressly

**APP. 075**

**Steptoe**
STEPTOE & JOHNSON LLP

Jay I. Bratt, Esq.
Heather H. Hunt, Esq.
Robert Wallace, Esq.
June 8, 2018
Page 7

cautioned that "the specificity with which an individual … was designated would not be solely determinative." *INAC*, 662 F.2d at 161 n.6.  As an example, the Second Circuit quoted the congressional testimony of former Assistant Attorney General Phillip B. Heymann:

> For instance, a congressman visits Turkey and during his trip he meets with government officials.  The government officials urge the case for foreign policies favorable to Turkey, and he supports these when he returns to Washington.  If that is considered a 'request' under the statute, the congressman is an unregistered foreign agent, even though he has taken no orders, is under no one's direction or control, and is not anyone's agent.

*Id.* (quoting *Inquiry Into the Matter of Billy Carter and Libya: Hearings Before the Subcomm. To Investigate the Activities of Foreign Governments of the Senate Comm. On the Judiciary*, 96th Cong. 701 (1980) (hereinafter, "Heymann Statement").[5]

Assistant Attorney General Heymann's example, quoted with approval by the Second Circuit, is similar to this case.  Though Wynn is not a congressman, he is in the position AAG Heymann described:  he was contacted by a foreign government official, who requested a U.S. government action favorable to that foreign government.  Concluding that it might be in the interests of the United States to consider Sun's request, Wynn passed on Sun's message in a transparent manner without advocacy to President Trump and administration officials.  Like the congressman in the Second Circuit's example, Wynn "has taken no orders, is under no one's direction or control, and is not anyone's agent." *Id.*  Moreover, Wynn's decision to pass the message to President Trump because it might benefit U.S. interests is an "independent action that incidentally benefits a foreign government but does not fall within the purview of the Act." *Id.*

### 2. A "request," without any direction or control, does not make Wynn an agent under established statutory interpretation canons as applied by the Supreme Court

The Supreme Court has repeatedly and recently cautioned against interpreting statutes expansively by relying on one broad term contained in a list of narrower statutory terms, without attention to the context in which it is employed.  For instance, in the honest services bribery trial of Virginia Governor Bob McDonnell, the question was whether the governor's arranging

---

[5] In language not quoted in *INAC*, AAG Heymann continued, "If [FARA] were read that way, the congressman would face potential criminal penalties of five years imprisonment and a $10,000 fine.  Because of possible results like this one, we do not read or apply the statute to instances of persuasion or the mere urging of a viewpoint.  Instead, we focus on the other language in the statute's definition of agent."  Heymann Statement, at 701.

**Steptoe**
STEPTOE & JOHNSON LLP

Jay I. Bratt, Esq.
Heather H. Hunt, Esq.
Robert Wallace, Esq.
June 8, 2018
Page 8

meetings with state officials, calling those officials to urge them to meet or to consider conducting studies of a product, and hosting promotional events, constituted "official acts" under applicable bribery law. *McDonnell v. United States*, 136 S. Ct. 2355, 2367-68 (2016); *see id.* at 2362-66 (describing charged acts). The statute defined "official act" as "any *decision or action* on any *question, matter, cause, suit, proceeding or controversy,* which may at any time be pending, or which may by law be brought before any public official" in his official capacity. *Id.* at 2367 (quoting 18 U.S.C. § 201(a)(3)) (emphasis added). The Court observed that "the last four words in that list—'cause,' 'suit,' 'proceeding,' and 'controversy'—connote a formal exercise of governmental power, such as a lawsuit, hearing, or administrative determination," and that there was no such action involved in the case. *Id.* at 2368. The government argued, as here, that the remaining terms in the list—there, "question" and "matter"; here, "request"—had broader meaning, and because they were listed in the disjunctive, the plain meaning of the statute included *any* decision or action on *any* issue falling within those broad terms. *See id.* at 2368.

The Supreme Court rejected that simplistic analysis, and instead "look[ed] to the context in which the words appear," employing "the familiar interpretive canon *noscitur a sociis,* 'a word is known by the company it keeps.'" *Id.* (quoting *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961)). To avoid "giving … unintended breadth to" Congress's enactment, the Court did not read "question" or "matter" in their broadest or even their plainest meaning. Instead, it interpreted them as meaning something similar to the other terms in the statutory list—"a formal exercise of governmental power that is similar in nature to a 'cause, suit, proceeding or controversy,' but that does not necessarily fall into one of those prescribed categories." *Id.* at 2369; *accord id.* at 2371-72. The Court found such interpretation a better indicator of congressional intent, as well as a way to avoid rendering the other statutory terms superfluous (as they would become if they fell within the broad definition of the outlying term). *See id.* at 2368-69[6]; *see also Gustafson v. Alloyd Co.*, 513 U.S. 561, 573-74 (1995) (where a statute defined "prospectus" as a 'prospectus, notice, circular, advertisement, letter, or communication," "communication" did not mean any type of communication'; rather, the because the list "refers to documents of wide dissemination," "communication" must therefore also mean "a public communication"); Antonin Scalia and Bryan Garner, *Reading Law: The Interpretation of Legal Texts*, Canon 31 (2012) (Associated-Words Canon).

Similarly, in *Yates v. United States*, 135 S. Ct. 1074 (2015), a commercial fisherman suspected of harvesting undersized fish, who directed a crew member to toss the suspect fish

---

[6] After all, "[i]f 'question' and 'matter' were as unlimited in scope as the Government argues, the terms 'cause, suit, proceeding or controversy' would serve no role in the statute—every 'cause, suit, proceeding or controversy' would also be a 'question' or 'matter.'" *Id.* at 2369.

**Steptoe**
STEPTOE & JOHNSON LLP

Jay I. Bratt, Esq.
Heather H. Hunt, Esq.
Robert Wallace, Esq.
June 8, 2018
Page 9

overboard, was charged with destruction of records in a federal investigation, under a statute that prohibited "destroy[ing,] ... conceal[ing], [or] cover[ing] up ... any record, document, or tangible object with intent to impede, obstruct, or influence" a federal investigation. *Id.* at 1078 (quoting 18 U.S.C. § 1519). Despite the fact that a fish is a "tangible object" by dictionary definition, the Supreme Court ruled that it was not a "tangible object" within the meaning of the statute, which was directed at the destruction of records, not wildlife. *See id.* at 1084-87 (plurality); *id.* at 1089-90 (Alito, J., concurring). The Court applied the *noscitur a sociis* canon, *id.*, as well as the related canon of *ejusdem generis*—"Where general words follow specific words in a statutory enumeration, the general words are [usually] construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Id.* at 1086 (plurality) (citation omitted); *accord id.* at 1089 (Alito, J., concurring) (citation omitted); *see also* Scalia and Garner, *supra*, Canon 32 (*Ejusdem Generis* Canon).

Here, both canons apply. The term "request" appears among the associated terms "at the order" and "under the direction or control," which give it meaning. Moreover, that list itself modifies the residual catch-all "any person who acts in any other capacity," which follows a list of specific terms ("agent, representative, employee, or servant"). Not only does "request" in this context connote something similar to "order," "direction," or "control," but it also defines the kind of person to whom the statute applies—a person who acts similarly to an "agent, representative, employee, or servant."

Thus, "request" is not, by its breadth, an escape valve that allows an end-run around the statute's otherwise clear terms. Instead, it must be interpreted similar to those surrounding terms, as connoting a request from someone who exercises some degree of direction or control over some person who acts in a capacity similar to an "agent, representative, employee, or servant." Wynn acted in none of these capacities or ways.

### 3. FARA's legislative history focuses on direction or control, not a "request"

The residual clause on which you rely here—"any person who acts in any other capacity at the order, request, or under the direction or control, of a foreign principal"—was added to FARA in 1966. P.L. 89-486, 80 Stat. 244 (July 4, 1966). The House Judiciary Committee report for that amendment explained that the amendment

> redefine[d] the phrase 'agent of a foreign principal' to insure that that phase covers persons who are either directly or indirectly[7] *subject to the direction*

---

[7] The report goes on to explain that "indirect control" refers to a situation where the foreign principal uses an intermediary to control the agent. *Id.* The phrase is thus not relevant here.

**Steptoe**
STEPTOE & JOHNSON LLP

Jay I. Bratt, Esq.
Heather H. Hunt, Esq.
Robert Wallace, Esq.
June 8, 2018
Page 10

> *or control* of a foreign principal…. The committee has approved an
> amendment suggested by the Department of Justice which will have the effect
> of establishing an agency relationship when a person engages in one of the
> enumerated activities and comes within either of these two categories: (1) is an
> agent, employee, representative, or servant of the foreign principal, or (2) acts
> at the order of, or is under the control of, a foreign principal.

H.R. Rep. 89-1470, at 4, *as reprinted in* 1966 U.S.C.C.A.N. 2397, 2400.

Neither the House Judiciary Committee nor the Conference Committee explained why
the word "request" was included in the bill. The broad reach of "request" asserted here,
however—making someone an "agent" even in the absence of *any* orders, direction or control or
*any* agent, representative, employment, or servant relationship—is inconsistent with the
Committee's summary and would drastically expand the meaning of the statute beyond that
described by the Committee report. "If Congress intended[, by amending FARA,] to take [such
a] drastic step, … then it would have engendered more discussion or debate," indeed, at least "a
single sentence in the legislative history." *United States v. McGoff*, 831 F.2d 1071, 1090 (D.C.
Cir. 1987). The absence of any mention in the legislative history of such a broad effect of this
one-word addition—which would undo the requirements as summarized in the Committee
report—strongly suggests that no such drastic effect was intended.

4. **A "request," without direction or control, does not make Wynn an
agent under consistent Department of Justice pronouncements**

Finally, the requirement of some degree of direction or control has been recognized in
statements over the years by Department of Justice officials responsible for FARA enforcement.

For instance, during a 2016 audit by the U.S. Department of Justice's Office of Inspector
General, the FARA Unit Chief told OIG investigators that even if a foreign government is trying
to influence U.S. policy, "if it is done in a way that does not create a statutory agency
relationship on the part of the agent acting within the United States *at the direction or control of
the foreign* government, then there is no agent of a foreign principal with an obligation under
FARA." Office of the Inspector General, U.S. Department of Justice, *Audit of the National
Security Division's Enforcement and Administration of the Foreign Agents Registration Act*, at 9
(September 2016) (emphasis added). Similarly, National Security Division officials told OIG
investigators that part of the reason there were few criminal FARA cases was that prosecutors
must prove "that the agent was *directed and controlled* by a foreign principal." *Id.* at 11
(emphasis added).

**Steptoe**
STEPTOE & JOHNSON LLP

Jay I. Bratt, Esq.
Heather H. Hunt, Esq.
Robert Wallace, Esq.
June 8, 2018
Page 11

These recent pronouncements reflect longstanding Department of Justice policy.  In 1980, Assistant Attorney General Heymann, testifying to the Senate Judiciary Committee, directly rejected the broad construction of "request" that has been suggested here:

> We emphasize, we have emphasized and I think must, to make sense of the statute, require something stronger than persuasion, *something stronger than a mere request*, something that suggests the legal concept of agency or in the words of this statute '*direction, control, order,' working for a foreign government*.  This requirement of direction, control—*working under the order of a foreign government*, something that establishes *a substantial and continuing relationship and a sense of direction*—that requirement applies, of course, to the civil obligations of the act and to criminal prosecutions.

Heymann Statement, *supra*, at 685 (emphasis added).

In testimony recognizing the interpretive canons discussed above, the AAG went on to state:

> If we broadly construed the word 'request' to include all forms of argument or persuasion, it would be totally out of line with the other terms 'agent,' 'order,' and 'direction and control.' … As we read the statute, … a person is a foreign agent, and must register with the Department, if he engages in the activities specified in the statute and if he does so at the order of a foreign principal, or under the direction or control of a foreign principal.  What this language emphasizes is that the relationship between the agent and the foreign principal must be one that substantially obligates the agent to the foreign principal.  Only then is it fair to draw the conclusion that an individual is not acting independently, is not simply stating his or her own views, but is acting as an agent or alter ego of the foreign principal.

*Id.* at 701.

Here, Wynn did not act as an "agent, representative, employee or servant," or "at the order … or under the direction or control," of Sun or the PRC.  The fact that Sun may have made a "request," in its broadest colloquial sense, and that Wynn gratuitously acquiesced in a manner that Wynn believed furthered U.S. interests, does not make Wynn an "agent" of Sun or the PRC for FARA purposes.



Jay I. Bratt, Esq.
Heather H. Hunt, Esq.
Robert Wallace, Esq.
June 8, 2018
Page 12

**B.      Wynn Did Not Act For Or In the Interests of Sun or China, Or Represent Their Interests**

The second component of the definition of "agent of a foreign principal" focuses on the actions taken on the foreign principal's behalf.  Even an individual who has a sufficient agency relationship with a foreign principal under the first paragraph of § 611(c)(1) falls within FARA's requirements only if he:

> (i) engages within the United States in political activities *for or in the interests of such foreign principal*;
>
> (ii) acts within the United States as a public relations counsel, publicity agent, information-service employee or political consultant for or in the interests of such principal;
>
> (iii) within the United States solicits, collects, disburses, or dispenses contributions, loans, money, or other things of value for or in the interest of such foreign principal; or
>
> (iv) within the United States *represents the interests of such foreign principal* before any agency or official of the Government of the United States.

22 U.S.C. § 611(c)(1) (emphasis added).  There is no suggestion that Wynn has acted in any of the public relations, political consulting, fundraising, or disbursement functions listed in subsections (ii) and (iii).  Nor is there any suggestion that Wynn has held himself out as a foreign agent under § 611(c)(2).  Wynn therefore can be subject to FARA only if he engaged in political activities in the United States for or in the interests of Sun or the PRC, or represented their interests before the President and other administration officials.  Here, where Wynn acted in the interests *of the United States*, his actions did not trigger FARA.

Contrary to statements in your May 16 letter, Wynn did not "plead" anyone's "cause" to the President—not his, Sun's or the PRC's.  Letter at 5.  He certainly did not "implore President Trump to facilitate the return of Guo to China for the benefit of its government."  *Id.* at 4.  Wynn merely reported to the President the request Sun made on behalf of the PRC.  Wynn did so not in the interests of China, but in the interests of the United States—to apprise the President of information that the President was free to use or to disregard.  Wynn was transparent about the source of the request.  In so doing, Wynn observed to the President that accommodating a favor to the Chinese, on an issue they apparently viewed as important, might strengthen the United States' relationship with China and President Xi, which Wynn believed to be of interest to the President at the time.  Wynn was not representing the PRC's interests before President Trump, or seeking to lobby or influence him for the PRC's benefit.  The fact that Wynn's actions to help President Trump and the United States might also have incidentally benefited the PRC does not

**Steptoe**
STEPTOE & JOHNSON LLP

Jay I. Bratt, Esq.
Heather H. Hunt, Esq.
Robert Wallace, Esq.
June 8, 2018
Page 13

make Wynn subject to FARA.  *See INAC*, 668 F.2d at 161 n.6 ("independent action that incidentally benefits a foreign government . . . does not fall within the purview of the Act.").

### C.   Because Mr. Wynn Is Not Presently an Agent of a Foreign Principal, He Has No Present Obligation to Register

Finally, even if, *arguendo*, Wynn was ever an agent of a foreign principal, he is no longer an agent, and has no obligation to register now.

We understand that the Department of Justice takes the position that FARA includes a continuing obligation to register even after an agency relationship terminates.  The D.C. Circuit, however, reached a different conclusion in *United States v. McGoff*, 831 F.2d 1071 (D.C. Cir. 1987), where the court concluded that "the statutory obligation to file expires when the agent ceases activities on behalf of the foreign principal."  *Id.* at 1082; *see also id.* ("After all, once an individual has ceased his activities, he is no longer an 'agent of a foreign principal' within the meaning of FARA.").

Here, Wynn cut off all communication with Sun in October 2017.  Thus, any obligation Wynn had to register at the time he was in contact with Sun—an obligation we dispute—expired when they ceased communication.

## IV.   CONCLUSION

Wynn was never an agent of a foreign principal—he was not employed by Sun or the PRC; he was not their representative or servant; he had no agreement with and received no compensation from them; and he did not act at or under their order, direction, or control.  Wynn merely accommodated a request, and transparently reported to the President a message Sun had asked him to convey, without engaging in any advocacy.  In so doing, Wynn did not become an agent of Sun or the PRC for purposes of FARA and had no obligation to register as one.  At the very least, Wynn has no current obligation to register.

**Steptoe**
STEPTOE & JOHNSON LLP

Jay I. Bratt, Esq.
Heather H. Hunt, Esq.
Robert Wallace, Esq.
June 8, 2018
Page 14

      For these reasons, we urge you to reconsider your determination that Wynn must register under FARA and close this matter.  In the event you decline to do so, we respectfully request an opportunity to seek review of this decision with your supervisors within the Department of Justice before any enforcement action.  Thank you for your consideration.

      Sincerely,

      Reid H. Weingarten
      Brian M. Heberlig
      Nicholas P. Silverman

      *Counsel for Stephen A. Wynn*

APP. 083

**U.S. Department of Justice**
Washington, DC 20530

**Registration Statement**
**Pursuant to the Foreign Agents Registration Act of 1938, as amended**

## INSTRUCTION SHEET-READ CAREFULLY

1. *Use.*  All persons required to register under this Act shall use this form in submitting the information required by Section 2(a).

2. *Read Act and Rules.*  Registrant should carefully read the Act and the Rules thereunder before completing this form.

3. *Answer.*  Unless otherwise specifically instructed in this form, a registrant shall answer every item on this form.  Whenever the item is inapplicable or the appropriate response to an item is "none", an express statement to that effect shall be made.

4. *Filing.*  The completed statement, including all exhibits, shall be filed in electronic form with the FARA Unit, Counterintelligence and Export Control Section, National Security Division, U.S. Department of Justice at https://www.fara.gov. The statement must be filed in accordance with 28 U.S.C. § 1746. A copy should be retained by the registrant.

5. *Filing Fee.*  The filing of this document requires the payment of a filing fee for each listed foreign principal as set forth in Rule 5(d)(1), 28 C.F.R. § 5.5(d)(1).

6. *Privacy Act Statement.*  The filing of this document is required for the Foreign Agents Registration Act of 1938, as amended, 22 U.S.C. § 611 *et seq.*, for the purposes of registration under the Act and public disclosure.  Provision of the information requested is mandatory, and failure to provide the information is subject to the penalty and enforcement provisions established in Section 8 of the Act.  Every registration statement, short form registration statement, supplemental statement, exhibit, amendment, copy of informational materials or other document or information filed with the Attorney General under this Act is a public record open to public examination, inspection and copying during the posted business hours of the FARA Unit in Washington, DC.  Statements are also available online at the FARA Unit's webpage: https://www.fara.gov.  One copy of every such document, other than informational materials, is automatically provided to the Secretary of State pursuant to Section 6(b) of the Act, and copies of any and all documents are routinely made available to other agencies, departments and Congress pursuant to Section 6(c) of the Act.  The Attorney General also transmits a semi-annual report to Congress on the administration of the Act which lists the names of all agents registered under the Act and the foreign principals they represent.  This report is available to the public in print and online at: https://www.fara.gov                     .

7. *Public Reporting Burden.*  Public reporting burden for this collection of information is estimated to average .75 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.  Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to Chief, FARA Unit, Counterintelligence and Export Control Section, National Security Division, U.S. Department of Justice, Washington, DC 20530; and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, DC 20503.

––––––––––

Note: *Omit this instruction sheet when filing this Statement.*

U.S. Department of Justice
Washington, DC 20530

**Registration Statement**
**Pursuant to the Foreign Agents Registration Act of
1938, as amended**

### I--REGISTRANT

1. Name of Registrant

2. Registration Number (To be assigned by the FARA Unit)

3. Primary Business Address

4. If the registrant is an individual, furnish the following information:

   (a)  Residence address(es)

   (b)  Nationality

   (c)  Year of birth

   (d)  Present citizenship

   (e)  If present citizenship not acquired by birth, state when, where and how acquired

   (f)  Occupation

5. If the registrant is not an individual, furnish the following information:

   (a)  Type of organization:  Committee  ☐     Association  ☐        Partnership  ☐          Voluntary group  ☐
                               Corporation  ☐   Other *(specify)* _____
   (b)  Date and place of organization

   (c)  Name of responsible individual
        (e.g., officer, director or partner)

   (d)  Other business address(es), if any, including
        locations of branch or local offices

   (e)  If a membership organization, provide number of members

(PAGE 2)

(f)  List all partners, officers, directors or persons performing the functions of an officer or director of the registrant.

| Name | Residence Address | Citizenship | Position |
|------|-------------------|-------------|----------|
|      |                   |             |          |

(g)  Which of the above named persons renders services directly in furtherance of the interests of any of the foreign principals?

| Name | Foreign Principal(s) | Services |
|------|----------------------|----------|
|      |                      |          |

(h)  Describe the nature of the registrant's regular business or activity.

(i)  Give a complete description of the ownership and control structure of the registrant.

6. List all individuals, other than those listed in Item 5(g), who render services or will render services to the registrant directly in furtherance of the interests of any foreign principal(s) in other than a clerical, secretarial, or in a related or similar capacity.

| Name | Residence Address | Foreign Principal(s) | Services |
|------|-------------------|----------------------|----------|
|      |                   |                      |          |

**APP. 086**

## II--FOREIGN PRINCIPAL

7. List every foreign principal[1] for whom the registrant is acting or has agreed to act.

| Foreign Principal | Foreign Principal Address |
|---|---|
| | |

## III--ACTIVITIES

8. In addition to the activities described in any Exhibit B to this statement, will the registrant engage or is the registrant engaging now in activity or rendering services on its own behalf which benefits any or all of its foreign principals?

Yes ☐          No ☐

If yes, describe fully.

| Foreign Principal | Activities/Services |
|---|---|
| | |

## IV--FINANCIAL INFORMATION

9. (a) **RECEIPTS-MONIES**

During the period beginning 60 days prior to the date of the registrant's obligation to register[2] under FARA, has the registrant received from any foreign principal named in Item 7 of this statement, or from any other source, for or in the interests of any such foreign principal, any contributions, income, or money either as compensation, or for disbursement or otherwise?

Yes ☐          No ☐

If yes, set forth below in the required detail and separately for each such foreign principal an account of such monies.[3]

| Foreign Principal | Date Received | From Whom | Purpose | Amount |
|---|---|---|---|---|
| | | | | |
| | | | | Total |

---

1 The term "foreign principal," as defined in Section 1(b) of the Act, includes a foreign government, foreign political party, foreign organization, foreign individual and, for the purpose of registration, an organization or an individual any of whose activities are directly or indirectly supervised, directed, controlled, financed, or subsidized in whole or in major part by a foreign government, foreign political party, foreign organization or foreign individual.

2 An agent must register within 10 days of becoming an agent, and before acting as such.

3 A registrant is required to file an Exhibit D if he collects or receives contributions, loans, monies, or other things of value for a foreign principal, as part of a fundraising campaign. There is no printed form for this exhibit. (See Rule 201(e), 28 C.F.R. § 5 201(e)).

**APP. 087**

(b) **RECEIPTS-THINGS OF VALUE**

During the period beginning 60 days prior to the date of the registrant's obligation to register[4] under FARA, has the registrant received anything of value[5] other than money, from any foreign principal named in Item 7 of this statement, or from any other source, for or in the interests of any such foreign principal?

Yes ☐          No ☐

If yes, furnish the following information:

| Foreign Principal | Date Received | From Whom | Purpose | Thing of Value |
|---|---|---|---|---|
| | | | | |

---

10. (a) **DISBURSEMENTS-MONIES**

During the period beginning 60 days prior to the date of the registrant's obligation to register[6] under FARA, has the registrant disbursed or expended monies in connection with activity on behalf of any foreign principal named in Item 7 of this statement or transmitted monies to any such foreign principal?

Yes ☐          No ☐

If yes, set forth below in the required detail and separately for each such foreign principal named including monies transmitted, if any, to each foreign principal.

| Foreign Principal | Date | Recipient | Purpose | Amount |
|---|---|---|---|---|
| | | | | |

---

(b) **DISBURSEMENTS-THINGS OF VALUE**

During the period beginning 60 days prior to the date of the registrant's obligation to register[7] under FARA, has the registrant disposed of any thing of value[8] other than money in furtherance of or in connection with its activities on behalf of any foreign principal named in Item 7 of this statement?          Yes ☐          No ☐

If yes, furnish the following information:

| Foreign Principal | Date | Recipient | Purpose | Thing of Value |
|---|---|---|---|---|
| | | | | |

---

(c) **DISBURSEMENTS-POLITICAL  CONTRIBUTIONS**

During the period beginning 60 days prior to the date of the registrant's obligation to register[9] under FARA, has the registrant (or any short form registrant) made any contribution of money or other thing of value from its own funds and on its own behalf in connection with an election to any political office or in connection with any primary election, convention, or caucus held to select candidates for any political office?          Yes ☐          No ☐

If yes, furnish the following information:

| Date | Donor | Political Organization/Candidate | Method | Amount/Thing of Value |
|---|---|---|---|---|
| | | | | |

---

4, 6, 7 and 9  See Footnote 2, on page 3.
5 and 8  Things of value include but are not limited to gifts, interest-free loans, expense-free travel, favored stock purchases, exclusive rights, favored treatment over competitors, "kickbacks", and the like.

(PAGE 5)

## V--INFORMATIONAL  MATERIALS[10]

11. Prior to the time of filing this statement,[11] has the registrant prepared, disseminated, or caused to be disseminated, any informational materials on behalf of any foreign principal listed in Item 7 of this statement?

   Yes ☐        No ☐

   If yes, identify each foreign principal and attach the informational materials.

| Foreign Principal | Informational Materials Attached | Type |
|---|---|---|

12. (a) Will the activities of the registrant on behalf of any foreign principal include the preparation or dissemination of informational materials?

   Yes ☐        No ☐

   (b) Identify each such foreign principal.

13. Has a budget been established or specified sum of money allocated to finance the registrant's activities in preparing or disseminating informational materials?        Yes ☐        No ☐

   If yes, identify each foreign principal, and specify the period of time and the amount.

| Foreign Principal | Period of Time | Amount |
|---|---|---|

14. Will any individuals or organizations, including public relations firms or publicity agents, participate in the preparation or dissemination of such informational materials?

   Yes ☐        No ☐

   If yes, furnish the names and addresses of such individuals or organizations.

| Name | Address | Foreign Principal(s) |
|---|---|---|

15. Activities in preparing or disseminating informational materials will include the use of the following:

☐ Magazine or newspaper      ☐ Advertising campaigns      ☐ Press releases      ☐ Pamphlets or other publications
☐ Lectures or speeches      ☐ Radio or TV broadcasts      ☐ Motion picture films      ☐ Letters or telegrams
☐ Email
☐ Website URL(s): _____
☐ Social Media website URL(s): _____
☐ Other *(specify)* _____

---

10 The term informational materials includes any oral, visual, graphic, written, or pictorial information or matter of any kind, including that published by means of advertising, books, periodicals, newspapers, lectures, broadcasts, motion pictures, electronic communications, or any means or instrumentality of interstate or foreign commerce or otherwise. Informational materials disseminated by an agent of a foreign principal as part of an activity in itself exempt from registration, or an activity which by itself would not require registration, need not be filed pursuant to Section 4(b) of the Act.

11 See Footnote 2, on page 3.

**APP. 089**

(PAGE 6)

16. Informational materials will be disseminated among the following groups:

☐ Public officials         ☐ Civic groups or associations
☐ Legislators           ☐ Libraries
☐ Government agencies     ☐ Educational groups
☐ Newspapers          ☐ Nationality groups
☐ Editors            ☐ Other *(specify)* _____

17. Indicate the language to be used in the informational materials:

☐ English           ☐ Other *(specify)* _____

## VI--EXHIBITS AND ATTACHMENTS

18. (a)  The following described exhibits shall be filed with a Registration Statement:

*Exhibit A-*   This exhibit, which is filed on Form NSD-3, sets forth the information required to be disclosed concerning each foreign principal named in Item 6.

*Exhibit B-*   This exhibit, which is filed on Form NSD-4, sets forth the information concerning the agreement or understanding between the registrant and the foreign principal.

(b)  An Exhibit C shall be filed when applicable.  This exhibit, for which no printed form is provided, consists of a true copy of the charter, articles of incorporation, association, constitution, and bylaws of a registrant that is an organization.  A waiver of the requirement to file an Exhibit C may be obtained for good cause shown upon written application to the Assistant Attorney General, National Security Division, U.S. Department of Justice, Washington, DC 20530. (See Rule 201(c) and (d)).

(c)  An Exhibit D shall be filed when applicable.  This exhibit, for which no printed form is provided, sets forth an account of money collected or received as a result of a fundraising campaign and transmitted for a foreign principal. (See Rule 201 (e)).

## VII--EXECUTION

In accordance with 28 U.S.C. § 1746, and subject to the penalties of 18 U.S.C. § 1001 and 22 U.S.C. § 618, the undersigned swears or affirms under penalty of perjury that he/she has read the information set forth in this Registration Statement, that he/she is familiar with the contents thereof, and that such contents are in their entirety true and accurate to the best of his/her knowledge and belief.

Date             Printed Name           Signature [12]

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

---

12 This statement shall be signed by the individual agent, if the registrant is an individual, or by a majority of those partners, officers, directors or persons performing similar functions, if the registrant is an organization, except that the organization can, by power of attorney, authorize one or more individuals to execute this statement on its behalf.

U.S. Department of Justice                                    **Exhibit A to Registration Statement**
Washington, DC 20530                                    **Pursuant to the Foreign Agents Registration Act of 1938, as amended**

---

INSTRUCTIONS. Furnish this exhibit for EACH foreign principal listed in an initial statement and for EACH additional foreign principal acquired subsequently. The filing of this document requires the payment of a filing fee as set forth in Rule (d)(1), 28 C.F.R. § 5.5(d)(1). Compliance is accomplished by filing an electronic Exhibit A form at https://www.fara.gov.

Privacy Act Statement. The filing of this document is required by the Foreign Agents Registration Act of 1938, as amended, 22 U.S.C. § 611 *et seq.*, for the purposes of registration under the Act and public disclosure. Provision of the information requested is mandatory, and failure to provide this information is subject to the penalty and enforcement provisions established in Section 8 of the Act. Every registration statement, short form registration statement, supplemental statement, exhibit, amendment, copy of informational materials or other document or information filed with the Attorney General under this Act is a public record open to public examination, inspection and copying during the posted business hours of the FARA Unit in Washington, DC. Statements are also available online at the FARA Unit's webpage: https://www.fara.gov. One copy of every such document, other than informational materials, is automatically provided to the Secretary of State pursuant to Section 6(b) of the Act, and copies of any and all documents are routinely made available to other agencies, departments and Congress pursuant to Section 6(c) of the Act. The Attorney General also transmits a semi-annual report to Congress on the administration of the Act which lists the names of all agents registered under the Act and the foreign principals they represent. This report is available to the public in print and online at: https://www.fara.gov.

Public Reporting Burden. Public reporting burden for this collection of information is estimated to average .22 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to Chief, FARA Unit, Counterintelligence and Export Control Section, National Security Division, U.S. Department of Justice, Washington, DC 20530; and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, DC 20503.

| 1. Name of Registrant | 2. Registration Number |
|---|---|
| | |

3. Primary Address of Registrant

| 4. Name of Foreign Principal | 5. Address of Foreign Principal |
|---|---|
| | |

6. Country/Region Represented

---

7. Indicate whether the foreign principal is one of the following:

☐ Government of a foreign country [1]

☐ Foreign political party

☐ Foreign or domestic organization: If either, check one of the following:

|   |   |
|---|---|
| ☐ Partnership | ☐ Committee |
| ☐ Corporation | ☐ Voluntary group |
| ☐ Association | ☐ Other *(specify)* _____ |

☐ Individual-State nationality _____

8. If the foreign principal is a foreign government, state:

   a) Branch or agency represented by the registrant


   b) Name and title of official with whom registrant engages

---

1 "Government of a foreign country," as defined in Section 1(e) of the Act, includes any person or group of persons exercising sovereign de facto or de jure political jurisdiction over any country, other than the United States, or over any part of such country, and includes any subdivision of any such group and any group or agency to which such sovereign de facto or de jure authority or functions are directly or indirectly delegated. Such term shall include any faction or body of insurgents within a country assuming to exercise governmental authority whether such faction or body of insurgents has or has not been recognized by the United States.

FORM NSD-3
Revised 05/20

9.  If the foreign principal is a foreign political party, state:

    a)   Name and title of official with whom registrant engages

    b)   Aim, mission or objective of foreign political party

10. If the foreign principal is not a foreign government or a foreign political party:

    a)   State the nature of the business or activity of this foreign principal.

    b)  Is this foreign principal:

| | |
|---|---|
| Supervised by a foreign government, foreign political party, or other foreign principal | Yes ☐  No ☐ |
| Owned by a foreign government, foreign political party, or other foreign principal | Yes ☐  No ☐ |
| Directed by a foreign government, foreign political party, or other foreign principal | Yes ☐  No ☐ |
| Controlled by a foreign government, foreign political party, or other foreign principal | Yes ☐  No ☐ |
| Financed by a foreign government, foreign political party, or other foreign principal | Yes ☐  No ☐ |
| Subsidized in part by a foreign government, foreign political party, or other foreign principal | Yes ☐  No ☐ |

11.  Explain fully all items answered "Yes" in Item 10(b).

12.  If the foreign principal is an organization and is not owned or controlled by a foreign government, foreign political party or other foreign principal, state who owns and controls it.

**APP. 092**

**EXECUTION**

In accordance with 28 U.S.C. § 1746, and subject to the penalties of 18 U.S.C. § 1001 and 22 U.S.C. § 618, the undersigned swears or affirms under penalty of perjury that he/she has read the information set forth in this statement filed pursuant to the Foreign Agents Registration Act of 1938, as amended, 22 U.S.C. § 611 *et seq.*, that he/she is familiar with the contents thereof, and that such contents are in their entirety true and accurate to the best of his/her knowledge and belief.

| Date | Printed Name | Signature |
|------|--------------|-----------|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

U.S. Department of Justice                 **Exhibit B to Registration Statement**
Washington, DC 20530             **Pursuant to the Foreign Agents Registration Act of 1938, as amended**

_____

INSTRUCTIONS.  A registrant must furnish as an Exhibit B copies of each written agreement and the terms and conditions of each oral agreement with his foreign principal, including all modifications of such agreements, or, where no contract exists, a full statement of all the circumstances by reason of which the registrant is acting as an agent of a foreign principal.  Compliance is accomplished by filing an electronic Exhibit B form at https://www.fara.gov.

Privacy Act Statement.   The filing of this document is required for the Foreign Agents Registration Act of 1938, as amended, 22 U.S.C. § 611 _et seq.,_ for the purposes of registration under the Act and public disclosure.  Provision of the information requested is mandatory, and failure to provide the information is subject to the penalty and enforcement provisions established in Section 8 of the Act.  Every registration statement, short form registration statement, supplemental statement, exhibit, amendment, copy of informational materials or other document or information filed with the Attorney General under this Act is a public record open to public examination, inspection and copying during the posted business hours of the FARA Unit in Washington, DC.  Statements are also available online at the FARA Unit's webpage: https://www.fara.gov.  One copy of every such document, other than informational materials, is automatically provided to the Secretary of State pursuant to Section 6(b) of the Act, and copies of any and all documents are routinely made available to other agencies, departments and Congress pursuant to Section 6(c) of the Act.  The Attorney General also transmits a semi-annual report to Congress on the administration of the Act which lists the names of all agents registered under the Act and the foreign principals they represent.  This report is available to the public in print and online at: https://www.fara.gov        .

Public Reporting Burden.  Public reporting burden for this collection of information is estimated to average .32 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.  Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to Chief, FARA Unit, Counterintelligence and Export Control Section, National Security Division, U.S. Department of Justice, Washington, DC 20530; and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, DC 20503.

| 1.  Name of Registrant | 2.  Registration Number |
|---|---|
| | |

3.  Name of Foreign Principal

_____

<u>Check Appropriate Box:</u>

4. ☐   The agreement between the registrant and the above-named foreign principal is a formal written contract.  If this box is checked, attach a copy of the contract to this exhibit.

5. ☐   There is no formal written contract between the registrant and the foreign principal.  The agreement with the above-named foreign principal has resulted from an exchange of correspondence.  If this box is checked, attach a copy of all pertinent correspondence, including a copy of any initial proposal which has been adopted by reference in such correspondence.

6. ☐   The agreement or understanding between the registrant and the foreign principal is the result of neither a formal written contract nor an exchange of correspondence between the parties.  If this box is checked, give a complete description below of the terms and conditions of the oral agreement or understanding, its duration, the fees and expenses, if any, to be received.

7.  What is the date of the contract or agreement with the foreign principal?

8.  Describe fully the nature and method of performance of the above indicated agreement or understanding.

**APP. 094**

9.  Describe fully the activities the registrant engages in or proposes to engage in on behalf of the above foreign principal.

10. Will the activities on behalf of the above foreign principal include political activities as defined in Section 1(o) of the Act[1].

       Yes ☐     No ☐

       If yes, describe all such political activities indicating, among other things, the relations, interests or policies to be influenced together with the means to be employed to achieve this purpose. The response must include, but not be limited to, activities involving lobbying, promotion, perception management, public relations, economic development, and preparation and dissemination of informational materials.

11. Prior to the date of registration[2] for this foreign principal has the registrant engaged in any registrable activities, such as political activities, for this foreign principal?

       Yes ☐     No ☐

If yes, describe in full detail all such activities. The response should include, among other things, the relations, interests, and policies sought to be influenced and the means employed to achieve this purpose. If the registrant arranged, sponsored, or delivered speeches, lectures, social media, internet postings, or media broadcasts, give details as to dates, places of delivery, names of speakers, and subject matter. The response must also include, but not be limited to, activities involving lobbying, promotion, perception management, public relations, economic development, and preparation and dissemination of informational materials.

Set forth below a general description of the registrant's activities, including political activities.

Set forth below in the required detail the registrant's political activities.

| Date | Contact | Method | Purpose |
|------|---------|--------|---------|

APP. 095

12. During the period beginning 60 days prior to the obligation to register[3] for this foreign principal, has the registrant received from the foreign principal, or from any other source, for or in the interests of the foreign principal, any contributions, income, money, or thing of value either as compensation, or for disbursement, or otherwise?

Yes ☐        No ☐

If yes, set forth below in the required detail an account of such monies or things of value.

| Date Received | From Whom | Purpose | Amount/Thing of Value |
|---|---|---|---|
| | | | |

Total

13. During the period beginning 60 days prior to the obligation to register[4] for this foreign principal, has the registrant disbursed or expended monies in connection with activity on behalf of the foreign principal or transmitted monies to the foreign principal?

Yes ☐        No ☐

If yes, set forth below in the required detail and separately an account of such monies, including monies transmitted, if any.

| Date | Recipient | Purpose | Amount |
|---|---|---|---|
| | | | |

---

1  "Political activity," as defined in Section 1(o) of the Act, means any activity which the person engaging in believes will, or that the person intends to, in any way influence any agency or official of the Government of the United States or any section of the public within the United States with reference to formulating, adopting, or changing the domestic or foreign policies of the United States or with reference to the political or public interests, policies, or relations of a government of a foreign country or a foreign political party.

2,3,4  Pursuant to Section 2(a) of the Act, an agent must register within ten days of becoming an agent, and before acting as such.

**APP. 096**

**EXECUTION**

In accordance with 28 U.S.C. § 1746, and subject to the penalties of 18 U.S.C. § 1001 and 22 U.S.C. § 618, the undersigned swears or affirms under penalty of perjury that he/she has read the information set forth in this statement filed pursuant to the Foreign Agents Registration Act of 1938, as amended, 22 U.S.C. § 611 *et seq.*, that he/she is familiar with the contents thereof, and that such contents are in their entirety true and accurate to the best of his/her knowledge and belief.

| Date | Printed Name | Signature |
|------|--------------|-----------|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

**APP. 097**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ATTORNEY GENERAL OF THE
UNITED STATES OF AMERICA,

                    Plaintiff,

       v.

STEPHEN A. WYNN,

                    Defendant.

Case No. 1:22-cv-01372-JEB

### [PROPOSED] ORDER GRANTING STEPHEN A. WYNN'S MOTION TO DISMISS THE COMPLAINT

      Upon consideration of Defendant Stephen A. Wynn's Motion to Dismiss the Complaint

pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, it is hereby:

      **ORDERED** that the Motion to Dismiss the Complaint is **GRANTED**; and it is further

      **ORDERED** that the Complaint for Declaratory and Injunctive Relief is **DISMISSED**

**WITH PREJUDICE**.

      **SO ORDERED** this _____ day of _____.

_____
HON. JAMES E. BOASBERG
United States District Judge

**APP. 098**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ATTORNEY GENERAL OF THE UNITED STATES OF AMERICA, | ) ) ) | |
| | ) | Civil Action No. 1:22-cv-01372 |
| Plaintiff, | ) ) | |
| | ) | |
| v. | ) ) | |
| STEPHEN A. WYNN, | ) ) | |
| | ) ) | |
| Defendant. | ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S**
**MOTION TO DISMISS THE COMPLAINT**

### TABLE OF CONTENTS

INTRODUCTION .................................................................................................1

BACKGROUND ...................................................................................................3

    A.    Statutory background .............................................................................3

    B.    Factual background ...............................................................................4

    C.    Procedural background .........................................................................7

STANDARD OF REVIEW ...................................................................................7

ARGUMENT .......................................................................................................8

    A.    Civil enforcement actions under FARA can be brought after the conclusion of an agency relationship ..............................................................................................8

        1.    *McGoff* does not foreclose civil enforcement actions after an agency relationship has terminated.......................................................................................9

        2.    FARA's legislative history supports allowing the Government to seek injunctive relief addressing past conduct .................................................................13

        3.    Requiring Defendant to register would uphold the purpose of FARA ...........................14

    B.    Requiring Defendant to register under FARA would not violate his Fifth Amendment rights ....................................................................................................16

    C.    Requiring Defendant to register under FARA would not violate Defendant's First Amendment rights ...........................................................................................21

        1.    Courts have repeatedly held that FARA comports with the First Amendment ..............21

        2.    FARA registration requires only the disclosure of factual, non-controversial information and does not require affirmation of a Government-dictated message or a statement of opinion or ideological belief ...........................................................................24

        3.    FARA's registration requirement survives more exacting scrutiny because the Government has a compelling interest in disclosure and the registration obligation is narrowly tailored to fulfill that interest ............................................................28

        4.    Defendant's proposed alternatives to FARA registration are not viable ........................30

    D.    By alleging that Defendant acted at the request of the PRC and Sun when he lobbied government officials, the Complaint sufficiently alleges that Defendant engaged in political activities on behalf of foreign principals ...............................................31

        1.    The Complaint sufficiently alleges that Defendant formed an agency relationship with Sun and the PRC by acting at their request......................................................32

        2.    The legislative history and other interpretive documents for FARA do not support Defendant's reading of agency .........................................................................36

        3.    Defendant's repeated lobbying of government officials on behalf of the PRC to seek the return of a PRC businessperson constitutes "political activities" under FARA ..............39

**APP. 100**

    4.     In the alternative, the Court should grant the Government leave to amend its Complaint ...…..........................................................................................................................41

  E.     The Court should not look beyond the four corners of the Complaint to resolve Defendant's motion ..........................................................................................................41

**CONCLUSION**...............................................................................................................42

**APP. 101**

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Albertson v. Subversive Activities Control Bd.*,
    382 U.S. 70 (1965) ................................................................ 20

*Anderson v. Holder*,
    647 F.3d 1165 (D.C. Cir. 2011) .......................................... 16

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .............................................................. 39

*Attorney Gen. v. Irish N. Aid Comm.*,
    668 F.2d 159 (2d Cir. 1982) ............................ 34, 35, 36, 37

*Attorney Gen. v. Irish People, Inc.*,
    595 F. Supp. 114 (D.D.C. 1984) ........................................ 35

*Attorney Gen. v. Irish People, Inc.*,
    796 F.2d 520 (D.C. Cir. 1986) .............................. 35, 36, 37

*Attorney Gen. v. Irish N. Aid Comm.*,
    346 F. Supp. 1384 (S.D.N.Y. 1972) ...................... 25, 30, 31

*Attorney Gen. v. Irish People, Inc.*,
    684 F.2d 928 (D.C. Cir. 1982) ............................................ 30

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .......................................................... 8, 39

*California v. Byers*,
    402 U.S. 424 (1971) ........................................................ 21, 22

*Cohen v. United States*,
    650 F.3d 717 (D.C. Cir. 2011) ............................................ 36

*Davis v. FEC*,
    554 U.S. 724 (2008) .............................................................. 29

*Doe v. United States*,
    487 U.S. 201 (1988) .............................................................. 18

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005) ................................................................ 7

*FDIC v. First Interstate Bank of Denver, N.A.*,
    937 F. Supp. 1461 (D. Colo. 1996) .............................. 38, 41

iii

**APP. 102**

*FEC v. Christian Coalition,*
    965 F. Supp. 66 (D.D.C. 1997) ........................................................... 18

*Full Value Advisors, LLC v. SEC,*
    633 F.3d 1101 (D.C. Cir. 2011) ........................................................... 29

*Hoffman v. United States,*
    341 U.S. 479 (1951) ........................................................................... 18

*Johanns v. Livestock Marketing Ass'n,*
    544 U.S. 550 (2005) ........................................................................... 26

*Kasten v. Saint Gobain Performance Plastics Corp.,*
    563 U.S. 1 (2011) ............................................................................... 11

*Leary v. United States,*
    395 U.S. 6 (1969) ........................................................................... 21, 22

*Marchetti v. United States,*
    390 U.S. 39 (1968) ......................................................................... 21, 22

*McDonnell v. United States,*
    579 U.S. 550 (2016) ....................................................................... 36, 37

*Meese v. Keene,*
    481 U.S. 465 (1987) ................................................................. *passim*

*Morales v. Daley,*
    116 F. Supp. 2d 801 (S.D. Tex. 2000) ................................................ 29

*Mount Vernon Mortg. Corp. v. United States,*
    236 F.2d 724 (D.C. Cir. 1956) ........................................................... 11

*Nat'l Ass'n of Mfrs. v. SEC,*
    800 F.3d 518 (D.C. Cir. 2015) ........................................................... 27

*Nat'l Ass'n of Mfrs. v. Taylor,*
    582 F.3d 1 (D.C. Cir. 2009) ........................................................... 29, 30

*Office of Pers. Mgmt. v. Richmond,*
    496 U.S. 414 (1990) ........................................................................... 40

*Riley v. Nat'l Fed. of the Blind v. N. Carolina,*
    487 U.S. 781 (1988) ........................................................................... 27

*Rumsfeld v. Forum for Acad. and Inst. Rights, Inc.,*
    547 U.S. 47 (2006) ............................................................................. 27

*Setser v. United States,*
    566 U.S. 231 (2012) ........................................................................... 34

iv

*Sickle v. Torres Advanced Enter. Sols., LLC,*
    884 F.3d 338 (D.C. Cir. 2018) ................................................................. 41

*Sparrow v. United Air Lines, Inc.,*
    216 F.3d 1111 (D.C. Cir. 2000) ................................................................. 7

*Steel Co. v. Citizens for Better Env't,*
    523 U.S. 83 (1998) ................................................................................... 15

*United States v. Arnold,*
    740 F.3d 1032 (5th Cir. 2014) ............................................................ 28, 29

*United States v. City of Palm Beach Gardens,*
    635 F.2d 337 (5th Cir. 1981) .................................................................... 11

*United States v. Craig,*
    401 F. Supp. 3d 49 (D.D.C. 2019) ...................................................... 3, 16

*United States v. Harriss,*
    347 U.S. 612 (1954) ................................................................................. 30

*United States v. Hubbell,*
    530 U.S. 27 (2000) ................................................................................... 20

*United States v. McGoff,*
    831 F.2d 1071 (D.C. Cir. 1987) ......................................................*passim*

*United States v. Peace Info. Ctr.,*
    97 F. Supp. 255 (D.D.C. 1951) ........................................... 19, 22, 25, 31

*United States v. Rafiekian,*
    991 F.3d 529 (4th Cir. 2021) .................................................................... 34

*United States v. Schmidt,*
    816 F.2d 1477 (10th Cir. 1987) ............................................................... 19

*United States v. Sindel,*
    53 F.3d 874 (8th Cir. 1995) ................................................................ 28, 29

*United States v. Stirling,*
    571 F.2d 708 (2nd Cir. 1978) .................................................................. 21

*United States v. Woods,*
    571 U.S. 31 (2013) ................................................................................... 34

*Viereck v. United States,*
    318 U.S. 236 (1943) ................................................................................. 25

*W. Va. State Bd. of Educ. v. Barnette,*
    319 U.S. 624 (1943) ................................................................................. 26

APP. 104

*Wood v. Moss*,
    572 U.S. 744 (2014) ................................................................................ 7

*Wooley v. Maynard*,
    430 U.S. 705 (1977) .............................................................................. 26

*Yates v. United States*,
    574 U.S. 528 (2015). ....................................................................... 36, 37

**Statutes**

22 U.S.C. § 611 .................................................................................... *passim*

22 U.S.C. § 612 .................................................................................... *passim*

22 U.S.C. § 616 ................................................................................... 16, 22

22 U.S.C. § 618 .................................................................................... *passim*

Lobbying Disclosure Act of 1995,
    Pub. L. No. 104-65, 109 Stat. 691 (1995) ........................................... 22


**Other Authorities**

28 C.F.R. § 5.205 ...................................................................................... 17

Eugene Volokh, *The Law of Compelled Speech*, 97 Tex. L. Rev. 355 (2018) ........................... 28

Federal Rule of Civil Procedure 12(b)(6) ................................................... 7

Federal Rule of Civil Procedure 15(a)(2) .................................................. 43

H.R. Rep. No. 89-1470 (1966) ................................................................. 38

*Audit of the Nat. Security Division's Enforcement and Admin. of the Foreign Agents
    Registration Act*, Office of the Inspector General (Sept. 2016), *available at*
    https://oig.justice.gov/reports/2016/a1624.pdf .......................................... 39

U.S. Department of Justice, FARA Unit (May 2020), *available at*
    https://www.justice.gov/nsd-fara/page/file/1279836/download ...................... 38, 39

**APP. 105**

**INTRODUCTION**

For at least several months in 2017, Defendant Stephen A. Wynn ("Defendant") helped the People's Republic of China ("PRC") and Sun Lijun ("Sun"), the then-Vice Minister of Public Security for the PRC, try to effectuate the removal of a PRC businessperson from the United States to the PRC. Defendant was recruited to join this effort by other U.S. citizens who were aware of Defendant's political connections, and the PRC communicated requests for Defendant's assistance either through those same individuals or directly in conversations between Sun and Defendant. In response to the PRC's requests, Defendant made multiple attempts to lobby high-level officials in the Administration of then-President Donald J. Trump, including the former President. These efforts involved providing documents to the former President's secretary; meeting on multiple occasions with high-level officials at the National Security Council and the White House, including the Chief of Staff; and speaking directly with the former President about the PRC's request, including once in person at a formal White House dinner and once in a phone call that Defendant made from a yacht off the coast of Italy. Defendant's actions on behalf of the PRC came at a time when he was preparing to renegotiate the licenses held by his business to operate casinos in Macau.

Once apprised of this conduct, the U.S. Department of Justice notified Defendant that he may be obligated to register under the Foreign Agents Registration Act ("FARA"). In May 2018, following discussions between Department of Justice officials and counsel for Defendant, the Department informed Defendant that it had determined that his conduct qualified him as a foreign agent under FARA and that he was therefore required to register. Defendant challenged this conclusion, and, despite further discussions between Department of Justice officials and Defendant's counsel, Defendant still has not registered. Accordingly, in May 2022, the

1

Government initiated the instant lawsuit, seeking an order to compel Defendant to comply with his registration obligation under the statute.

Defendant now seeks dismissal of the Government's suit, raising four challenges to the Complaint. None of these challenges has any merit. First, relying on a misreading of D.C. Circuit court precedent, Defendant seeks to cabin the Government's authority to bring civil enforcement suits to only the time before an agency relationship is terminated. This argument misconstrues the precedent on which Defendant relies, which applied only to criminal prosecutions, and would significantly narrow civil enforcement authority under FARA in a manner that would be plainly contrary to the purpose of the statute. Second, Defendant claims that being required to register would violate his Fifth Amendment right against self-incrimination, but he fails to meet his burden to establish that such a right is implicated in this case based on Defendant's disagreement with the Government about the legal significance of his actions.

Nor does Defendant's third argument—a First Amendment challenge to FARA's registration requirement—serve as a basis for dismissal. FARA registration imposes no restraint on free expression, and the registration and labeling requirements under the Act are narrowly tailored to satisfy the statute's vital interest to ensure that the public is sufficiently informed about agents of foreign principals and their activities in this country. Fourth and finally, Defendant's challenge to the sufficiency of the Complaint should be rejected. The Complaint sufficiently alleges that Defendant acted "at the request" of the PRC and Sun in a manner that is consistent with circuit court precedent, FARA's legislative history, and the Government's interpretive guidance. Furthermore, the allegations in the Complaint that Defendant lobbied high-level U.S. government officials at the request of a foreign government are more than

APP. 107

sufficient to allege that Defendant engaged in political activities.  For all of these reasons,

Defendant's motion should be denied.

## BACKGROUND

### A.     Statutory background

The Foreign Agents Registration Act of 1938, as amended, 22 U.S.C. §§ 611-621

("FARA" or "the Act"), requires that agents of a foreign principal register with the Attorney

General and make certain disclosures in registration filings concerning their agency relationships

and activities undertaken within the United States on behalf of their respective foreign principals.

22 U.S.C. § 612(a).  Among the chief purposes of FARA is to "prevent covert influence over

U.S. policy by foreign principals."  *United States v. Craig*, 401 F. Supp. 3d 49, 54 (D.D.C.

2019).  "Simply put, the statute ensures that the public is informed of the true source or sponsor

behind the information being disseminated for its consideration."  *Id*.

"The scope of persons subject to FARA is broad," *see United States v. McGoff*, 831 F.2d

1071, 1074 (D.C. Cir. 1987), and the standard for determining when an agency relationship

exists consists of two parts.  First, a person must "act[] as an agent, representative, employee, or

servant" or "in any other capacity at the order, request, or under the direction or control" of a

foreign principal or the intermediary of a foreign principal.  22 U.S.C. § 611(c)(1).  Second, the

person must undertake certain types of activities within the United States on the foreign

principal's behalf, including, most relevant here, political activities.  *Id*. § 611(c)(1)(i).  FARA

defines "political activities" to mean activities that the agent either believes will, or actually

intends to, "in any way" influence U.S. government officials or a section of the U.S. public

regarding U.S. domestic or foreign policies or the political or public interests, policies, or

relations of a foreign government or foreign political party.  *Id*. § 611(o).

3

Persons who qualify as agents of one or more foreign principals under FARA are required to submit a registration statement with the Attorney General within ten days of the start of the relationship.  *Id*. § 612(a).  FARA prescribes that certain information be included in the registration statement, *id*. § 612(a)(1)-(11), and supplements must be filed at six-month intervals, *id*. § 612(b).  Persons who willfully violate the registration requirements or any other provision of the Act are subject to criminal prosecution.  *Id*. § 618(a), (e).  The Attorney General is also authorized to bring suit seeking appropriate injunctive relief, including "an order requiring compliance with any appropriate provision" of the statute or accompanying regulations.  *Id*. § 618(f).

## B.   **Factual background**

As alleged in the Complaint, Defendant acted as an agent of two foreign principals: Sun, the former Vice Minister for Public Security in the PRC, and the PRC itself.  Compl., ECF No. 1, ¶ 1.  Specifically, at the request of Sun, and on behalf of the PRC, Defendant conveyed to former President Trump and his Administration ("the Administration") the PRC's request to remove from the country a PRC businessperson who had sought political asylum in the United States. *Id.* ¶ 2.  In so doing, from at least June 2017 through at least August 2017, Defendant acted as an agent for foreign principals Sun and the PRC and engaged in political activities on their behalf in the United States.  *Id.*

Defendant is a U.S. citizen, real estate developer, and businessperson who has owned multiple casinos and resorts, including three casino properties located in Macau, which is a special administrative region of the PRC.  *Id.* ¶ 8.  Defendant also served as the Republican National Committee ("RNC") finance chair from January 2017 through January 2018.  *Id.* ¶ 17. In that role, Defendant met Elliot Broidy, a former finance chair of the RNC.  *Id.* ¶¶ 16-17.

4

**APP. 109**

In approximately June 2017, Broidy, on behalf of Sun, elicited Defendant's help with conveying the PRC's request to cancel the visa or otherwise remove the PRC businessperson from the United States. *Id.* ¶¶ 16-17. Broidy provided Defendant with the PRC businessperson's passport photos, an Interpol red notice, and links to various news articles about the PRC businessperson. *Id.* ¶ 19. Broidy believed that Defendant's RNC experience, combined with Defendant's business dealings in the PRC and friendship with the then-President, would be helpful in getting access to Administration officials. *Id.* ¶ 17.

Defendant spoke by telephone with Sun at least eight times from approximately June 2017 through at least August 2017. *Id.* ¶ 23. These calls varied in length but lasted approximately thirty minutes on average. *Id.* Sun requested Defendant's assistance with seeking the removal of the PRC businessperson, having his new visa application denied, and having him placed on the No Fly List. *Id.* ¶¶ 20-21. Defendant mentioned his business interests in Macau to Sun on multiple calls. *Id.* ¶ 23.

Defendant agreed to raise the matter with the then-President and Administration officials. *Id.* ¶ 20. During a dinner on or about June 27, 2017 with the former President and other Administration officials in Washington, D.C., Defendant conveyed the PRC's desire to have the PRC businessperson removed from the United States and provided the PRC businessperson's passport photos to the then-President's secretary. *Id.* ¶ 22. After the dinner, Broidy informed Defendant by text that Sun was "extremely pleased and said that President Xi Jinping appreciates [Defendant's] assistance." *Id.* ¶ 22.

In addition, between approximately June 2017 and August 2017, Defendant contacted multiple Administration officials about the PRC businessperson, including senior officials on the National Security Council ("NSC") and at the White House. *Id.* ¶ 25. For example, during one

**APP. 110**

late July 2017 meeting with the White House Chief of Staff and two senior NSC officials,

Defendant stated that PRC officials had contacted him and advised him that "they were very

interested in having" the PRC businessperson returned to China. *Id.* ¶ 25. In or around August

2017, Defendant on multiple occasions visited the White House in person to have what appeared

to be unscheduled meetings with the then-President; some of these discussions, including a

meeting on August 25, 2017, concerned the PRC businessperson. *Id.* ¶ 25. Further, on August

19, 2017, Broidy and Defendant called the then-President from Broidy's yacht during a trip off

the coast of Italy. *Id.* ¶ 25. During that call, Defendant asked the then-President about the PRC

businessperson's status, and the then-President responded that he would look into the matter. *Id.*

Sun continued to contact Defendant through approximately October 2017, at which point

Defendant informed Sun that he had made U.S. government officials aware of the request, that

Defendant was not able to provide any more assistance, and that Sun should stop contacting him.

*Id.* ¶ 27. Defendant wanted to exit the situation gracefully, preserve his business interests in

China, and avoid offending anyone. *Id.* The efforts by Defendant and others to have the PRC

businessperson removed ultimately were unsuccessful. *Id.* ¶ 26.

Defendant's conduct was motivated by his desire to protect his business interests in the

PRC. *Id.* ¶ 28. In an undated text message, Defendant wrote to a person whom Defendant

believed to be Sun's assistant:

> [a]t this point, as a private citizen, I believe I have exhausted the advantages of my
> position. If there is any other aspect of this situation [sic] may occur to you going
> forward, I would of course be anxious to help. I remain grateful for the privilege of
> being part of the Macau and PRC business community.

*Id.* According to public reporting, in 2016, shortly before the conduct described above occurred,

the Macau government restricted the number of gaming tables and machines that Defendant's

casino could operate. *Id.* ¶ 29. Also according to public reporting, Defendant was scheduled to

**APP. 111**

renegotiate his licenses to operate casinos in Macau in 2019, subsequent to the conduct described above. *Id.*

## C.   Procedural background

The Government filed suit in this case on May 17, 2022 seeking two types of relief:  (1) a declaratory judgment stating that Defendant has an obligation to register for conduct undertaken on behalf of Sun and the PRC, and (2) a permanent injunction requiring Defendant to file a registration statement and any necessary supplements pursuant to § 612(a).  *Id.*, Prayer for Relief.  On July 18, 2022, Defendant filed a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), raising statutory and constitutional challenges to the Complaint.  *See generally* Def.'s Mem. of Law in Supp. of Mot. to Dismiss the Complaint ("Def.'s Mot."), ECF No. 11-1.  Through this filing, the Government now responds to that motion.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In reviewing such a motion, a court must "treat the complaint's factual allegations as true and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged."  *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (citations and internal quotation marks omitted).  These pleading rules are "not meant to impose a great burden upon a plaintiff."  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).  While the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level," a plaintiff may survive a Rule 12(b)(6) motion even if "recovery is very remote and unlikely."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).  A complaint must simply "contain sufficient factual

matter, accepted as true, to state a claim to relief that is plausible on its face." *Wood v. Moss*, 572 U.S. 744, 757-58 (2014) (citation omitted).

## ARGUMENT

None of the four bases for Defendant's motion warrants dismissal of this case.  First, the Government is permitted to bring civil enforcement actions after an agency relationship terminates.  This reading of the statute is consistent with D.C. Circuit court precedent, and to hold otherwise would severely undercut the Government's civil enforcement power under FARA.  Second, FARA registration does not implicate Defendant's rights under the Fifth Amendment.  Defendant fails to identify any past statement that would be contradicted by his registering, nor can his belief that he is not required to register—a statement of opinion, not fact—serve as a valid basis for a Fifth Amendment objection.  Third, Defendant's First Amendment rights are similarly not implicated by FARA registration.  Any burden on expression imposed by registering is minor, and any such imposition is narrowly tailored to further the goal of informing the public about the activities of foreign agents in this country.  Fourth, the Complaint sufficiently alleges that Defendant acted "at the request" of two foreign principals so as to give rise to an agency relationship for purposes of FARA.  Defendant's conduct as described in the Complaint—lobbying officials at the highest level of the U.S. Government on behalf of a foreign power—easily qualifies as political activities.  Having failed to raise any valid basis for dismissal, Defendant's motion should be denied.

## A.   Civil enforcement actions under FARA can be brought after the conclusion of an agency relationship

Defendant contends that, under FARA, the obligation of an agent of a foreign principal to register ceases upon termination of the agency relationship.  According to Defendant, because any agency relationship that may have existed between him and the PRC ended in October 2017,

the Government cannot now bring suit seeking an injunction compelling him to register.  Under

this logic, the only valid civil enforcement action that the Government could bring under FARA

is one in which it files suit and obtains judgment in the five-month window in which Defendant

engaged in registerable activity.

FARA, however, contains no restraints on when the Government can pursue civil

enforcement actions.  The statute expressly states that "termination of [agency] status shall not

relieve such agent from his obligation to file a registration statement for the period during which

he was an agent of a foreign principal."  22 U.S.C. § 612(a).  This provision was specifically

added to the statute to address the concern that those subject to FARA "were attempting to evade

the Act's requirements by ceasing their activities and claiming as an affirmative defense that

withdrawal from an agency relationship automatically eliminated liability for failure to file."

*McGoff*, 831 F.2d at 1087.  And retrospective enforcement actions are consistent with the long-

standing rule that the Government is not time-limited when seeking equitable relief to enforce its

rights.  *See, e.g.*, *United States v. Summerlin*, 310 U.S. 414, 416 (1940); *FEC v. Christian Coal.*,

965 F. Supp. 66, 71 (D.D.C. 1997).

Defendant nevertheless now seeks this Court's blessing to do precisely what Congress

sought to disallow:  evade his statutory obligation to register for the work he undertook on behalf

of Sun and the PRC by declaring that he is no longer acting as a foreign agent.  For the following

reasons, the Court should reject that argument.

    1.  <u>*McGoff* does not foreclose civil enforcement actions after an agency relationship has
        ended</u>

Defendant relies almost entirely on the D.C. Circuit's decision in *McGoff* interpreting

FARA for purposes of a criminal prosecution, but that case does not compel dismissal of the

instant action.  There, the Government charged the defendant for failing to register as an agent of

**APP. 114**

the government of South Africa based on conduct that predated the criminal information by more than seven years.  *McGoff*, 831 F.2d at 1072.  Specifically, the Government alleged that the defendant's failure to register violated 22 U.S.C. § 612(a), which requires persons meeting the definition of agent of a foreign principal to file registration statements, as well as 22 U.S.C. § 618(e), which makes it a continuing criminal offense to fail to register under FARA.  *Id.* Based on its reading of the relevant statutory language and legislative history, the majority concluded that the statute of limitations for a continuing offense under § 618(e) begins to run on the last day a person acts as an agent of a foreign principal.  *Id.* at 1071.

Defendant relies almost entirely on two pieces of dicta in the majority opinion's analysis. First, the majority commented that "it appears that the statutory obligation to file expires when the agent ceases activities on behalf of the foreign principal," reasoning that "once an individual has ceased his activities, he is no longer an 'agent of a foreign' principal within the meaning of FARA."  *Id.* at 1082.  Second, in furthering construing FARA's statutory text, the majority stated that "FARA does not evince an antiquarian interest on Congress'[s] part; FARA's focus is on the here and now."  *Id.*

Neither of these passing references, however, was outcome-determinative or otherwise central to the holding in *McGoff*.  In fact, the majority offered the passages cited by Defendant as one possible reading of § 612(a) before ultimately concluding that the provision is "ambiguous." *Id.* at 1083.  In the end, the majority's holding in the case rested not on its interpretation of the text of § 612(a) but its review of the legislative history for that provision.  *Id.* at 1089 (concluding that § 612(a) was added "for the specific purpose of causing the statute of limitations to commence on the day the agency relationship terminated").  Given its conclusion

10

**APP. 115**

that the text of § 612(a) is ambiguous, the majority did not embrace the phrasing cited by

Defendant as the definitive interpretation.

      *McGoff*, furthermore, was focused on the narrow question of when the statute of

limitations for a continuing offense charge under § 618(e) begins to run, not on whether

retrospective civil enforcement actions could be brought.  The majority's central concern with

the Government's interpretation of § 618(e) was that "it would virtually eliminate the statute of

limitations for failure to file under FARA," *id*. at 1093, an outcome the majority described as

being "unusual," "remarkable," "draconian," and a "bold step" for criminal prosecutions, *id*. at

1090.  Civil enforcement actions, however, are authorized by a separate statutory provision.  *See*

22 U.S.C. § 618(f).  And whereas it is "unusual" for criminal prosecutions not to be bound by a

statute of limitations—in matters reserved for only "the most heinous crimes known to our law,"

*McGoff*, 831 F.2d at 1093—that same constraint does not exist for civil enforcement actions, *see*

*Mount Vernon Mortg. Corp. v. United States*, 236 F.2d 724, 725 (D.C. Cir. 1956) (holding that

statutes of limitations do not apply where the United States brings suit "to enforce a public

right"); *accord United States v. City of Palm Beach Gardens*, 635 F.2d 337, 339 (5th Cir. 1981)

("[C]ourts have long held that the United States is not bound by any limitations period unless

congress explicitly directs otherwise.").  The concern about imposing a stopping point on the

Government's ability to bring prosecutions is not present in a civil enforcement proceeding.

      Considerations unique to criminal prosecutions undergird the *McGoff* majority's opinion

elsewhere.  The majority, for instance, made multiple references to how its analysis was

influenced by considerations specific to the criminal context.  *See McGoff*, 831 F.2d at 1077 ("*In

the criminal context*, courts have traditionally required greater clarity in draftsmanship than in

civil contexts . . . ." (emphasis added)); *id*. ("[T]he law of crimes must be clear.  There is less

room in a statute's regime for flexibility . . . ."); *id*. at 1084 n.22 ("We owe, of course, no deference to the Government's construction of a *criminal statute*").  It further emphasized this point at the conclusion of the majority opinion, noting that its "holding finds solid support in the well-established principle of interpretation of *criminal statutes* known as the rule of lenity."  *Id*. at 1095 (emphasis added).  That rule provides that any ambiguity in criminal statutes should be resolved in favor of lenity and, as the majority explained, counseled in favor of the defendant's reading of § 618(e).  *Id*. at 1095-96.  But the rule applies only to the interpretation of criminal statutes, or to a statutory provision with both criminal and noncriminal application.  *See Kasten v. Saint Gobain Performance Plastics Corp.*, 563 U.S. 1, 16 (2011).  It thus has no bearing on the interpretation of § 618(f) and whether that provision allows the Government to bring an enforcement action to compel registration where the agency relationship may have ceased.  *See McGoff*, 831 F.2d at 1094 n.32 (declining to adopt the dissent's view that the majority ruling precludes the Government's ability to bring civil enforcement actions).  None of special considerations specific to criminal prosecutions relied upon by the majority are present where the Government exercises its civil enforcement authority.

These considerations also animated the majority's discussion of the purpose of FARA in *McGoff*.  As described by the majority, "Congress'[s] fundamental purpose . . . was not to punish foreign agents for the activities described in the statute."  *Id*. at 1093-94.  Instead, Congress's goal "was to compel disclosure to permit evaluation of these activities," a goal Congress "further stressed" by adding a civil enforcement mechanism to the statute.  *Id*. at 1094.  Unlike the criminal prosecution at issue in *McGoff*, which sought to "punish" the defendant for engaging in conduct that required registration under the statute, the Government's aim in the instant lawsuit is plainly consistent with the central goal of FARA:  to compel disclosure to allow government

12

officials as well as the public to evaluate Defendant's activities.  That remains true even where

that disclosure occurs years after the agency relationship has ceased to exist:  disclosing the

existence of a previously unidentified agency relationship will still affect how government

officials and the public view policy decisions influenced by that foreign agent.  Unlike in a

criminal prosecution, the Government's reliance on § 618(f) in this case fits squarely within

FARA's central aim of promoting public awareness.

2.  <u>FARA's legislative history supports allowing the Government to seek injunctive relief addressing past conduct</u>

Equally without merit is Defendant's contention that FARA's legislative history supports

his narrow reading of the statute.  *See* Def.'s Mot. at 11.  Defendant principally focuses on one

reference in the majority opinion's analysis of the legislative history in which the majority

observes that, had Congress intended to eliminate any statute of limitations for FARA criminal

prosecutions, it would have done so in a more obvious fashion than what the historical record

shows.  *McGoff*, 831 F.2d at 1090.  But this passage has no bearing on a civil lawsuit under

FARA seeking injunctive relief because such suits are not governed by the criminal statute of

limitations at issue in *McGoff*.

In fact, *McGoff*'s discussion of FARA's legislative history leaves no doubt that Congress

intended for the Government's ability to enforce FARA to survive the cessation of an agency

relationship.  As noted by the majority, a core concern motivating Congress was that "individuals

subject to FARA were attempting to evade the Act's requirements by ceasing their activities and

claiming as an affirmative defense that withdrawal from an agency relationship automatically

eliminated liability for failure to file."  *Id*. at 1087.  Congress amended § 612(a) in 1950 at the

request of the Department of Justice by adding that "termination of such [agency] status shall not

relieve such agent from his obligation to file a registration statement for the period during which

13

**APP. 118**

he was an agent of a foreign principal," and it did so specifically to "eliminate[] as an affirmative defense the argument that the agency relationship had ended and so too had the reporting obligation." *Id*. at 1087-88.  The outcome Defendant seeks in this case—to immunize himself from a civil enforcement action by virtue of having terminated his agency relationship—would be directly contrary to the purpose of the 1950 amendments, as recognized in *McGoff*. *See id*. at 1089 n.27 ("Our interpretation vindicates the express purpose [of § 612] which was to . . . foreclose an agent from cutting off liability for failing to comply with FARA's registration requirements by simply terminating the agency . . . .").

   3.   Requiring Defendant to register would uphold the purpose of FARA

   As a final matter, Defendant's claim that his interpretation of *McGoff* is consistent with the purpose of FARA is likewise unavailing.  Defendant suggests that the broader purpose of FARA is concerned only with the present and "evaluat[ing] an agent's political speech and activities contemporaneously in their proper context." *See* Def.'s Mot. at 12.  Such a constrained reading of the statute would collapse the Government's enforcement authority:  FARA enforcement actions could be brought only where a person is about to violate or is presently violating the statute, and such persons would be able to escape registration by terminating their agency relationship at any time, including after the Government files suit.  It is a dubious proposition that Congress intended to give the Government civil enforcement authority, only to have it be subject to such easy evasion.

   Defendant is also mistaken that any disclosures he purportedly made to government officials satisfies the purpose of FARA.  *See id*. ("Wynn contemporaneously disclosed to U.S. government officials that he was conveying a message from the PRC, allowing the U.S. officials to evaluate his activities in their proper context.").  Such a cramped reading of FARA accounts

14

only for disclosure to the listener and overlooks Congress's desire to make the broader public aware of the conduct of persons acting as agents on behalf of foreign principals. *See Meese v. Keene*, 481 U.S. 465, 480 (1987) ("Congress simply required [agents of foreign principals] to make additional disclosures that would better enable *the public* to evaluate the import of the[ir messages]." (emphasis added)); *Craig*, 401 F. Supp. 3d at 54 ("Simply put, the statute ensures that the public is informed of the true source or sponsor behind the information being disseminated for its consideration."). Congress's focus on public notification is further evidenced by 22 U.S.C. § 616, which requires the Attorney General to maintain a publicly available database consisting of information from registration statements filed with the Department of Justice. *See* 22 U.S.C. § 616(d).

Defendant's reliance on his purported self-disclosure also falls short of providing the full panoply of information required under the statute. Persons serving as agents of foreign principals must disclose multiple details about the scope and nature of the agency relationship beyond the mere existence of a qualifying relationship, 22 U.S.C. § 612(a)(1)-(11), as well as supplemental statements at six-month intervals updating certain of these categories of information, *id*. § 612(b). Registered agents, moreover, must file termination statements with the Department of Justice, and those statements must include sufficient information to allow a determination that an agent "has fully discharged all his obligations under the Act." 28 C.F.R. § 5.205(a)-(b). Defendant's selective representations to certain government officials about his relationship with the PRC cannot substitute for the statutorily required disclosures. The suggestion that the constitute an alternative way to fulfill the purpose of FARA is unfounded.

For similar reasons, Defendant also overreaches when asserting that his reading of § 612(a) is consistent with the prospective nature of injunctive relief. *See* Def.'s Mot. at 13.

Without knowing more details about the nature of Defendant's relationship with the PRC and Sun, the Government cannot be certain that Defendant has in fact ceased engaging in registerable conduct.  Having the information Defendant is required to provide in his registration statement, *see* 22 U.S.C. § 612(b), as well as the information contained in a termination statement, *see* 28 C.F.R. § 5.205(b), would put the Government in the best position to evaluate whether Wynn's relationship with Sun and the PRC truly ended in October 2017.  Even if it did, FARA still permit the Government to bring suit, for the reasons discussed above.  Notably, the statute is not alone in authorizing the Government to compel the disclosure of information that pertains to past conduct.  *See, e.g.*, *Anderson v. Holder*, 647 F.3d 1165, 1169 (D.C. Cir. 2011) (affirming district court judgment requiring parolee to register as a sex offender following passage of registration law that post-dated parolee's offense conduct by twelve years); *Christian Coalition*, 965 F. Supp. at 72 (denying motion to dismiss claim brought by the Federal Election Commission pertaining to conduct that had occurred five years prior).  The Government's suit seeking to compel Defendant to register is accordingly consistent with both the purpose of FARA and the use of injunctive relief more broadly.

## B.    Requiring Defendant to register under FARA would not violate his Fifth Amendment rights

Defendant next argues that requiring him to register under FARA would violate the Fifth Amendment because it would force him to "make a sworn public declaration, under penalty of perjury, that he acted as an agent of foreign principals Sun and the PRC" and "[t]hose sworn statements would directly contradict Wynn's prior sworn testimony and representations in his correspondence with DOJ."  Def.'s Mot. at 14-15.  As with Defendant's flawed reading of *McGoff*, this argument provides no justification for granting his motion.

16

APP. 121

Wynn has not met his burden of showing that any statement required by the registration form would in fact "directly contradict" any past statements he has made, and this failure dooms his Fifth Amendment claim.  To invoke the protections afforded by the Fifth Amendment, claimants must demonstrate that they have a "reasonable cause to apprehend danger" of providing information that would "support a conviction" or "furnish a link in the chain of evidence needed to prosecute" them for violating the law.  *Hoffman v. United States*, 341 U.S. 479, 486 (1951).  But Defendant is not excused from registering under FARA simply because "he declares that in so doing he would incriminate himself—his say-so does not of itself establish the hazard."  *Id*.  Rather, it is Defendant's burden to "factually establish that the risks of incrimination resulting from" completing a FARA registration form "to be 'substantial and 'real,' not merely trifling or imaginary, hazards of incrimination.'"  *See United States v. Schmidt*, 816 F.2d 1477, 1481 (10th Cir. 1987) (quoting *Marchetti v. United States*, 390 U.S. 39, 53 (1968)).

Defendant's motion falls well short of meeting this threshold burden.  Although Defendant contends that registering would "directly contradict" statements he made in correspondence with the Government, citing a June 8, 2018 letter from his counsel to the Department of Justice, *see* Def.'s Mot. at 15 (citing June 8, 2018 Letter from Reid H. Weingarten, Brian M. Heberlig, and Nicholas P. Silverman, to Jay I. Bratt, Heather H. Hunt, and Robert Wallace ("June 2018 Letter"), ECF No. 11-3), he fails to identify any statement in the 14-page letter that would be contrary to a representation he would be required to make as part of a FARA registration.  Even more specious is Defendant's assertion that registering would contradict prior sworn testimony that he has given.  *See* Def.'s Mot. at 16.  No such testimony is part of the record on Defendant's motion, so there is no way to assess what purported

17

**APP. 122**

contradiction exists—including whether it extends to the act of registering as a whole or only to certain statements called for by the registration form—or to otherwise evaluate the credibility of Defendant's claim.  Defendant has failed to meet his burden of demonstrating that there exists any potential conflict between his past statements and what he would be required to disclose as a FARA registrant.  His Fifth Amendment challenge to the Complaint should accordingly be denied.

Even if Defendant had identified one or more statements that he believed would conflict with any FARA registration filing, his Fifth Amendment challenge should still fail because the protections afforded by the privilege do not extend to his beliefs about the legal significance of his actions.  The right against self-incrimination exists "to resist compelled explicit or implicit disclosures of incriminating *information*" and "to prevent the use of legal compulsion to extract from the accused a sworn *communication of facts* which would incriminate" the accused.  *Doe v. United States*, 487 U.S. 201, 212 (1988) (emphasis added).  "[I]n order to be testimonial, an accused's communication must itself, explicitly or implicitly, relate *a factual assertion or disclose information*."  *Id*. at 210 (emphasis added); *see also United States v. Hubbell*, 530 U.S. 27, 34 n.8 (2000) ("It is consistent with the history of and the policies underlying the Self-Incrimination Clause to hold that the privilege may be asserted only to resist compelled explicit or implicit disclosures of incriminating *information*." (emphasis added)).

Here, Defendant's Fifth Amendment challenge is not based on any perceived conflict between disclosures in FARA registration materials and factual information previously provided to the Government.  Instead, it centers on the fact that Defendant previously expressed an opinion about the legal significance of his conduct.  *See* Def.'s Mot. at 14 ("Granting the government's requested relief would compel Wynn to act as a witness against himself and to

*state an opinion he does hold . . . .*" (emphasis added)); *id.* at 15 (noting that "Wynn disputed the

Department [of Justice]'s *analysis* in his June 8, 2018 letter" (emphasis added) (internal

quotation marks omitted)); *id.* at 7 ("[I]n August 2020, Wynn provided an interview and sworn

testimony during the criminal investigation of Broidy and others, in which he stated that *he*

*believed* he was acting in the interests of the United States, and not as an agent of Sun or the

PRC." (emphasis added)).  But Defendant's past statements about his opinion of whether he

should be required to register is not the type of factual information covered by the Fifth

Amendment and thus cannot serve as grounds for invoking the privilege.  Were that true, persons

under investigation for FARA violations could be immunized from any civil enforcement action

by simply opining to the Government that their conduct did not create a registration obligation.

Nor is it the case that, by registering, Defendant would be forced to convey a belief he does not

hold.  FARA registration in no way inhibits Defendant from continuing to express his belief that

he should not have been required to register.  *See Keene*, 481 U.S. at 481 (observing that FARA

registrants "may go beyond the disclosures required by statute and add any further information

they think germane" to the public's understanding of their activities).  Defendant's disagreement

with the Government about the legal significance of his actions does give rise to a Fifth

Amendment violation.

     More broadly, FARA's registration requirement in general does not infringe upon the

rights afforded by the Fifth Amendment.  No such conflict exists where the Government

mandates that the public to comply with an "essentially regulatory, not criminal" statute, where

"self-reporting is indispensable to its fulfillment," and where there are no "substantial hazards of

self-incrimination."  *California v. Byers*, 402 U.S. 424, 429-31 (1971) (rejecting Fifth

Amendment challenge to California state law requiring drivers of cars involved in accidents to

**APP. 124**

provide their names and addresses on the scene); *see also, e.g.*, *United States v. Stirling*, 571

F.2d 708, 727-28 (2nd Cir. 1978) (dismissing challenge to SEC stock reporting requirement),

*cert. denied*, 439 U.S. 824 (1978).  By contrast, laws do implicate the Fifth Amendment where

they target "a highly selective group inherently suspect of criminal activities."  *See Albertson v.*

*Subversive Activities Control Bd.*, 382 U.S. 70, 79 (1965) (invalidating on Fifth Amendment

grounds order of Subversive Activities Control Board requiring registration by members of

Communist-action organizations); *Marchetti*, 390 U.S. at 61 (holding that the Fifth Amendment

privilege afforded a complete defense to prosecutions for noncompliance with federal gambling

tax and registration requirements); *Leary v. United States*, 395 U.S. 6, 15, 27 (1969) (same for

law imposing transfer and occupational tax on marijuana dealers).

FARA's registration obligation fits comfortably within the parameters established in

*Byers*.  Rather than targeting a group of persons engaged in inherently criminal activity, FARA is

a statute of general applicability, and its purpose is to promote transparency, not to "facilitate

criminal convictions."  *See Byers*, 402 U.S. at 430.  Information gathered from the registration

statements, moreover, is indispensable to fulfilling FARA's purpose of promoting transparency.

The information collected from registration materials and supplementary filings is made publicly

available, *see* 22 U.S.C. § 616(a), (d), which allows the Government and public at large to "be

informed of the identity of such persons and . . . appraise their statements and actions in the light

of their associations and activities," *Keene*, 481 U.S. at 469; *see also Peace Info. Ctr.*, 97 F.

Supp. at 263 (denying Fifth Amendment challenge to FARA because the statute "does not

require the disclosure of any information except on a voluntary basis as a condition of carrying

on certain occupations or certain activities").  Unlike the statutes at issue in *Albertson*, *Marchetti*,

and *Leary*, FARA is not aimed at conduct that is criminalized by other federal or state statutes.

Acting as the agent of a foreign principal is not a crime, so long as the agent complies with the requisite registration requirements.

For all of these reasons, the Court should reject Defendant's Fifth Amendment challenge to the Complaint.[1]

## C.  Requiring Defendant to register under FARA would not violate Defendant's First Amendment rights

Just as FARA registration does not violate Defendant's Fifth Amendment rights, so too does it comport with the First Amendment.  FARA registration imposes no restriction on the ability of an agent to speak or otherwise act on behalf of a foreign principal, and it is designed to extract limited factual information from persons who act as foreign agents, as opposed to requiring such persons to disseminate government-sponsored statements of ideology.  But even under a more demanding standard of review, FARA registration still passes constitutional muster because the Government has a compelling interest in ensuring there is public disclosure about the work of foreign agents, and FARA's registration requirement is narrowly tailored to advance this interest.

### 1.  Courts have repeatedly held that FARA comports with the First Amendment

In the decades since it was passed, FARA has been subject to multiple First Amendment challenges, none of which has succeeded.  In *Block v. Meese*, for example, the D.C. Circuit addressed a First Amendment claim brought by multiple individuals who wished to exhibit a film

---

[1] Even if the Court were to conclude that FARA registration implicates a foreign agent's Fifth Amendment rights, it would still not necessitate dismissal of a civil enforcement action. Where a valid Fifth Amendment claim exists, the Government should be given the option of continuing to pursue a civil enforcement action or providing some form of immunity to the registrant with respect to the past statements.

21

about nuclear war and two others about acid rain. *See* 793 F.2d at 1306. All three films were produced by the National Film Board of Canada ("NFBC"), an entity that served as an instrumentality of the Canadian government and used its New York office to disseminate the films in the United States. *Id*. As such, NFBC registered as an agent of a foreign principal, and certain of its films were deemed by the Department of Justice to constitute "political propaganda" under FARA.[2] *Id*. The plaintiffs sued to challenge the requirement under FARA that a registrant notify the Department of Justice within forty-eight hours of transmitting "political propaganda" as well as a statement identifying the places, times, and extent of the transmittal. *Id*. at 1307. In addition, the plaintiffs challenged a regulation requiring an agent to report the name of any individual or entity receiving more than 100 copies of material subject to FARA and to identify the theater, viewing dates, and estimated attendance whenever that material was a movie. *Id*. According to the plaintiffs, classifying the material as propaganda and requiring public disclosure of their names—as the exhibitors of the movies—infringed on their First Amendment rights. *Id*. at 1311.

The court dispensed with both claims. With respect to the reporting requirements, the court observed that the general objective of FARA is to disclose "to the public the nature and extent of agents' dissemination of foreign advocacy." *Id*. at 1316 (citation omitted). FARA's reporting obligation fulfills this purpose, the court continued, by disclosing those segments of society "which the foreign agent has been successful in reaching with his principal's message." *Id*. Underlying the plaintiffs' challenge, the court surmised, was a desire to *prevent* the

---

[2] Previously, FARA's definition of "political activities" at § 611(o) included reference to "the dissemination of political propaganda," which was defined by § 611(j). In 1995, Congress amended FARA to remove any reference to "political propaganda" in § 611(o) and to strike § 611(j) altogether. *See* Lobbying Disclosure Act of 1995, Pub. L. No. 104-65, § 9, 109 Stat. 691, 699 (1995).

dissemination of information and a desire that the "already extant public knowledge of their [film] exhibition [not] be any more widespread than necessary." *Id*. at 1317.  The Government's interest in ensuring public awareness about the reach of a foreign agent's message ultimately outweighed this concern.  *Id*. at 1317-18.

One year later, the Supreme Court in *Meese v. Keene* denied a First Amendment challenge to the "political propaganda" provision of FARA brought by a state legislator and attorney who sought to exhibit the same three Canadian films at issue in *Block*.  481 U.S. at 467. The plaintiff claimed that the statute violated his First Amendment rights by suggesting he was engaged in the dissemination of political propaganda, which he believed to be a pejorative term, and he sought to enjoin FARA's registration and labeling requirements.  *Id*. at 467-68.  In rejecting this claim, the Court reasoned that FARA "places no burden on protected expression" and did not prevent the plaintiff from accessing and exhibiting the Canadian films.  *Id*. at 480. The Court noted that instead of censoring the plaintiff, FARA simply requires persons subject to the Act "to make additional disclosures that would better enable the public to evaluate the import of" the information being disseminated.  *Id*.  Moreover, the Court observed that persons subject to FARA's requirements "may go beyond the disclosures required by statute" and convey any additional message they wish to express.  *Id*. at 481.  As such, FARA "recognizes that the best remedy for misleading or inaccurate speech . . . is fair, truthful, and accurate speech."  *Id*.

Although they do not squarely address FARA's registration requirement, *Keene* and *Block* should nevertheless guide the Court's analysis in this case.  Both cases recognized that any burdens that FARA imposes on free speech are minimal and that FARA promotes free speech by ensuring that the Government and the public have accurate information about agents disseminating information on behalf of foreign principals.  *See also Vireeck v. United States*, 318

**APP. 128**

U.S. 236, 251 (1943) (Black, J., dissenting) ("Resting on the fundamental constitutional principle

that our people, adequately informed, may be trusted to distinguish between the true and the

false," FARA is intended to ensure that "hearers and readers may not be deceived by the belief

that the information comes from a disinterested source.  *Such legislation implements rather than*

*detracts from the prized freedoms guaranteed by the First Amendment*." (emphasis added)).  This

Court should similarly affirm the constitutionality of FARA's registration requirement.

 2. <u>FARA registration requires only the disclosure of factual, non-controversial</u>
 <u>information and does not require affirmation of a government-dictated message or a</u>
 <u>statement of opinion or ideological belief</u>

Defendant's First Amendment challenge is premised on the mistaken belief that

registering under FARA requires him "to speak a particular government-dictated message."

Def.'s Mot. at 17.  According to Defendant, filling out a registration form would force him "to

state an opinion he does not hold" because it requires him to, among other things, identify every

foreign principal for whom he has agreed to act and provide certain details about that agency

relationship.  *Id*. at 14 (citing U.S. Department of Justice Registration Statement, Pursuant to the

Foreign Agents Registration Act of 1938, as amended, ECF. No. 11-4, at 3).  But because

FARA's registration requirement makes no demand that Defendant communicate a government-

sponsored message, any burden imposed it imposes is at most minimal.

The Supreme Court has long recognized that "the First Amendment does not leave it

open to public authorities to compel a person to utter a message with which he does not agree."

*Johanns v. Livestock Marketing Ass'n*, 544 U.S. 550, 557 (2005) (citation and internal brackets

and quotation marks omitted).  Consistent with this principle, the Court invalidated a state law

mandating participation by public school students in a daily recitation of the pledge of allegiance

and flag salute, concluding that no government official "can prescribe what shall be orthodox in

politics, nationalism, religion, or other matters of opinion . . . ." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).  In a separate case, the Court held that it would be unconstitutional to force a person "to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable" by being required to serve as a "mobile billboard for the State's ideological message." *Wooley v. Maynard*, 430 U.S. 705, 715 (1977) (internal quotation marks omitted) (invalidating state law requiring display of the state motto on non-commercial license plates).

FARA registration, which seeks only basic information about "the nature of [foreign agents'] business and their political activities," *Keene*, 481 U.S. at 469, presents none of these same concerns.  Like any registrant, Defendant is required to complete a six-page form asking for factual information about the parties to the agency relationship, including names, addresses, citizenship, and corporate structure.  *See* ECF No. 11-4 at 1-3.  The form also seeks information about the relationship between the agent and foreign principal, including what activities the agent has engaged in, any financial arrangements between the two, and whether the agent has disseminated any materials on behalf of a foreign principal.  *Id*. at 3-7.  These requirements apply "equally to agents of friendly, neutral, and unfriendly governments." *Keene*, 481 U.S. at 469-70.  Registration under FARA thus stands in stark contrast to laws compelling persons to disseminate a particular message in the government's preferred language.  *See, e.g.*, *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 530 (D.C. Cir. 2015) (holding that law requiring publicly traded companies to disclose publicly that their products were not "conflict free" violated the First Amendment, based in part on the fact that the government's message "was hardly factual and non-ideological" (internal quotation marks omitted)).  Nothing about FARA approaches a

requirement that a registrant affirm a government-sponsored view or convey a state-sponsored message.

Indeed, multiple courts have drawn a distinction between laws that compel disclosure of factual information and those that compel statements of opinion.  Although both types of compulsion are subject to scrutiny under the First Amendment, the former do not "dictate the content of the speech" and thus impose considerably less burdens on free speech than do laws that involve the government "telling people what they must say."  *See Rumsfeld v. Forum for Acad. and Inst. Rights, Inc.*, 547 U.S. 47, 61-62 (2006) (holding that law requiring the Department of Defense to deny federal funding to colleges and universities that prohibited military officials from accessing their campuses for recruiting purposes did not violate the First Amendment); *Riley v. Nat'l Fed. of the Blind v. N. Carolina*, 487 U.S. 781, 800 (1988) (noting that, "as a general rule," the government may itself disseminate information obtained from persons who file legally-required disclosure forms because it would involve communicating "the desired information to the public without burdening a speaker").  This reasoning applies with particular force where, as with FARA, the government regulation at issue requires the disclosure of information as part of a registration requirement or another type of important government function.  *See, e.g.*, *United States v. Arnold*, 740 F.3d 1032, 1035 (5th Cir. 2014) (holding that sex offender registry statute did not violate the First Amendment because it involved the government "conduct[ing] an essential operation of the government, just as it does when it requires individuals to disclose information for tax collection" (internal brackets and quotation marks omitted)); *United States v. Sindel*, 53 F.3d 874, 878 (8th Cir. 1995) (holding that requirement for individuals to submit information about cash transactions in excess of $10,000 to

26

the Internal Revenue Service did not require the plaintiff to "disseminate publicly a message with which he disagrees").[3]

Defendant characterizes FARA registration as constituting "a statement of opinion and ideological belief with which [Defendant] emphatically disagrees," Def.'s Mot. at 21, but this is not so. As the Court recognized in *Keene*, FARA does not prevent Defendant in any way from expressing his disagreement about the Government's conclusion regarding his agency status or otherwise voice his opinion. 480 U.S. at 481 (noting that disseminators of information subject to FARA's requirements "may go beyond the disclosures required by statute and add any further information they think germane to the public's" understanding of their agency relationship). The FARA registration form serves as a vehicle for Defendant to satisfy his legal obligation to disclose certain information to the Department of Justice, but it in no way requires Defendant to publicly state his agreement with the law—Defendant remains free to express his disagreement with FARA and its requirements, so long as he discloses the requisite factual information and otherwise complies with the statute.

Given this, FARA's registration requirement does not warrant a heightened standard of review. *See Full Value Advisors, LLC v. SEC*, 633 F.3d 1101, 1109 (D.C. Cir. 2011) (applying rational basis to compulsion of investment information divulged by a company to the SEC in the

---

[3] As First Amendment scholar Eugene Volokh has observed,

the constitutionality of such pure factual compulsions is particularly important because we are all routinely required to state various facts to the government. We have to tell federal and state income tax authorities how much money we make. We may have to register for the draft. We may have to answer census forms. We may have to report to the police certain crimes we witness.

Eugene Volokh, *The Law of Compelled Speech*, 97 Tex. L. Rev. 355, 380 (2018).

course of applying for confidential treatment).  Defendant's First Amendment challenge should

accordingly be denied without applying any further scrutiny.

> 3.  <u>FARA's registration requirement survives more exacting scrutiny because the
> Government has a compelling interest in disclosure and the registration obligation is
> narrowly tailored to fulfill that interest</u>

Even if the Court concludes that a higher standard of review applies in this case,

Defendant's First Amendment challenge should fail.[4]  Courts have repeatedly recognized that the

statute has a vital purpose of notifying the public about the nature and extent of the work an

agent performs on behalf of a foreign principal.  FARA's registration requirement—which does

nothing to prevent an agent from speaking and only seeks information about the agency

relationship—is a narrowly tailored means of accomplishing that compelling interest.

The purpose of FARA has always been linked to public disclosure.  As the Court in

*Keene* explained, in order to "protect the national defense, internal security, and foreign relations

of the United States," FARA requires "public disclosure by persons engaging in propaganda

activities and other activities for or on behalf of" foreign principals.  *Keene*, 481 U.S. at 469

(citation omitted).  Such disclosure allows "the Government and the people of the United States

[to] be informed of the identity of such persons and [] appraise their statements and actions in the

light of their associations and activities."  *Id.*; *accord Block*, 793 F.2d at 1316 (recognizing that

the purpose of FARA is to disclose "to the public the nature and extent of agents' dissemination

---

[4] For similar reasons described herein, FARA's registration requirement also survives exacting scrutiny.  Under that standard, "there must be a relevant correlation or substantial relation between the governmental interest and the information required to be disclosed, and the governmental interest must survive exacting scrutiny.  That is, the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights."  *Davis v. FEC*, 554 U.S. 724, 744 (2008) (citations and internal quotation marks omitted); *see also Nat'l Ass'n of Mfrs. v. Taylor*, 582 F.3d 1 (D.C. Cir. 2009) (finding that the disclosure statute survived even strict scrutiny).

of foreign advocacy").  Courts have consistently held that disclosure laws such as FARA serve a

compelling government purpose by keeping the public informed.  *See United States v. Harriss*,

347 U.S. 612, 626 (1954) (finding that the government has a "vital national interest" in providing

the public with information regarding lobbying efforts to influence public officials); *Nat'l Ass'n

of Mfrs.*, 582 F.3d at 16 (holding that Congress's interest in public awareness of the lobbying

efforts to influence the public decision-making process is sufficiently compelling to withstand

strict scrutiny).  There can be no doubt that the Government's interest is compelling where it

seeks to inform the public about persons acting within the United States on behalf foreign

interests.  *See Attorney Gen. v. Irish N. Aid Comm.*, 346 F. Supp. 1384, 1390 (S.D.N.Y. 1972),

*affirmed without opinion*, 465 F.2d 1405 (2d Cir.), *cert. denied*, 409 U.S. 1080 (1972) ("*INAC

I*"), 346 F. Supp. at 1390 (describing the Government's purpose in enacting FARA as "strong").

FARA's registration requirement is targeted to satisfy this compelling interest in public

disclosure.  As the court noted in *Block*, FARA enables the Government to collect sufficient

information to educate the public about foreign agents as well as the nature and scope of their

activities.  *Block*, 793 F.2d at 1316 ("[I]t is obvious that the objective [of the statute] cannot be

substantially achieved" if the Government fails to make public information about the reach of a

foreign agent's propaganda activities.).  Furthermore, no less intrusive means exists to obtain

information about the work agents undertake on behalf of their foreign principals.  Absent

Defendant registering and submitting the necessary paperwork, there is no way to ensure that the

public is fully informed about the extent of his efforts on behalf of the PRC and Sun.  Nor does

FARA registration burden Defendant's protected expression—it "neither prohibits nor censors"

his ability to speak.  *Keene*, 481 U.S. at 478.  And FARA compels only that information

necessary to understand the nature and duration of a relationship between an agent and a foreign principal.

Given the important Government interests advanced by FARA, and the fact that it does not burden free speech, it is not surprising that FARA has repeatedly been upheld in the face of First Amendment challenges.  *See Keene*, 481 U.S. 465; *Block*, 793 F.2d at 1315; *INAC I*, 346 F. Supp. at 1391 (holding that compelling agent's disclosure of books and records does not infringe on the First Amendment); *Peace Info. Ctr.*, 97 F. Supp. at 262 (holding that FARA "neither limits nor interferes with freedom of speech" because "[i]t does not regulate expression of ideas" or "preclude the making of any utterances," but "merely requires persons carrying on certain activities to identify themselves by filing a registration statement.").  As one judge has remarked, the fact that no provision of FARA has been deemed unconstitutional in the more than 80 years of its existence strongly indicates that "it is well settled that FARA is constitutional."  *Attorney Gen. v. Irish People, Inc.*, 684 F.2d 928, 935 (D.C. Cir. 1982) (Wilkey, J.).

    4.  <u>Defendant's proposed alternatives to FARA registration are not viable</u>

Defendant claims that his purported self-disclosures to certain government officials provides an alternative method of meeting FARA's goals, but this claim is as baseless with respect to his First Amendment argument as it is to his Fifth Amendment challenge.  As an initial matter, the content of Defendant's self-disclosure is unclear.  There is no record of what Defendant may have communicated to government officials, including whether he identified both the PRC and Sun as foreign principals and whether he was receiving any monetary benefit or thing of value in exchange for his assistance.  Aside from the few pieces of documentary information about the PRC businessperson that Defendant provided to the then-President's secretary, *see* Compl. ¶ 22, it is also unknown whether Defendant transmitted any documents or

**APP. 135**

other informational materials to government officials that may have fallen within FARA's

labeling requirement (and whether any such materials were labeled in accordance with the Act).

In addition, the scope of Defendant's purported disclosures is not evident from the record.  The

Complaint identifies certain instances when Defendant is believed to have contacted government

officials about the PRC businessperson, but it is not known if these were the only occasions on

which Defendant lobbied government officials and whether he disclosed his relationship with the

PRC on every occasion.  Finally, even if Defendant had disclosed to every government official

whom he lobbied that he was assisting the PRC and Sun, that still would not satisfy FARA's core

purpose of informing *the public* that Defendant was acting as an agent of a foreign principal.  *See*

*Keene*, 481 U.S. at 469.  Defendant's purported self-disclosures are no substitute for FARA's

registration requirement.

Similarly, Defendant's contention that the Government has alternative ways to convey

information about Defendant's conduct—that it "is free to speak for itself, which it has already

done," *see* Def.'s Mot. at 28—warrants no serious consideration.  To the extent the Government

has "spoken" about Defendant at all, it is only through the filing of this lawsuit and issuing an

accompanying press release.  The Government has no independent authority outside of FARA to

make the public aware when individuals like Defendant are acting as agents of foreign

principals.  Defendant offers no valid basis for seeking to be excused from that requirement.

**D.     By alleging that Defendant acted at the request of the PRC and Sun when he lobbied
         government officials, the Complaint sufficiently alleges that Defendant engaged in
         political activities on behalf of foreign principals**

For his final challenge to the Complaint, Defendant claims that the Government failed to

sufficiently plead that he had an agency relationship with Sun and the PRC or that he engaged in

political activities on their behalf.  Defendant's arguments in support of this claim are either

31

**APP. 136**

contrary to well-settled precedent, belied by the allegations in the Complaint, or both. Accordingly, they should be rejected by the Court.

1. The Complaint sufficiently alleges that Defendant formed an agency relationship with Sun and the PRC by acting at their request

Defendant disputes the Complaint's allegation that he formed a registerable agency relationship with the PRC and Sun when he acted at their request. According to Defendant, a "request," standing alone, is insufficient to trigger FARA's obligations—there must also be an allegation that a foreign principal ordered, directed, or controlled the agent. Def.'s Mot. at 30.

This argument, however, is contrary to both the plain language of the statute and well-settled law interpreting the relevant statutory text. FARA makes clear that a person becomes an agent of a foreign principal by acting "at the order, request, or under the direction or control" of the foreign principal. 22 U.S.C. § 611(c)(1). Congress's use of the word "or" in this provision constitutes a clear signal that the items in the list should be read separately. *See United States v. Woods*, 571 U.S. 31, 45 (2013) (noting that the "ordinary use [of the word 'or'] is almost always disjunctive, that is, the words it connects are to be given separate meanings" (citation and internal quotation marks omitted)). Defendant's proposed reading does precisely the opposite— it effectively eliminates the word "request" as a stand-alone item in the list and gives effect only to the remaining three. In so doing, Defendant's interpretation violates the fundamental interpretive rule of statutory construction to "give effect to every clause and word." *See Setser v. United States*, 566 U.S. 231, 239 (2012) (citation and internal ellipsis omitted).

Every court that has been called upon to interpret § 611(c)(1), moreover, has agreed with the Government's reading. As recognized by this precedent, "agency" for purposes of FARA is different from other definitions, including that found in the Restatement (Second) of Agency, which focuses on the "control" exercised by the foreign principal over the agent. *Attorney Gen.*

*v. Irish N. Aid Comm.*, 668 F.2d 159, 161 (2d Cir. 1982) (per curium) ("*INAC II*"); *see also*

*United States v. Rafiekian*, 991 F.3d 529, 539 (4th Cir. 2021) (describing FARA's definition of

agency as "sweeping" and containing "far-reaching verbiage").  Under FARA, the concern "is

not whether the agent can impose liability upon his principal but whether the relationship

warrants registration by the agent to carry out the informative purposes of the Act."  *INAC II*,

668 F.2d at 161.  To be sure, the Second Circuit in *INAC II* cautioned that "agency" should not

be read "in its most precatory sense" and that the exact contours of the definition fall

"somewhere between a command and a plea."  *Id.*  But the court went on to identify two

guideposts for ascertaining when acting in response to a request forms an agency relationship.

First, the court focused on whether those requested to act "were identified with specificity by the

principal."  *Id.*  The court noted the contrast between a plea made to members of a large

religious, racial, or ethnic group with a request made to a particular individual or sufficiently

limited group of identifiable individuals.  *Id.*  Second, the court found that there should be

consideration of "the specificity of the action requested," distinguishing "a general plea for

political or financial support" from "a more specific instruction."  *Id.* at 161-62.  "Once a foreign

principal establishes a particular course of conduct to be followed, those who respond to its

'request' for complying action may properly be found to be agents under the Act."  *Id.* at 162.

　　A judge from this district adopted the Second Circuit's reading of § 611(c)(1) two years

later.  *See Attorney Gen. v. Irish People, Inc.*, 595 F. Supp. 114, 117 (D.D.C. 1984), *aff'd in part,*

*rev'd in part on other grounds*, 796 F.2d 520 (D.C. Cir. 1986) ("*Irish People I*") (concluding,

based on *INAC II*, that "[t]he requirements of the statute are stated in the disjunctive").  Although

the district court's opinion was reversed on unrelated grounds, the D.C. Circuit affirmed that §

611(c)(1) should be read in the disjunctive.  *See Atty Gen. v. Irish People, Inc.*, 796 F.2d 520,

33

**APP. 138**

523 (D.C. Cir. 1986) ("*Irish People II*") (reviewing district court record and concluding that there was no evidence that the alleged agent ever worked at INAC's "order *or request*" and that there was no evidence of a "*request*, order, command, *or* directive" (emphasis added)).

The D.C. Circuit, moreover, identified an additional statutory basis for distinguishing "request" from "direction" and "control," one not discussed by the Second Circuit in *INAC II*. Reviewing the district court's determination that an agency relationship existed between a small weekly newspaper called Irish People and the Irish Republican Army ("IRA"), the D.C. Circuit questioned the finding that INAC had served as an intermediary between the two organizations. *Id*. at 233.  Although the district court had concluded that INAC functioned as an intermediary because it had registered under FARA as an agent of the IRA, the circuit court disagreed, noting that "intermediary" and "agent" have definitions that are only partially overlapping under the statute.  *Id*. at 233-34.  Specifically, the court noted that the definition of "agent" is broader because it covers those who act "at the order, request, or under the direction or control of a foreign principal."  *Id*. at 233.  The definition of "intermediary," by contrast, covers persons whose activities are directed or controlled by a foreign principal—but not those who act at the "order" or "request" of such a person—thereby making it a narrower definition.  *Id*. (holding that, because INAC's agency status was based on its acting at the "request" of the IRA, it did not meet the definition of intermediary under FARA).  Through its examination of the statutory text, the D.C. Circuit rjeected the reading of § 611(c)(1) now put forward by Defendant here:  that "request" cannot exist independent of direction or control.

Neither *McDonnell v. United States*, 579 U.S. 550 (2016), nor *Yates v. United States*, 574 U.S. 528 (2015), two cases cited by Defendant that do not concern FARA, undermine the above analysis.  In both cases, the Court applied the interpretive cannon of *noscitur a sociis* to ensure

34

that each word listed as part of a statutory definition was given a meaning "similar in nature" to the other words in the list. *See McDonnell*, 579 U.S. at 569; *Yates* 574, U.S. at 545. But "similar in nature" is not the same as "identical to," and at no point in either case did the Court adopt a reading of a statutory provision that would make a key term synonymous with another, as Defendant seeks to do here with "request." In fact, the Court wanted to avoid exactly this outcome. *See McDonnell*, 579 U.S. at 569 (applying the presumption "that statutory language is not superfluous" (citation omitted)). These cases thus weigh against adopting Defendant's reading of § 611(c).

The allegations in the Complaint concerning Defendant's relationship with Sun and the PRC are more than sufficient to meet the standard for agency set forth in *INAC II* and *Irish People II*. As alleged therein, Elliot Broidy contacted Defendant on behalf of Sun to help lobby for the return of the PRC businessperson. Compl. ¶ 17. Broidy chose Defendant for this outreach because at the time Defendant was serving as the RNC finance chair, and Broidy believed that Defendant's political connections and friendship with the former President would be helpful in getting access to Administration officials. *Id*. In addition, Broidy provided Defendant with materials about the PRC businessperson to share with the then-President and others in the Administration. *Id*. ¶ 18. Broidy continued to convey requests for assistance from the PRC and Sun. *Id*. ¶ 21. At the same time, Defendant participated in a series of telephone calls with Sun, during which Sun discussed the PRC national and stated that he would appreciate Defendant's help with having the PRC national removed. *Id*. ¶ 23. Defendant acted in response to this request for help by contacting White House officials and the then-President, informing them that his foreign principals wanted the PRC national returned to China as soon as possible. *Id*. ¶ 25. These allegations make clear that the PRC's requests for assistance were not general

35

pleas to the broader public.  Rather, they were requests for Defendant to engage in a specific type

of conduct, aimed directly at Defendant due to his political and business connections.  Therefore,

they more than meet the Government's burden to plead that Defendant was engaged in an agency

relationship under FARA.

> 2. The legislative history and other interpretive documents for FARA do not support
> Defendant's reading of agency

In an effort to bolster his erroneous reading of § 611(c)(1), Defendant also invokes

FARA's legislative history and interpretive documents and statements from the Department of

Justice.  These arguments are equally unavailing.

*First*, the lack of reference to "request" in the legislative history to FARA's 1966

amendments does not mean that the term is afforded no meaning in the statute itself.  Assuming

reference to legislative history is even necessary in this case given the lack of ambiguity in

§ 611(c)(1), Defendant's argument would lead to the absurd result of effectively removing a term

from statutory text based on the absence of discussion about that term in congressional reports.

*See Cohen v. United States*, 650 F.3d 717, 730 (D.C. Cir. 2011) ("Of course, it is the enacted text

rather than the unenacted legislative history that prevails." (citation and internal quotation marks

omitted)).  But even on its own terms, the House Report cited by Defendant weighs against

interpreting "request" as requiring some element of direction or control.  *See* H.R. Rep. No. 89-

1470, at 5 (1966) (noting that "the proposed amendment would continue the provision of existing

law that an agency relationship be found to exist where a person has merely agreed to become an

agent without entering upon his functions, or where the agent acts other than pursuant to

contractual arrangements, or merely holds himself out as an agent of a foreign principal").

FARA's legislative history simply does not support Defendant's reading of the statutory text.

*Second*, the 2020 interpretive guidance issued by the Department of Justice about

§ 611(c)(1)'s use of "request" supports the Government's construction of that phrase in this case,

not Defendant's.  *See* "The Scope of Agency Under FARA," U.S. Department of Justice, FARA

Unit (May 2020), *available at* https://www.justice.gov/nsd-fara/page/file/1279836/download.

Contrary to Defendant's view, the guidance adopts *INAC II*'s interpretation of "request" and

makes clear that it means something separate and apart from the other terms listed in § 611(c).

*Id.* at 3 ("[A] mere 'request' cannot be equated with an 'order,' or require a legally enforceable

obligation, as that would violate a presumption of construction that statutory language is not

superfluous." (citation and internal quotation marks omitted)).  To be sure, as Defendant points

out, the guidance states that the term "request" connotes "some level of power by the principal

over the agent or some sense of obligation on the part of the agent to achieve the principal's

interest."  *Id.*  But that standard is met here, given the allegation in the Complaint that Defendant

was motivated by his desire to protect his business interests in the PRC, noting that he brought

up his business dealings in multiple conversations with Sun and expressed gratitude for being

able to remain part of the Macau and PRC business community.  Compl., ¶¶ 23(e), 28.  To the

extent "request" requires the principal having some type of leverage over the agent, the

Complaint plainly alleges that such a power dynamic existed between Defendant and his foreign

principals.

*Third*, Defendant's reference to statements by individual Department of Justice

employees describing their understanding of FARA cannot dictate the proper construction of

"request" under § 611(c)(1) in this case.  Defendant cites to Congressional testimony from

former Assistant Attorney General Phillip B. Heymann in 1980, focusing on an excerpt in which

the former official states that registration is required where a person "engages in the activities

specified in the statute and [] does so at the order of a foreign principal, or under the direction or

control of a foreign principal."  Def.'s Mot. at 34 (quoting *Inquiry Into the Matter of Billy Carter*

*and Libya:  Hearings Before the Subcomm. to Investigate the Activities of Foreign Governments*

*of the Senate Comm. on the Judiciary*, 96th Cong. 683, 701 (1980) ("Heymann Statement")).

But the Assistant Attorney General goes on to make clear that, in the view of the Department of

Justice, "the relationship between the agent and the foreign principal must be one that

substantially obligates the agent to the foreign principal."  Heymann Statement at 701.  As noted

above, the Complaint includes such an allegation in this case, asserting that Defendant acted out

of concern about his business interests in the PRC.  *See* Compl. ¶ 28. And to the extent Assistant

Attorney General Heymann's testimony reflected a different gloss on the statute than more

recent guidance discussed above, it has been superseded by the latter.

    Defendant's reference to statements made by individual Department of Justice employees

during the course of an investigation by the Office of the Inspector General ("OIG"), *see* Def.'s

Mot. at 35-36, merits no serious consideration.  Unlike the interpretive guidance and Heymann

testimony, these statements do not constitute prepared formal guidance intended for the public or

Congress, and Defendant's suggestion to the contrary is baseless.  *See, e.g.*, *Office of Pers.*

*Mgmt. v. Richmond*, 496 U.S. 414, 419 (1990) (observing that "equitable estoppel will not lie

against the Government as it lies against private litigants").  This is especially true given that the

statements in the OIG report are paraphrased and unattributed.  *See Audit of the Nat. Security*

*Division's Enforcement and Admin. of the Foreign Agents Registration Act*, Office of the

Inspector General (Sept. 2016), at 9, 11, *available at*

https://oig.justice.gov/reports/2016/a1624.pdf.

3.  <u>Defendant's repeated lobbying of government officials on behalf of the PRC to seek
the return of a PRC businessperson constitutes "political activities" under FARA</u>

Defendant also asserts that the Complaint fails to plead sufficiently that Defendant

engaged in political activities on behalf of the PRC and Sun.  *See* Def.'s Mot. at 38-42.

Specifically, Defendant claims that the Complaint falls short of establishing (1) that Defendant's

agreement with the PRC and Sun was to deliver a message, not to influence government

officials, and (2) that Defendant believed his actions would or intended for his actions to

influence those same officials.  *Id.*  Defendant's assertion as to both contentions is meritless.

Under FARA, "political activities" include "any activity" that the foreign agent "believes

will, or . . . intends to, in any way influence" any government agency or official, or any segment

of the public "with reference to formulating, adopting, or changing the domestic or foreign

policies of the United States or with reference to the political or public interests, policies, or

relations of a government of a foreign country or a foreign political party."  22 U.S.C. § 611(o).

The Government's burden to establish in the Complaint that Defendant engaged in such

activities on behalf of the PRC and Sun is not onerous.  It need only plead facts that "allow[] the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In addition, the Court must accept all factual

allegations as true, "even if doubtful in fact," *Twombly*, 550 U.S. at 555, and it must further grant

the Government "the benefit of all inferences that can reasonably be derived from the facts

alleged," *Sickle v. Torres Advanced Enter. Sols., LLC*, 884 F.3d 338, 345 (D.C. Cir. 2018)

(internal brackets omitted).

The Complaint makes clear that Defendant was part of a broader effort to effectuate the

return of a PRC businessperson who was criminally charged in the PRC and had sought asylum

in the United States.  Compl. ¶ 16.  Defendant was recruited to assist in the effort due to his

political and business connections.  *Id.* ¶ 17.  The Complaint alleges that, as part of this

recruitment effort, Defendant was told that the PRC businessperson was a criminal whom the

PRC wanted to arrest.  *Id.* ¶ 18.  Defendant, moreover, was told that the businessperson's visa

was due to expire soon and that the PRC wanted help in seeking the return of the businessperson

to China. *Id.*  Defendant was given information about the businessperson, including his passport

photos and an Interpol red notice, to use in his discussions with high-ranking government

officials.  *Id.* ¶¶ 17-19.  In addition, the Complaint alleges that, during calls with Defendant, Sun

stressed the importance of the businessperson's visa not being renewed and that "he would

appreciate [] Defendant's help."  *Id.* ¶ 23.d.  Collectively, these allegations do more than suggest

that the PRC merely wanted Defendant's assistance "in bringing the PRC's proposal to the

attention of Administration officials," as Defendant contends.  *See* Def.'s Mot. at 39.  They

plausibly give rise to the conclusion that the PRC and Sun wanted the businessperson returned,

specifically wanted Defendant's assistance in doing so, and armed him with information they

thought would help make it happen.

   Nor can Defendant credibly argue that the Complaint fails to plausibly allege that

Defendant simply delivered a message to the PRC without any desire to influence U.S.

policymakers.  Among other allegations, the Complaint asserts that Broidy inquired about the

status of the PRC businessperson's visa and whether he had been put on the No Fly List.  Compl.

¶ 22.  In response, Defendant stated that officials at the "highest level" of the Department of

State and Department of Defense were "working on this."  *Id.*  The Complaint further alleges

that, in an August 2017 call with the former President, Defendant asked specifically about the

PRC businessperson's status, to which the former President responded by stating that he would

look into the matter.  *Id.* ¶ 25.  These allegations highlight how Defendant wanted to ensure that

the officials with whom he had met were not just aware of the message from the PRC but were

taking action in response to it as well.  In addition, the Complaint quotes from a written message

from Defendant to the PRC in which Defendant reports that he had been assured "that all parties

in the White House were fully sensitive to the timing of this issue and the relevant USA

procedural law involved." *Id*. ¶ 28.  Defendant's reference to making White House officials

"sensitive" to the PRC's request similarly suggests that Defendant sought to do more than to

make White House officials aware of the PRC's desire to have the businessperson removed—he

wanted to influence how they thought about and perceived the issue.

4. <u>In the alternative, the Court should grant the Government leave to amend its Complaint</u>

The Government believes it has sufficiently plead a cause of action under FARA for the

reasons stated above.  Should the Court disagree, however, the Government seeks leave to

amend the Complaint pursuant to Federal Rule of Civil Procedure 15(a)(2).

**E.     The Court should not look beyond the four corners of the Complaint to resolve Defendant's motion**

In contravention of well-settled law that the record on a Rule 12(b)(6) motion to dismiss

is limited to a complaint and only those documents that are attached or are integral to the

pleading, *see Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004), Defendant impermissibly

relies on unsupported factual allegations at various points in his motion, *see, e.g.*, Def.'s Mot. at

7 (asserting that "in August 2020, Wynn provided an interview and sworn testimony during the

criminal investigation of Broidy and others, in which he stated that he believed he was acting in

the interests of the United States and not as an agent of Sun or the PRC"); 19-20 (claiming that

"[n]o audience member was deceived" by Defendant's purported self-disclosures and that "all

material facts have since been disclosed to the public"); *id*. at 27 (asserting that Defendant

41

**APP. 146**

disclosed "all material facts").  To the extent these factual allegations by Defendant are material to the Court's resolution of the claims raised in his motion, the Government is entitled to discovery before the Court rules in Defendant's favor.

This point is especially true given that FARA affords the Government no power to issue subpoenas or to otherwise compel the production of documents or witnesses.  *See generally*, 22 U.S.C. § 618.  The Government must accordingly rely on what information it is able to obtain voluntarily from witnesses.  Here, the only information provided by Defendant to the Government was a factual narrative prepared and communicated by Defendant's attorneys.  *See* June 2018 Letter at 1 n.1, 3-5.  From this limited information, the Government has not yet been able to ascertain the details of what Defendant communicated to the government officials with whom he spoke, how he characterized his relationship with the PRC and Sun, and whether Defendant disclosed this relationship to some but not all of the government officials with whom he met.  The Court should not dismiss the Complaint where the Government has not yet had the opportunity to gather this factual information and where such information is material to the issues raised in Defendant's motion.

## CONCLUSION

For the foregoing reasons, Defendant's motion should be denied.

Dated: August 17, 2022                    Respectfully submitted,

                                          MATTHEW G. OLSEN
                                          Assistant Attorney General
                                          National Security Division
                                          U.S. Department of Justice

                                          JENNIFER KENNEDY GELLIE
                                          Chief, FARA Unit

**APP. 147**

National Security Division
U.S. Department of Justice

/s/ *Nathan M. Swinton*
NATHAN M. SWINTON
EMMA ELLENRIEDER
Trial Attorneys
U.S. Department of Justice
National Security Division
Counterintelligence and Export Control Section
950 Pennsylvania Ave NW, Room 7700D
Washington, D.C. 20530
Telephone: (202) 353-0267
Email: Nathan.Swinton@usdoj.gov
        Emma.Ellenrieder@usdoj.gov

APP. 148

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ATTORNEY GENERAL OF THE
UNITED STATES OF AMERICA,

                    Plaintiff,

          v.                                    Case No. 1:22-cv-01372-JEB

STEPHEN A. WYNN,

                    Defendant.


## **REPLY IN SUPPORT OF MOTION TO DISMISS THE COMPLAINT**

Reid H. Weingarten (D.C. Bar No. 365893)
Brian M. Heberlig (D.C. Bar No. 455381)
Nicholas P. Silverman (D.C. Bar No. 1014377)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, DC  20036
Tel: (202) 429-3000
Fax: (202) 429-3902
rweingarten@steptoe.com
bheberlig@steptoe.com
nsilverman@steptoe.com

Robert D. Luskin (D.C. Bar No. 293621)
Leo R. Tsao (*pro hac vice*)
PAUL HASTINGS LLP
2050 M Street, N.W.
Washington, DC  20036
Tel: (202) 551-1700
Fax: (202) 551-0410
robertluskin@paulhastings.com
leotsao@paulhastings.com

*Counsel for Defendant Stephen A. Wynn*

Dated:   August 29, 2022

## TABLE OF CONTENTS

INTRODUCTION..................................................................................................... 1

ARGUMENT .......................................................................................................... 2

I.      FARA DOES NOT REQUIRE REGISTRATION AFTER AN INDIVIDUAL CEASES
        TO ACT AS A FOREIGN AGENT ................................................................. 2

        A.      *McGoff*'s Interpretation of § 612(a) Was Part of Its Holding, Not Dicta .............. 2

        B.      Section 612(a) Must Be Interpreted Consistently in Civil and Criminal Cases ..... 3

        C.      FARA's Legislative History Supports Wynn's Interpretation of § 612(a)............. 4

        D.      *McGoff* Is Consistent with FARA's Purpose and the Purpose of Injunctive
                Relief................................................................................................. 5

II.     COMPELLING WYNN TO SWEAR THAT HE ENGAGED IN POLITICAL
        ACTIVITIES AS AN AGENT OF FOREIGN PRINCIPALS WOULD VIOLATE HIS
        FIFTH AND FIRST AMENDMENT RIGHTS ................................................... 6

        A.      Compelling Wynn to Contradict His Past Testimony and Statements Would
                Violate the Fifth Amendment ................................................................. 7

        B.      Compelling Wynn to Speak a Government-Dictated Message Would Violate the
                First Amendment ................................................................................. 9

                1.      Strict Scrutiny Applies Because the Requested Relief Would Dictate the
                        Content of Wynn's Speech ........................................................... 9

                2.      The Requested Relief Fails Even Exacting Scrutiny ............................ 12

III.    THE COMPLAINT FAILS TO SUFFICIENTLY ALLEGE THAT WYNN ACTED
        AS AN AGENT OF FOREIGN PRINCIPAL .................................................. 14

        A.      The Complaint Fails to Allege That Wynn Had an Agency Relationship with a
                Foreign Principal.............................................................................. 14

                1.      The Statute's Residual Clause Must Be Read Consistently with Its Other
                        Terms Requiring the Agent to Submit to the Continued Authority or
                        Control of the Principal............................................................. 15

                2.      The Government's Arguments for a Broad Interpretation of "Request"
                        Are Without Merit.................................................................... 17

        B.      The Government's Opposition Fails to Identify Any Factual Allegations
                Supporting That Wynn Engaged in Political Activities........................................ 20

        C.      The Government Should Not Be Granted Leave to Amend ................................ 23

IV.     THE COURT MAY CONSIDER DOCUMENTS INCORPORATED IN THE
        COMPLAINT ........................................................................................ 24

CONCLUSION .................................................................................................... 25

APP. 150

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Ams. for Prosperity Found. v. Bonta,*
    141 S. Ct. 2373 (2021)..................................................................................12

*Ashcroft v. ACLU,*
    542 U.S. 656 (2004)....................................................................................14

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)....................................................................................23

*Att'y Gen. v. Irish N. Aid Comm.,*
    668 F.2d 159 (2d Cir. 1982)..................................................................17, 18

*Attorney General v. Irish People,*
    796 F.2d 520 (D.C. Cir. 1986)....................................................................19

*Bell Atl. v. Twombly,*
    550 U.S. 544 (2007)....................................................................................21

*Block v. Meese,*
    793 F.2d 1303 (D.C. Cir. 1986)....................................................................9

*Crandon v. United States,*
    494 U.S. 152 (1990)......................................................................................3

*In re Dreier LLP,*
    453 B.R. 499 (Bankr. S.D.N.Y. 2011).......................................................24

*Gartrell v. Ashcroft,*
    191 F. Supp. 2d 23 (D.D.C. 2002).............................................................14

*Gavin v. Dep't of Air Force,*
    314 F. Supp. 3d 297 (D.D.C. 2018)...........................................................24

*Habliston v. FINRA Dispute Resol., Inc.,*
    251 F. Supp. 3d 240 (D.D.C. 2017)...........................................................23

*Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Bos.,*
    515 U.S. 557 (1995)..............................................................................10, 11

*Jenkins v. Strauss,*
    931 A.2d 1026 (D.C. 2007) ......................................................................16

*Kastigar v. United States,*
    406 U.S. 441 (1972).....................................................................................8

*Kent v. Bledsoe*,
    No. 09-cv-1701, 2010 WL 771583 (M.D. Pa. Mar. 2, 2010) ...................................24

*Landmark Legal Found. v. IRS*,
    267 F.3d 1132 (D.C. Cir. 2001) ..........................................................................18

*Leocal v. Ashcroft*,
    543 U.S. 1 (2004) .....................................................................................................3

*Lewis-Burke Assocs. LLC v. Widder*,
    725 F. Supp. 2d 187 (D.D.C. 2010) ........................................................................3

*Louis v. Hagel*,
    221 F. Supp. 3d 40 (D.D.C. 2016) ........................................................................24

*McClendon v. Long*,
    22 F.4th 1330 (11th Cir. 2022) .............................................................................11

*McDonnell v. United States*,
    579 U.S. 550 (2016) ..........................................................................................16, 17

*Meese v. Keene*,
    481 U.S. 465 (1987) ...........................................................................................9, 13

*Mia. Herald Publ'g Co. v. Tornillo*,
    418 U.S. 241 (1974) ...............................................................................................11

*Nat'l Ass'n of Mfrs. v. SEC*,
    800 F.3d 518 (D.C. Cir. 2015) ................................................................................9

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n*,
    475 U.S. 1 (1986) ...................................................................................................11

*Podany v. Robertson Stephens, Inc.*,
    350 F. Supp. 2d 375 (S.D.N.Y. 2004) ...................................................................23

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992) ...............................................................................................14

*Riley v. Nat'l Fed'n of the Blind of N.C. Inc.*,
    487 U.S. 781 (1988) ...........................................................................................9, 13

*Rumsfeld v. Forum for Acad. and Inst. Rights, Inc.*,
    547 U.S. 47 (2006) .................................................................................................10

*Sarfati v. Antigua & Barbuda*,
    923 F. Supp. 2d 72 (D.D.C. 2013) .........................................................................25

**APP. 152**

*SEC v. Steadman*,
    967 F.2d 636 (D.C. Cir. 1992) ........................................................ 6

*Seminole Tribe of Fla. v. Florida*,
    517 U.S. 44 (1996) .......................................................................... 2

*Slate v. Pub. Def. Serv. for D.C.*,
    31 F. Supp. 3d 277 (D.D.C. 2014) ................................................. 24

*Tate v. Showboat Marina Casino P'ship*,
    431 F.3d 580 (7th Cir. 2005) .......................................................... 2

*Tepeyac v. Montgomery Cnty.*,
    5 F. Supp. 3d 745 (D. Md. 2014) .................................................. 12

*United States v. Care Alts.*,
    952 F.3d 89 (3d Cir. 2020) .............................................................. 7

*United States v. Hoskins*,
    __ F.4th ___, 2022 WL 3330357 (2d Cir. Aug. 12, 2022) .................. 15

* *United States v. McGoff*,
    831 F.2d 1071 (D.C. Cir. 1987) ............................... 1, 2, 3, 4, 5, 12

*United States v. Rafiekian*,
    991 F.3d 529 (4th Cir. 2021) ........................................................ 19

*United States v. Thompson/Center Arms Co.*,
    504 U.S. 505 (1992) ........................................................................ 3

*United States v. Yellow Cab Co.*,
    340 U.S. 543 (1951) ........................................................................ 5

*Wash. Post v. McManus*,
    355 F. Supp. 3d 272 (D. Md. 2019) ......................................... 11, 23

*Yates v. United States*,
    574 U.S. 528 (2015) ...................................................................... 16

**Statutes**

18 U.S.C. § 951 .................................................................................. 19

18 U.S.C. § 6001 ................................................................................. 8

22 U.S.C. § 611 ............................................................................ 15, 22

22 U.S.C. § 612 ............................................................................ 2, 3, 4

APP. 153

22 U.S.C. § 618 ..................................................................................................2, 3

Pub. L. 89-486, 80. Stat. 248 (July 4, 1966) ...............................................5

**<u>Other Authorities</u>**

ABA Task Force on the Foreign Agents Registration Act, *FARA: Issues &*
    *Recommendations for Reform* at 1 (July 16, 2021),
    https://www.fara.us/assets/htmldocuments/ABA%20ILS%20
    FARA%20Task%20Force%20Report%2009-29-21.pdf ..........................................10

Cambridge Dictionary,
    https://dictionary.cambridge.org/us/dictionary/english/sensitive .........................21

DOJ Justice Manual § 9-23.210 ...............................................................8

DOJ, *Recent FARA Cases*, https://www.justice.gov/nsd-fara/recent-cases .................22

Fed. R. Civ. P. 12(b)(6) ..........................................................................23

Fed. R. Civ. P. 15(a)(1) ..........................................................................23

Local R. Civ. P. 5.1(g) ...........................................................................25

Inquiry Into the Matter of Billy Carter and Libya: Hearings Before the Subcomm.
    to Investigate the Activities of Foreign Governments of the Senate Comm. On
    the Judiciary, 96th Cong. (1980) .......................................................18, 19

*Restatement (Third) of Agency* § 1.01 (2006) .............................................15

Robert Mueller, 1 *Report on the Investigation Into Russian Interference in the*
    *2016 Presidential Election* (Mar. 2019) ..............................................22

Shambie Singer, 3 *Sutherland Statutes and Statutory Construction* § 59:4 (8th ed.) .......3

**APP. 154**

## INTRODUCTION

The government's Opposition confirms that the Complaint fails to state a claim for failure to register under the Foreign Agents Registration Act (FARA); requests relief that violates Wynn's First and Fifth Amendment rights; and fails to allege facts sufficient to establish that Wynn engaged in political activities as an agent of a foreign principal.

The Complaint fails to allege a current or imminent violation of FARA, as required for injunctive relief.  While the D.C. Circuit's holding in *McGoff*—that FARA's obligation to register terminates when an individual stops acting as an agent of a foreign principal—arose in a criminal case, a statute with criminal and civil applications must be interpreted consistently in both contexts.  Moreover, the government's requested relief would require Wynn to affirm government-dictated statements.  Whether those statements are facts or opinions, they would contradict Wynn's past statements to the government and expose him to criminal jeopardy in violation of the Fifth Amendment and compel him to speak in violation of the First Amendment.

Equally, the Complaint fails to allege facts sufficient to establish an agency relationship or political activities undertaken on behalf of the principal, as the statute requires.  *First*, although the government argues that any action undertaken at the mere "request" of a foreign principal is sufficient to create an agency relationship, such an expansive reading would be contrary to traditional principles of statutory construction and would render the rest of the statutory clause mere surplusage.  *Second*, the government fails to identify any allegation that Wynn acted to influence a political decision on behalf of a foreign principal, rather than delivering a message to the U.S. government because Wynn believed that sharing the request was in the United States' interest.  The government has spent over four years investigating this matter, and the resulting Complaint is insufficient to state a claim.  The Complaint should be dismissed with prejudice and without leave to amend.

## <u>ARGUMENT</u>

I.   **FARA DOES NOT REQUIRE REGISTRATION AFTER AN INDIVIDUAL CEASES TO ACT AS A FOREIGN AGENT**

The government does not contest that 22 U.S.C. § 612(a) governs when an individual is required to register under FARA, or that the D.C. Circuit has unambiguously held that § 612(a)'s obligation to file ends on "the last day that an individual acts as an agent of a foreign principal." *United States v. McGoff*, 831 F.2d 1071, 1096 (D.C. Cir. 1987).  Because any agency relationship ended years ago, the Complaint fails to allege that Wynn is engaged in or about to engage in a violation of § 612(a), and thus fails to state a claim under § 618(f).

A.   *McGoff*'s Interpretation of § 612(a) Was Part of Its Holding, Not Dicta

Without taking issue with *McGoff*'s interpretation of § 612(a), the government nonetheless argues that the interpretation was not "outcome-determinative or otherwise central to the holding."  Pl.'s Opp. to Def's Mot. to Dismiss the Complaint at 10, Dkt. 14 (Aug. 17, 2022) ("Opp.").  This argument cannot be squared with the D.C. Circuit's unambiguous admonition that "our focus … must necessarily include the proper interpretation of [§ 612(a)]," that "resolution of the issue before us lies in the duration of the obligation to file imposed by [§] 612(a)," and that "the decisive question … turns on the duration of the registration obligation of [§] 612(a)."  *McGoff*, 831 F.2d at 1079, 1081-82.

"When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound."  *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996); *Tate v. Showboat Marina Casino P'ship*, 431 F.3d 580, 582 (7th Cir. 2005) (Posner, J.) ("[T]he holding of a case includes, besides the facts and the outcome, the reasoning essential to that outcome.").  As *McGoff* made explicitly clear, its interpretation of § 612(a) is part of its holding and compels dismissal of this case because the Complaint's sole

basis for seeking a civil injunction is its allegation that Wynn violated § 612(a).  Compl. ¶¶ 39-42 (Count I, Violation of 22 U.S.C. § 612(a)).

### B.      Section 612(a) Must Be Interpreted Consistently in Civil and Criminal Cases

The government suggests *McGoff* is inapplicable because the government here is pursuing a civil remedy under § 618(f), rather than criminal enforcement under §§ 618(a), (e).  As the government acknowledges, however, FARA provides both a civil injunctive remedy and criminal enforcement remedy, Opp. at 4, both of which are based on the failure to register when obligated to do so by § 612(a).  As the Supreme Court has stated, "we must interpret [a] statute consistently, whether we encounter its application in a criminal or noncriminal context." *Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004); *see also Lewis-Burke Assocs. LLC v. Widder*, 725 F. Supp. 2d 187, 194 (D.D.C. 2010) ("The [Computer Fraud and Abuse Act] is primarily a criminal statute, with a civil cause of action, and a court is bound to interpret the statute consistently….").

This principle of consistent statutory interpretation includes interpretations supported by the rule of lenity.  Although the government argues that the rule of lenity has "no bearing on the interpretation of § 618(f)," Opp. at 12, this case involves a dispute over the interpretation of § 612(a), not § 618(f).  As the government acknowledges, the rule of lenity applies in civil cases interpreting "a statutory provision with both criminal and noncriminal application." *Id.* (citing *Kasten v. Saint Gobain Performance Plastics Corp.*, 563 U.S. 1, 16 (2011)).  Indeed, the Supreme Court has repeatedly applied the rule of lenity in civil cases involving a statute with criminal applications.  *See, e.g.*, *United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 517-18 (1992); *Crandon v. United States*, 494 U.S. 152, 158 (1990); *see also* Shambie Singer, 3 *Sutherland Statutes and Statutory Construction* § 59:4 (8th ed.) ("If a law has both criminal and civil applications, the rule of lenity governs its interpretation in both settings.").  Here, § 612(a) has both criminal (*see* §§ 618(a), (e) (as applied in *McGoff*)) and civil (*see* § 618(f) (as applied in

3

**APP. 157**

Compl. ¶¶ 1, 39-42)) applications.  Simply put, the statute's terms must be interpreted the same

way in both contexts.  Any other result would lead to hopeless confusion, because an individual

would be forced to guess whether the government might proceed criminally or civilly in

assessing whether he or she has an obligation to register.

The government is also incorrect when it claims that the *McGoff* majority "declin[ed]"

(Opp. at 12) to adopt the dissent's view that "[i]f the obligation to file ends with the termination

of the agency relationship, then … the United States will be unable to use an injunction to

compel [retroactive] registration, since the agent is no longer under any obligation to register."

*McGoff*, 831 F.2d at 1103.  The court did not, in fact, "declin[e]" to adopt the interpretation that

injunctive remedies are unavailable for wholly past conduct.  Rather, the majority stated,

"[a]ssuming *arguendo* that injunctive remedies would not lie once the individual's agency status

has terminated," the government was "far from powerless" because it could still pursue criminal

enforcement.  *Id.* at 1094 n.32.

### C.    FARA's Legislative History Supports Wynn's Interpretation of § 612(a)

The government's reliance on legislative history that pre-dates the enactment of civil

injunctive relief under FARA is badly misplaced.  Opp. at 13-14.  The government cites

*McGoff*'s summary of legislative history surrounding the 1950 FARA amendments, in which

Congress explained that under then-existing law, a criminal defendant required to register under

FARA could "evade the Act's requirements by ceasing their activities and claiming as an

affirmative defense that withdrawal from an agency relationship automatically eliminated

liability for failure to file."  *McGoff*, 831 F.2d at 1087.  However, that was a reference to trial

strategy in *criminal cases involving liability*, not civil injunctive suits.  *Id.* at 1089 n.27.  Civil

injunctive suits (which do not impose "liability" at all) did not exist at the time and were not

added to FARA until the 1966 amendments.  Pub. L. 89-486, 80. Stat. 248 (July 4, 1966).  By

4

**APP. 158**

attempting to apply this statement about criminal liability to then non-existent civil injunctive authority, the government is mixing apples and oranges.  *See United States v. Yellow Cab Co.*, 340 U.S. 543, 549-50 & n.8 (1951) (rejecting government reliance on legislative history from earlier versions of a bill).

### D.   *McGoff* Is Consistent with FARA's Purpose and the Purpose of Injunctive Relief

The government also argues that reading FARA to be "concerned only with the present and 'evaluat[ing] an agent's political speech and activities contemporaneously in their proper context' …. would collapse the government's enforcement authority."  Opp. at 14.  The government's argument has two fundamental flaws.  *First*, contrary to the government's position, the D.C. Circuit in *McGoff* has already assessed the temporal limitations of the statute, instructing: "the stated purpose of FARA, which is to permit, promptly, evaluation of these activities as they are undertaken.  … FARA does not evince an antiquarian interest on Congress' part; FARA's focus is on the here and now."  *McGoff*, 831 F.2d at 1082.  The government cannot plausibly invite this Court to ignore binding precedent to address speculative concerns.

*Second*, the government's concern about a "collapse" in enforcement authority is belied by the fact that it has not brought a single civil injunctive action related to historical conduct in the 35 years since *McGoff*—which is why this issue has not arisen until now.  Moreover, FARA imposes no civil penalties and, therefore, provides no "civil enforcement authority."  The government's only "enforcement authority" is criminal under FARA's unique structure.

FARA's only available civil remedy is an injunction, which is a "drastic remedy" reserved to remedy ongoing or threatened violations.  *See* Mem. Supp. Mot. to Dismiss the Compl. at 13, Dkt. 11-1 (July 18, 2022) ("MTD"); *SEC v. Steadman*, 967 F.2d 636, 648 (D.C. Cir. 1992).  While the government speculates that it "cannot be certain that [Wynn] has in fact

5

**APP. 159**

ceased engaging in registerable conduct," Opp. at 16, that claim both flips the burden of proof

and is belied by the Complaint itself, which alleges that Wynn acted as an agent only through

August 2017 (¶ 2) and severed ties with Sun in October 2017 (¶ 27).

## II.   COMPELLING WYNN TO SWEAR THAT HE ENGAGED IN POLITICAL ACTIVITIES AS AN AGENT OF FOREIGN PRINCIPALS WOULD VIOLATE HIS FIFTH AND FIRST AMENDMENT RIGHTS

Requiring Wynn to register as an agent of the PRC and Sun would compel Wynn to state

that he engaged in political activities for, on behalf of, and as an agent of the PRC and Sun.  The

specific statements that Wynn would need to make are:

### "Agent"

1. Wynn must register as an agent of a foreign principal under the Foreign Agents
Registration Act.
2. Wynn "must furnish as an Exhibit B … a full statement of all the circumstances by
reason of which the registrant is acting as an agent of a foreign principal."  The term
"registrant" is equated in footnotes with "agent."  *See* Dkt. 11-4 at 11; 4 n.2; 5 nn.4, 6, 7,
9; 6 n.11; 12-13 nn.2-4.

### "For" / "Political Activities"

1. Sun Lijun and the PRC were each a "foreign principal for whom [Wynn] is acting or
has agreed to act."  *Id.* at 4.
2. Prior to the date of registration, Wynn "engaged in … political activities, for this
foreign principal."  *Id.* at 12.

### "On Behalf of" / "Political Activities"

1. Wynn engaged in "political activities as defined in … the Act" "on behalf of the above
foreign principal."  *Id.* at 12.
2.  Wynn "engages in or proposes to engage in" activities "on behalf of the above foreign
principal."  *Id.* at 12.
3. When Wynn disseminated informational materials, he did so "on behalf of [his]
foreign principal[s]."  *Id.* at 6.

Forcing Wynn to contradict his previous statements that he did not act on behalf of, for, or as an

agent of Sun or the PRC, by stating in a public filing that he did so would (a) furnish a link in the

chain of prosecution for false statements or perjury and therefore violate the Fifth Amendment, and (b) compel speech in violation of the First Amendment.

### A.   Compelling Wynn to Contradict His Past Testimony and Statements Would Violate the Fifth Amendment

Wynn's prior statements are in the form of a letter from his counsel to DOJ that was attached as an exhibit to his motion to dismiss (Dkt. 11-3), in an interview conducted by the government, and in his prior sworn testimony during the government's criminal investigation. The direct contradictions between those statements and the speech compelled by the government's requested relief are obvious on their face.  For example, Wynn repeatedly stated that he did not act on behalf of, for, or as an agent of Sun or the PRC.  *See, e.g.*, Dkt. 11-3 at 2 (Wynn acted "because he believed it was in the interests of the United States" and "was not Sun's or the PRC's agent"); *id.* ("Wynn was not representing the PRC, nor acting for or in the PRC's interests."); *id.* at 12 ("Wynn was not representing the PRC's interests before President Trump, or seeking to lobby or influence him for the PRC's benefit.").  These statements are directly at odds with the compelled statements that the government seeks to require in the FARA registration form.  Wynn easily meets his burden to show contradiction and a risk of incrimination on these statements alone.[1]

The government also argues, with no supporting authority, that the Fifth Amendment is not implicated because Wynn's statements are "opinion" and not "factual information."  Opp. at 18-19.  In reality, statements of opinion can be "false" if not sincerely held.  *United States v. Care Alts.*, 952 F.3d 89, 95-96 (3d Cir. 2020) ("[A]n opinion can be considered 'false' for

---

[1] The government faults Wynn for failing to identify specific contradictory statements in his prior testimony.  Opp. at 17-18.  The government fails to disclose, however, that it possesses the transcript from Wynn's interview but has refused to provide it to Wynn's counsel despite repeated requests.  As that transcript would show, Wynn testified consistently with the factual proffer in his counsel's letter.  Dkt. 11-3.

**APP. 161**

purposes of liability.").  Wynn's statements that he was not Sun's agent, did not act in his or the

PRC's interest, and did not lobby Trump Administration officials involve both sincerely held

opinions and factual assertions.  Notably, the government contradicts itself later in the brief by

arguing that the same statements are mere uncontroversial facts, not opinion, to attempt to

overcome Wynn's First Amendment challenge.  *Id.* at 24-27.  As either opinions or facts,

Wynn's statements are protected by the Fifth Amendment.

The government also misses the point by arguing "[m]ore broadly" that the FARA

registration statements are similar to records required to be kept by regulatory disclosure statutes

that do not implicate the Fifth Amendment, unlike laws that "target 'a highly selective group

inherently suspect of criminal activities.'"  Opp. at 19-20 (quoting *California v. Byers*, 402 U.S.

424, 429-31 (1971) and *Albertson v. Subversive Activities Control Bd.*, 382 U.S. 70, 79 (1965)).

But Wynn does *not* contend that FARA's registration obligation by itself implicates the Fifth

Amendment, nor is this a facial challenge to the statute itself.  Rather, the government's

requested relief would compel Wynn to make statements contradicting his prior statements,

thereby exposing him to potential prosecution for false statements or perjury.  That argument is

supported by a line of cases on contradictory testimony, *see* MTD at 16, which the government

simply ignores in its Opposition.[2]

---

[2] The government maintains in a footnote it "should be given the option of continuing to
pursue [this case] or providing some form of immunity to [Wynn] with respect to the past
statements."  Opp. at 21 n.1.  The government cites no precedent for the use of formal immunity
to compel statements in a FARA registration.  Formal immunity has traditionally been limited to
compelling witness testimony in a judicial or other proceeding.  *See Kastigar v. United States*,
406 U.S. 441, 445-46 (1972) ("Immunity statutes … seek a rational accommodation between the
imperatives of the privilege and the legitimate demands of government to compel citizens to
testify."); *see also* 18 U.S.C. § 6001(3) (limiting agency proceedings eligible for formal
immunity).  Moreover, Justice Department policy requires multiple showings that the compelled
testimony is necessary to the public interest, *see, e.g.*, DOJ Justice Manual § 9-23.210, none of
which appear to have been made.

**APP. 162**

**B.    Compelling Wynn to Speak a Government-Dictated Message Would Violate the First Amendment**

Granting the government's requested relief would also violate Wynn's First Amendment rights by compelling him to state that he engaged in political activities for, on behalf of, and as an agent of the PRC and Sun.  "[M]andating speech that a speaker would not otherwise make necessarily alters the content of the speech" and is "a content-based regulation of speech," subject to strict scrutiny.  *Riley v. Nat'l Fed'n of the Blind of N.C. Inc.*, 487 U.S. 781, 782 (1988).  The government, however, cannot satisfy exacting scrutiny, much less strict scrutiny.

**1.    Strict Scrutiny Applies Because the Requested Relief Would Dictate the Content of Wynn's Speech**

The government presents three arguments for why strict scrutiny should not apply, none of which has merit.  *First*, the government cites two cases, which it argues held that "FARA comports with the First Amendment."  Opp. at 21, 23 (citing *Block v. Meese*, 793 F.2d 1303 (D.C. Cir. 1986) and *Meese v. Keene*, 481 U.S. 465 (1987)).  Those case are inapposite, however, because they only addressed the burden imposed by FARA on predicate political speech.  They do not address FARA's registration requirement, which compels an individual to engage in government-dictated speech by stating—publicly and under oath—that he acted on behalf of, for, and as an agent of a foreign principal.  The compelled speech issue did not arise in *Block* and *Keene* because the litigants in both cases were non-registrants who were not forced to make any statements and were free to remove the political propaganda label.  *See Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 529 (D.C. Cir. 2015); *see also Keene*, 481 U.S. at 495, *rev'g Keene v. Smith*, 569 F. Supp. 1513, 1519 (E.D. Cal. 1983); *Block*, 793 F.2d at 1307 n.1.  The D.C. Circuit addressed this distinction when it held that companies could not be forced to file reports or make public statements on their websites that agreed with the SEC's position that their products had not been proven to be conflict free.  *See* MTD at 23-24 (discussing *Nat'l Ass'n of Mfrs.*).

9

**APP. 163**

*Second*, the government contends that the requested relief "does not warrant a heightened standard of review," because the FARA registration form requires only disclosure of factual, non-controversial information.  Opp. at 27.  But that argument grossly understates the nature of the affirmative statements that Wynn would be forced to make.  The speech compelled by the government's requested relief is not "non-controversial."  As described *supra* at 6, Wynn would be compelled to state that he was an agent of the PRC and Sun and that he agreed to engage in political activities for and on behalf of those foreign principals.  Wynn vehemently disagrees with each of those statements.  Whether it is a statement of opinion or fact, compelling Wynn to state that he acted as an agent of the PRC and Sun is highly controversial and would damage his reputation.  As explained by an American Bar Association Task Force co-chaired by the former Chief of the DOJ section administering FARA, FARA's terminology is "stigmatizing" and "regularly associated colloquially with covert government-sponsored espionage activities."  *See* ABA Task Force on the Foreign Agents Registration Act, *FARA: Issues & Recommendations for Reform* at 1 (July 16, 2021), https://www.fara.us/assets/htmldocuments/ABA%20ILS%20 FARA%20Task%20Force%20Report%2009-29-21.pdf.  The PRC is also a political lightning rod.  This lawsuit has resulted in a wave of negative publicity, reporting the government's inaccurate allegations that Wynn acted for the PRC and tarnishing his reputation.  Forcing Wynn himself to parrot these statements would do untold further harm.

Moreover, the government is wrong that heightened First Amendment scrutiny does not apply to statements of fact.  *See Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995) (holding that First Amendment protection "applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid"); *see also Rumsfeld v. Forum for Acad. and Inst. Rights, Inc.*, 547 U.S. 47, 61-62 (2006)

10

**APP. 164**

("[C]ompelled statements of fact …, like compelled statements of opinion, are subject to First

Amendment scrutiny.").  Disclosures of non-controversial facts "in commercial advertising" may

be subject to the *Zauderer* rule (*see* MTD at 22-23), but "outside that context," strict scrutiny

applies in the absence of another exception.  *See Hurley*, 515 U.S. at 573; *Wash. Post v.*

*McManus*, 355 F. Supp. 3d 272, 296 (D. Md.) ("The 'exacting scrutiny' standard [is] … a limited

exception to the general rule that compelled disclosure laws, like all content-based regulations,

must overcome strict scrutiny."), *aff'd*, 944 F.3d 506 (4th Cir. 2019).  This is particularly true

when the speaker believes the compelled statements of fact to be false.  *See infra* § II.B.2.

 *Lastly*, the government incorrectly asserts that Wynn's First Amendment rights would not

be violated by the requested injunction because he could choose to state his disagreement with

the compelled statements despite affirming their veracity under oath.  Opp. at 27.  That Wynn

could supplement the compelled speech (with which he disagrees) with voluntary speech (with

which he agrees) is *always* present in *every* compelled speech challenge and is legally irrelevant.

The First Amendment prohibits the government from "requir[ing] speakers to affirm in one

breath that which they deny in the next."  *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n*, 475 U.S.

1, 16 (1986) (striking down compelled speech despite company's ability to respond because

"[t]hat kind of forced response is antithetical to the free discussion that the First Amendment

seeks to foster"); *Mia. Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 257 (1974) (newspaper

could not be compelled to run counter-editorials).  For example, in *McClendon v. Long*, the

Eleventh Circuit reversed a district court decision upholding a requirement that sex offenders

post warning signs in their front yards.  As the court explained, "the plaintiffs' ability to place

their own yard signs disagreeing with the [compelled] warning signs" did not "cure the original

violation."  22 F.4th 1330, 1337 (11th Cir. 2022).

11

**APP. 165**

### 2.     The Requested Relief Fails Even Exacting Scrutiny

Even if the Court were to apply exacting scrutiny instead of strict scrutiny, the

government would still fail that standard as applied to Wynn.   "In an as-applied challenge, the

state must justify the challenged regulation with regard to its impact on the [counterparty]."

*Tepeyac v. Montgomery Cnty.*, 5 F. Supp. 3d 745, 753 (D. Md. 2014) (quoting *Educ. Media Co.

v. Insley*, 731 F.3d 291, 298 (4th Cir. 2013)).   The exacting scrutiny test requires the government

to demonstrate, as applied to Wynn, that (1) the compelled disclosure has a substantial

relationship with a sufficiently important governmental interest, and (2) "narrow tailoring."   *See

Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383 (2021) (resolving split on exacting

scrutiny standard); *contra* Opp. at 28 n.4 (incorrectly describing the exacting scrutiny standard

based on pre-*Bonta* law).

Wynn made three arguments: (1) exacting scrutiny does not permit compelled statements

of ideological beliefs or compelled statements of fact that the speaker believes to be false, MTD

at 21-25; (2) the requested relief is untethered from any important government interest, as

applied in this case, *id.* at 26-27; and (3) the requested relief is not narrowly tailored, *id.* at 28-29.

The government does not dispute that if the Court finds the compelled statements to be

ideological beliefs or statements of fact that Wynn believes to be false, then its requested relief is

unconstitutional.   Instead, it disputes only the latter two arguments.

*First*, the government argues that it satisfies the important government interest standard

because forcing Wynn to state he was an agent of the PRC would support FARA's purpose to

assist in the "apprais[al] [of agents'] statements and actions."   Opp. at 28 (quoting *Keene*, 481

U.S. at 469).   The government, however, neglects to mention that the D.C. Circuit has interpreted

this language to mean that the purpose of FARA "is to permit … evaluation of these activities as

they are undertaken," which would not be served in this as-applied challenge.   *McGoff*, 831 F.2d

**APP. 166**

at 1082; *accord Keene*, 481 U.S. at 469 n.15 (FARA is "intended to label information of foreign origin so that hearers and readers are not deceived by the belief that the information comes from a disinterested source.") (quoting *Viereck v. United States*, 318 U.S. 236, 251 (1943) (Black, J., dissenting)) (quoted with approval by Opp. at 23-24).  The government points to cases involving political propaganda targeting the public, but the public was not part of the audience appraising Wynn's speech or activities.  Trying to sweep the public into Wynn's audience, the government relies on Federal Lobbying Act cases, Opp. at 29, but it fails to address the line of cases deeming lobbyist registration statutes unconstitutional when applied to non-professionals like Wynn.  *See* MTD at 26-27.  FARA's purpose to facilitate an audience's ability to evaluate speech has already been served in this case.  *See id.* at 12-13, 19-20, 26.

 *Second*, the government argues its requested relief is "precisely tailored" to "compelling necessity," *Riley*, 487 U.S. at 800, because the lesser alternatives of asking about facts (rather than requiring specific affirmations of the government's conclusions about the existence of an agency relationship and political activities taken for or on behalf of the principal) or relying on government speech are "not viable."  Opp. at 26, 30.  This argument is wrong.  The government has spent four years investigating and amassed an enormous record, including Wynn's responses to every question the government chose to ask him.  As he explained, Wynn passed on a message, "received no compensation or benefits," and "was transparent about the circumstances" when speaking with administration officials.  Dkt. 11-3 at 2.  The government has all requested information and is free to state its own conclusions without forcing Wynn to agree.

 The government unpersuasively claims that Wynn's less restrictive alternatives are not viable because "[t]he Government has no independent authority" to speak.  Opp. at 31.  The government does not need authority to speak.  The DOJ has a website, social media accounts,

and near-daily press releases or press conferences that are widely covered by the media.

Moreover, the FARA Unit makes semi-annual reports to Congress, which are publicly available

on DOJ's website.  Regardless, the status quo's lack of a law or regulation empowering DOJ to

speak is not an excuse for the fact that the existing DOJ implementation of FARA, including the

forms in Dkt. 11-4, would unconstitutionally compel Wynn's speech.  *See Ashcroft v. ACLU*,

542 U.S. 656, 666, 669-70 (2004) (explaining that "the test does not begin with the status quo of

existing regulations" but instead asks whether there are "plausible, less restrictive alternatives" to

the status quo); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 395-96 (1992) (striking down content-

based ordinance because government could pass a content-neutral version); *Gartrell v. Ashcroft*,

191 F. Supp. 2d 23, 39-40 (D.D.C. 2002) (collecting cases and concluding "the government

cannot meet its burden to prove least restrictive means unless it has actually considered and

rejected the efficacy of less restrictive measures before adopting the challenged practice").  If a

less restrictive alternative could be enacted, then the onus is on the government to do so.

## III.   THE COMPLAINT FAILS TO SUFFICIENTLY ALLEGE THAT WYNN ACTED AS AN AGENT OF FOREIGN PRINCIPAL

Under FARA, an "agent" must have (A) a sufficient relationship with a foreign principal,

and (B) engage in political activities in the foreign principal's interests.  The Complaint fails to

sufficiently allege either of these elements.

### A.   The Complaint Fails to Allege That Wynn Had an Agency Relationship with a Foreign Principal

The Complaint does not allege that the PRC or Sun exercised direction, control, or

authority over Wynn.  It alleges that the PRC and Sun made a "request" of Wynn only in the

most precatory, non-authoritative sense of the word, and speculates that Wynn was motivated to

accept this request out of desire to protect his business interests.  Opp. at 6, 35.  The Complaint

does not allege that this desire was rooted in any promise of benefit or threat of punishment by

the PRC or Sun.  The government's argument that Wynn could be an "agent of a foreign

principal" without agreeing to be subject to any level of control, direction or authority of the

foreign principal ignores the statute's structure and would render key terms surplusage.

**1.     The Statute's Residual Clause Must Be Read Consistently with its
Other Terms Requiring the Agent to Submit to the Continued
Authority or Control of the Principal**

The Complaint can only survive if it sufficiently alleges that Wynn acted as "an agent,

representative, employee, or servant, or any person who acts in any other capacity at the order,

request, or under the direction or control, of a foreign principal."  22 U.S.C. § 611(c)(1).  The

definition of "agent of a foreign principal" contains a list within a list, requiring a two-step

interpretative process.  First, *the residual clause* ("any person who acts in any other capacity at

the order, request, or under the direction or control, of a foreign principal") must be read

consistently with the terms that the residual clause joins—"agent," "representative," "employee,"

and "servant,"—each of which involve an agreed-upon relationship involving control.  Second,

*within the residual clause*, "request" must also be read consistently with "at the order" and

"under the direction or control."  In arguing that the Complaint is sufficient, the government

ignores the first step, which is important context that informs the statute's meaning.

"Agent," "representative," "employee," and "servant" each connote a pre-existing

relationship in which an agent and a principal have agreed that the agent will submit to the

continued authority of the principal.  This is consistent with the common-law definition of an

"agent": "Agency is the fiduciary relationship that arises when one person (a 'principal')

manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf

and subject to the principal's control, and the agent manifests assent or otherwise consents so to

act."  *Restatement (Third) of Agency* § 1.01 (2006); *United States v. Hoskins*, __ F.4th ___, 2022

WL 3330357, at *5 (2d Cir. Aug. 12, 2022) ("The three elements necessary to an agency

15

**APP. 169**

relationship are (1) a manifestation by the principal that the agent will act for him; (2) acceptance by the agent of the undertaking; and (3) an understanding between the parties that the principal will be in control of the undertaking."); *Jenkins v. Strauss*, 931 A.2d 1026, 1033 (D.C. 2007).

The residual clause ("any person who acts in any other capacity at the order, request, or under the direction or control, of a foreign principal") must be interpreted in a way consistent with the four terms it joins, lest it swallow the entire provision. *See* MTD at 30-33. The Supreme Court's interpretation of "any decision or action on any question, matter, cause, suit, proceeding or controversy" in *McDonnell v. United States*, 579 U.S. 550, 565-69 (2016) illustrates how *noscitur a sociis* ("a word is known by the company it keeps") applies here. In *McDonnell*, the Court observed that the final four listed words "connote a formal exercise of governmental power," *id.* at 568, and therefore concluded that "question," and "matter" must also mean "a formal exercise of governmental power that is similar in nature to a 'cause, suit, proceeding or controversy,' but that does not necessarily fall into one of those prescribed categories." *Id.* at 569, 574. As the Court observed in *Yates v. United States*, "where general words follow specific words in a statutory enumeration, the general words are [usually] construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." 574 U.S. 528, 545, 549-51 (2015). Here, "any person who acts in any other capacity at the order, request, or under the direction or control, of a foreign principal" must also involve an agreed-upon relationship involving control that does not necessarily fall under the terms of "agent," "representative," "employee," and "servant." Similarly, the term "request" within the residual clause must be interpreted consistently with the other terms of the clause: "at the order" or "under the direction and control"—each of which connotes a mutual understanding that one is serving under another's authority.

16

The government is simply wrong in claiming that Wynn's interpretation would "effectively eliminate[] the word 'request' as a stand-alone item in the list …."  Opp. at 32.  An agent can agree to be subject to the functional control of a principal in many ways.  He may explicitly agree that the principal can "control" his actions or give him "direction," including in exchange for compensation.  Or he may establish a practice of adhering to "orders" or "requests" from the principal in exchange for some authoritative mechanism of rewarding agreement or punishing refusal.  But deeming mere acquiescence to a precatory request—without establishing any authority similar to an agent, representative, employee or servant—to establish an agency relationship would cause the residual clause to subsume the terms that precede it.  To be sure, every "agent," "representative," "employee," and "servant" acts at the "request" of their superior.  The government's unmoored reading of "request" would render these other statutory terms unnecessary, a far more significant violation of the presumption against surplusage.  *See McDonnell*, 579 U.S. at 569.

## 2.   The Government's Arguments for a Broad Interpretation of "Request" Are Without Merit

The government is incorrect that courts have "agreed with [its] reading" that complying with a mere "request" is sufficient.  Opp. at 32.  The government relies on a *per curiam*, out-of-circuit opinion issued forty years ago holding only that the definition of a sufficient request fell "somewhere between a command and a plea."  *See* MTD at 33-35 (addressing *Att'y Gen. v. Irish N. Aid Comm.*, 668 F.2d 159 (2d Cir. 1982) (per curiam) (*INAC*)).  *INAC* considered the totality of the circumstances including whether those requested to act "were identified with specificity by the principal," Opp. at 33, and here, Wynn was identified by Broidy, not by a foreign principal, Opp. at 35 ("Broidy chose [Wynn]….").  Most importantly, while declining to delve deeper into the meaning of "request," *INAC* cited and quoted with approval the testimony of

17

**APP. 171**

Assistant Attorney General Phillip B. Heymann that forms the most solid available distinction

"between a command and a plea":

> For instance, a congressman visits Turkey and during his trip he meets with
> government officials. The government officials urge the case for foreign policies
> favorable to Turkey, and he supports these when he returns to Washington. If that
> is considered a 'request' under the statute, the congressman is an unregistered
> foreign agent, even though he has taken no orders, is under no one's direction or
> control, and is not anyone's agent.

668 F.2d at 161 n.6 (quoting Inquiry Into the Matter of Billy Carter and Libya: Hearings Before

the Subcomm. to Investigate the Activities of Foreign Governments of the Senate Comm. On the

Judiciary, 96th Cong. 701 (1980) (hereinafter, "Heymann Statement")); *see* Heymann Statement

at 701 (noting that such "persuasion" or "urging" from a foreign nation was insufficient to create

an agency relationship under FARA); *see also* MTD at 34-35.

Although Wynn's opening brief noted the obvious links between the scenario described

in Heymann's testimony and the allegations in this case, the government does not attempt to

distinguish the testimony. Instead, the government urged the Court to disregard the Heymann

Statement and DOJ-OIG's 2016 FARA Unit quotes (which are consistent with the Heymann

Statement), in favor of an interpretative guidance that the FARA Unit authored *two years after*

initiating contact with Wynn's counsel. *See* MTD at 35 (addressing 2020 guidance). The

government is wrong to claim that the FARA Unit's made-for-litigation guidance carries more

weight than the Heymann Statement. Opp. at 38; *see Landmark Legal Found. v. IRS*, 267 F.3d

1132, 1136 (D.C. Cir. 2001) (interpretations found in litigation statements in agency briefs do

not carry force of law and do not warrant *Chevron* deference).

Regardless of the weight to be accorded to the 2020 guidance, however, both parties

agree that it still requires a "relationship between the agent and the foreign principal … that

substantially obligates the agent to the foreign principal." Opp. at 38 (quoting Heymann

Statement at 701).  Heymann's testimony is the source of this "substantially obligates" test, which it defines to require a person to act "at the order of a foreign principal, or under the direction or control of a foreign principal."  Heymann Statement at 701; *id.* at 702 ("The test, as I indicated, is whether [the agent] acted at the order of [a foreign principal] or under [its] control.").  The Complaint does not allege that Wynn was substantially obligated to Sun or the PRC, and therefore fails under that test.  It does not matter that the Complaint alleges that Wynn "was motivated by his desire to protect his business interests in the PRC," Compl. ¶ 28—an ill-founded allegation that lacks any support except a businesslike text message clearly attempting to be polite.  Even assuming such an unspoken motivation for the purpose of a motion to dismiss, that unilateral desire would not give Sun or the PRC authority over Wynn necessary to render him their agent for purposes of FARA merely by complying with their request.

None of the other authority relied upon by the government is persuasive.  In *United States v. Rafiekian*, the court interpreted the scope of agency under 18 U.S.C. § 951, not FARA, and its statements about FARA were dicta.  991 F.3d 529, 539-40 (4th Cir. 2021).  In *Attorney General v. Irish People*, the D.C. Circuit held that the district court erred in granting summary judgment that Irish People acted at INAC's "order or request" because although the Irish People received funding from INAC, shared an editor and offices with INAC, and had convergent editorial views, "motivation and intent issues" precluded summary judgment.  796 F.2d 520, 523-24 (D.C. Cir. 1986) (per curiam).  Importantly, the D.C. Circuit cast doubt upon whether a mere request from INAC would be sufficient, instructing that "mere receipt of a bona fide subsidy not subjecting the recipient to the direction or control of the donor does not require the recipient of the subsidy to register as an agent of the donor."  *Id.* at 524.  While *Irish People* did not define

19

**APP. 173**

"request," it made clear that FARA requires foreign principal control even in cases where the foreign principal compensates the alleged agent, a factor notably absent here.

### B.    The Government's Opposition Fails to Identify Any Factual Allegations Supporting That Wynn Engaged in Political Activities

The government does not dispute that merely delivering a message on behalf of the PRC without intent to influence the Administration does not constitute "political activities" under the statute.  MTD at 39.  Thus, absent clear factual allegations in the Complaint that Wynn lobbied or intended to lobby Administration officials on the PRC's behalf, the government cannot be permitted to proceed.  This is no mere technicality; requiring the government to allege specific facts establishing Wynn's intent to influence is central to a claim under FARA and required by the statute's plain terms.

The government, nevertheless, fails to identify a single *factual* allegation in the Complaint supporting the claim that Wynn lobbied or otherwise intended to influence the Administration on the PRC's behalf.  None exist.  The Complaint alleges only that Wynn made Administration officials aware of the PRC's request, *i.e.*, that Wynn "*conveyed* the PRC's desire," "*advised*" White House officials about the request, "*stated*" what PRC officials had told him, and "*asked* … about the PRC businessperson's status."  Compl. ¶¶ 22, 25 (emphases added); MTD at 39.  There are no allegations that Wynn lobbied or otherwise intended to influence the Administration on the PRC's behalf, nor any alleged facts from which this conclusion might plausibly be inferred.

The government instead seeks to salvage its deficient pleading with conclusory statements that Wynn engaged in "repeated lobbying."  *See* Opp. at 39.  For example, the government states that Wynn's intent to influence can be inferred from Wynn's text message that "all parties in the White House were fully sensitive to the timing of this issue and the relevant

**APP. 174**

USA procedural law involved."  Opp. at 41 (citing Compl. ¶ 28).  From Wynn's use of the term "sensitive," the government insists without explanation that "[Wynn] … wanted to influence how they thought about and perceived the issue."  *Id.*  But there is nothing reasonable, much less plausible in this inference; and, of course, it is utterly at odds with the government's own characterization of Wynn's actions: that he conveyed, advised, stated, and asked.  Simply restating this conclusion falls far short of the government's burden to "provide grounds of [its] entitlement to relief" with "more than labels and conclusions."  *Bell Atl. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations marks and brackets omitted).

Indeed, as is plain from the context, "sensitive" merely meant "having or showing awareness and understanding, esp. of other people's feelings and needs."  *See* Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/sensitive.  That is precisely what Wynn did here—provide Administration officials with an awareness and understanding of the PRC's request, a conclusion that is entirely consistent with the Complaint's factual allegations.  The text message confirms what the government elsewhere repeatedly alleges: namely, that Wynn was a messenger, nothing more.  Notably, in describing this text earlier in its Opposition, the government agrees that this is what Wynn's text was communicating to the PRC. Opp. at 6 (stating that "Sun continued to contact [Wynn] through approximately October 2017, at which point [Wynn] informed Sun that *he had made U.S. officials aware of the request*, that [Wynn] was not able to provide any more assistance, and that Sun should stop contacting him.") (emphasis added)).

In apparent recognition that the Complaint's factual allegations about Wynn's intentions are deficient, the government instead relies heavily on allegations of what *others* intended.  Opp. at 40.  There is no dispute that Sun wanted his request to be granted, but his intentions are beside

21

APP. 175

the point.  As the statute makes clear, it is what *Wynn* intended that counts.  Under FARA, "political activities" only includes those activities "that *the person* … believes will, or that *the person* intends to, in any way influence" a relevant party.  22 U.S.C. § 611(o).  In an attempt to impute the PRC's and Sun's intent to Wynn, the government argues Wynn "was part of a broader effort to effectuate the return of a PRC businessperson," and that Wynn acted "as part of this recruitment effort."  Opp. at 39, 40.  But this argument founders on the plain terms of the statute and the factual allegations in the Complaint, which do not allege a conspiracy, much less articulate any allegations that Wynn agreed to be part of a "broader effort" beyond merely delivering the PRC's message.

Finally, the government seeks to excuse the defects in its pleading by complaining "that FARA affords the Government no power to issue subpoenas or otherwise compel [discovery]," and thus that it must "rely on what information it is able to obtain voluntarily from witnesses." Opp. at 42.  The government argues, therefore, that the "Court should not dismiss the Complaint where the Government has not yet had the opportunity to gather this factual information and where such information is material to the issues raised in the Defendant's motion."  *Id.*  The government's argument is puzzling, because it has and routinely exercises the power to compel the production of documents or witnesses relating to FARA through the criminal investigatory process.  *See, e.g.*, Robert Mueller, 1 *Report on the Investigation Into Russian Interference in the 2016 Presidential Election* 181-83 (Mar. 2019) (describing FARA portion of investigation and resulting charges); DOJ, *Recent FARA Cases*, https://www.justice.gov/nsd-fara/recent-cases (describing over a dozen recent cases).  The government did so here, compelling testimony and documents from Wynn—now possessed by the DOJ attorneys in this matter—and many others, leading to several plea agreements and criminal charges.  *See* MTD at 5 (listing cases).

22

**APP. 176**

Moreover, the government distorts the role of discovery and eviscerates the critical

purpose served by Rule 12(b)(6).  As courts have explained, "[e]xcept in certain limited

circumstances … discovery is authorized solely for parties to develop the facts in a lawsuit in

which a plaintiff has [already] stated a legally cognizable claim, not in order to permit a plaintiff

to find out whether he has such a claim[.]"  *Podany v. Robertson Stephens, Inc.*, 350 F. Supp. 2d

375, 378 (S.D.N.Y. 2004); *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009) ("Rule 8 … does not

unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.");

*McManus*, 355 F. Supp. 3d at 298 ("The mere, ever-present possibility that some unknown and

unanticipated new facts will emerge to prop up the non-moving party's case is no reason to deny

the [motion].").  The government should not be permitted to engage in a fishing expedition

through discovery to find a viable claim that it cannot support through good-faith allegations.

### C.      The Government Should Not Be Granted Leave to Amend

The government also requests that—if the Complaint is dismissed—it be granted leave to

amend.  Opp. at 41.  Because the time for amending the Complaint as a matter of course under

Fed. R. Civ. P. 15(a)(1) has passed, the government must obtain leave of Court to amend.

"When evaluating whether to grant leave to amend … , the Court must consider these factors:

(1) undue delay; (2) prejudice to the opposing party; (3) futility of the amendment; (4) bad faith;

and (5) whether the plaintiff has previously amended the complaint."  *Habliston v. FINRA*

*Dispute Resol., Inc.*, 251 F. Supp. 3d 240, 244 (D.D.C. 2017).  The government has not met its

burden that such leave should be granted.

As an initial matter, the government has neither submitted a proposed amended complaint

nor disclosed what additional factual allegations it would include if leave were granted.  Without

such information, the Court cannot evaluate whether to grant leave to amend.  *See Gavin v. Dep't*

*of Air Force*, 314 F. Supp. 3d 297, 304-05 (D.D.C. 2018).  In any event, an amendment would be

futile.  The government has had more than four years to collect any facts necessary to support its claim, with the cooperation and testimony from Wynn, and has enjoyed unfettered access to the individuals with whom Wynn interacted, who could furnish facts relevant to his intent.  *See In re Dreier LLP*, 453 B.R. 499, 518 (Bankr. S.D.N.Y. 2011) (holding that "leave to replead these claims would not be productive" because plaintiff already had two years of research and preparation before initial complaint).  In short, the problem with the Complaint is not that there are more facts to allege, but that the facts that the government has alleged—presumably in good faith—do not meet the requirements of a FARA claim.  Allowing the government to try to recast those facts in a different light would be unfair, prejudicial, and contrary to the interests of justice.

If the government possessed additional facts to support its FARA claim but did not include them in its Complaint for strategic or other reasons, the Court should deny leave to amend for bad faith and delay.  *Kent v. Bledsoe*, No. 09-cv-1701, 2010 WL 771583, at *3 (M.D. Pa. Mar. 2, 2010) (denying leave to amend "due to bad faith and a dilatory motive" where the plaintiff was aware of claims but did not include them in the original complaint).

## IV.    THE COURT MAY CONSIDER DOCUMENTS INCORPORATED IN THE COMPLAINT

The Court may properly consider Wynn's exhibits as explained in the authorities cited in MTD at 4 n.1 and unrebutted by the government.  *See Louis v. Hagel*, 221 F. Supp. 3d 40, 43 n.4 (D.D.C. 2016) (holding that letter from defendant could be considered because it was referenced in the complaint and the authenticity of the document was undisputed); *Slate v. Pub. Def. Serv. for D.C.*, 31 F. Supp. 3d 277, 287-88 (D.D.C. 2014) (collecting cases and holding that the court would consider a letter referenced in the complaint and a plaintiff-drafted document).  Wynn's exhibits are incorporated by the Complaint and properly before the Court in deciding Wynn's constitutional arguments (Section II)—the only arguments that implicate the exhibits.  What is

24

less clear is whether the Court must consider the government's contrary argument, which was not raised in the government's timely filed brief (Dkt. 13) but was only raised after the Court ordered the government to refile a brief that complied with Local Rule 5.1(d).  Local Rule 5.1(g) specifies that a party must file a "corrected" pleading, but it does not grant a party permission to make substantive changes or add new arguments, as the government liberally did here.  In the alternative, the Court may convert the Motion to Dismiss to one, in that part, for summary judgment.  *See Sarfati v. Antigua & Barbuda*, 923 F. Supp. 2d 72, 74-75 (D.D.C. 2013).

## CONCLUSION

For the foregoing reasons and those stated in Dkt. 11-1, Wynn respectfully requests that the Court dismiss the Complaint with prejudice.

APP. 179

Respectfully submitted,

/s/_____
Reid H. Weingarten (D.C. Bar No. 365893)
Brian M. Heberlig (D.C. Bar No. 455381)
Nicholas P. Silverman (D.C. Bar No. 1014377)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, DC  20036
Tel: (202) 429-3000
Fax: (202) 429-3902
rweingarten@steptoe.com
bheberlig@steptoe.com
nsilverman@steptoe.com

/s/_____
Robert D. Luskin (D.C. Bar No. 293621)
Leo R. Tsao (*pro hac vice*)
PAUL HASTINGS LLP
2050 M Street, N.W.
Washington, DC  20036
Tel: (202) 551-1700
Fax: (202) 551-0410
robertluskin@paulhastings.com
leotsao@paulhastings.com

Dated: August 29, 2022          *Counsel for Defendant Stephen A. Wynn*

26

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**ATTORNEY GENERAL OF THE**
**UNITED STATES OF AMERICA,**

      **Plaintiff,**

          **v.**                                    **Civil Action No. 22-1372 (JEB)**

**STEPHEN A. WYNN,**

      **Defendant.**

## ORDER

      For the reasons set forth in the accompanying Memorandum Opinion, the Court

ORDERS that:

    1.  Defendant's Motion to Dismiss is GRANTED; and

    2.  The case is DISMISSED WITHOUT PREJUDICE.


                          /s/ James E. Boasberg
                          JAMES E. BOASBERG
                          United States District Judge

Date:  October 12, 2022

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**ATTORNEY GENERAL OF THE**
**UNITED STATES OF AMERICA,**

     **Plaintiff,**

       **v.**

**STEPHEN A. WYNN,**

     **Defendant.**

**Civil Action No. 22-1372 (JEB)**

## <u>MEMORANDUM OPINION</u>

While many people may know Defendant Stephen A. Wynn as a developer who turned up the wattage in Las Vegas with his high-end resorts and casinos, the Government here contends that he has moonlighted in another sphere as well: as an agent of the People's Republic of China. In this suit, the Attorney General seeks an injunction forcing him to register as such under the Foreign Agents Registration Act (FARA).

During five months in 2017, Wynn and the Government agree that he had numerous meetings and conversations with members of the Trump Administration regarding the PRC's interest in the return of an unnamed Chinese businessperson, who fled China in 2014 and sought political asylum in the United States. The Department of Justice, alleging that Wynn traded these lobbying efforts for favorable treatment of his casino business in Macau, repeatedly advised him over the course of four years that he was obligated to register as a foreign agent under FARA. Wynn, who contests this obligation and has refused to so register, now moves to dismiss this suit, arguing that the Government cannot compel him to register after his alleged

1

agency relationship terminated.  Because the Court agrees with him that binding Circuit

precedent forecloses the Government's efforts here, it will grant the Motion.

**I.      Background**

      The Court begins with a brief overview of the purposes and structure of FARA and then

turns to the factual and procedural history of the case.

      A.  Foreign Agents Registration Act

      FARA is a disclosure statute.  It requires any person engaging in certain political,

financial, or public-relations activities on behalf of a foreign principal to register with the

Attorney General and to make periodic public disclosures about her relationship with the foreign

principal and the activities she undertakes in the United States on its behalf.  See generally 22

U.S.C. §§ 611–12.  The purpose of these disclosures is to "prevent covert influence over U.S.

policy by foreign principals . . . [by] ensur[ing] that the public is informed of the true source or

sponsor behind the information being disseminated for its consideration."  United States v. Craig,

401 F. Supp. 3d 49, 54 (D.D.C. 2019); see also 22 U.S.C. § 611 Note on Policy and Purpose of

Subchapter.

      The scope of persons subject to FARA is broad.  Section 611 of the Act defines an "agent

of a foreign principal" to mean anyone "who directly or through any other person . . . engages

within the United States in political activities for or in the interests of such foreign principal" or

"represents the interests of such foreign principal before any agency or official of the

Government of the United States."  22 U.S.C. § 611(c)(1).  The Act then defines "political

activities" to mean any activity that is intended to or could "influence any agency or official of

the Government of the United States or any section of the public within the United States with

reference to formulating, adopting, or changing the domestic or foreign policies of the United

**APP. 183**

States or with reference to the political or public interests, policies, or relations of a government

of a foreign country or a foreign political party." Id. § 611(o).  FARA's definition of "foreign

principal" is similarly broad, encompassing foreign governments, foreign political parties, and

other combinations of foreign persons or groups doing business outside of the United States.  Id.

§ 611(b).  Under these definitions, nearly anyone who represents the political or public-relations

interests of a foreign principal in the United States is covered under FARA.

  When an agent of a foreign principal undertakes any of these covered activities, she

becomes subject to the statute's reporting requirements.  Id. § 612.  Under the terms of § 612(a),

an agent must submit a registration statement to the Attorney General within ten days of the start

of the agency relationship.  That statement must include certain required disclosures, including,

*inter alia*, the "registrant's name and address(es)," the registrant's nationality, a "comprehensive

statement of the nature of [the] registrant's business," and the details of any written or oral

agreements between the registrant and her foreign principal.  Id. § 612(a)(1)–(11).  After initial

filing, agents must then file supplements at six-month intervals.  Id. § 612(b).  Section 615

further requires that registered agents "keep and preserve while [they are] an agent of a foreign

principal such books of account and other records" as the Attorney General's regulations specify.

  As will become relevant later, violations of FARA may lead to both criminal and civil

sanctions.  Individuals who willfully violate the registration requirements or any other provision

of FARA are subject to criminal prosecution, id. § 618(a), and § 618(e) specifically makes

failure to file the required registration statements a continuing offense.  The Attorney General

may also bring a civil suit for appropriate injunctive relief, including seeking "an order requiring

compliance with any appropriate provision" of FARA.  Id. § 618(f).

**APP. 184**

B.  Underline{Factual Background}

Taking the facts alleged in the Complaint as true — as the Court must at this stage, see

Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) — efforts to enlist

Wynn as an agent of the Chinese government began with a May 2017 meeting that included an

unusual cast of characters: a former RNC finance chair (Elliott Broidy), a businessperson (Nickie

Lum Davis), and a member of the hit 1990s hip-hop group The Fugees (Prakazrel Michel).  See

ECF No. 3 (Compl.), ¶ 16.  That meeting, coordinated by foreign national Low Take Jho,

involved a request from Sun Lijun, the former Chinese Vice Minister for Public Security, for

help lobbying then-President Trump and his Administration on behalf of the People's Republic

of China.  Id.  Perhaps embracing The Fugees' famous line — "ready or not, here I come, you

can't hide,"  The Fugees, Ready or Not, on The Score (Ruffhouse Records 1996) — the PRC

sought to have the Trump Administration cancel the visa of and remove from the United States

an unnamed Chinese businessperson whom the PRC had charged with corruption.  The Chinese

businessperson, perhaps understanding that "jail bars ain't golden gates," id., had fled China in

2014, seeking political asylum in the United States.  See Compl., ¶ 16.

Defendant entered the picture in June 2017, following that initial meeting, when Broidy

approached him on behalf of Sun to elicit his help in the PRC's lobbying effort.  Id., ¶ 17.  At

that time, Wynn was acting as the latest RNC finance chair, and, according to the Complaint,

Broidy "believed that [Wynn's] RNC experience, combined with [his] business dealings in the

PRC and friendship with then-President Trump, would be helpful in getting access to Trump

Administration officials."  Id.  Broidy explained to Defendant that the Chinese businessperson

was a "criminal wanted by the PRC who was hiding in the United States, that the PRC wanted

him arrested, and that his visa was due to expire soon."  Id., ¶ 18.  Specifically, the PRC wanted

Wynn to lobby the Trump Administration to deny his upcoming visa-renewal application and to place him on the No Fly List.  Id., ¶ 21.  Broidy then provided Defendant with the Chinese businessperson's "passport photos, an Interpol red notice, and links to various news articles about [him]."  Id., ¶ 19.

After Broidy softened the ground, Sun began communicating with Wynn directly, at which point Defendant "agreed to raise the matter with then-President Trump and Trump Administration officials."  Id., ¶ 20.  At a dinner on June 27, 2017, Wynn made good on that promise.  There, Defendant "conveyed to then-President Trump the PRC's desire to have the PRC national removed from the United States and provided the PRC national's passport photos to then-President Trump's secretary."  Id., ¶ 22.  Over the rest of the summer, Wynn and Sun kept in touch by phone, with Sun reiterating the importance of the United States' not renewing the visa of the Chinese businessperson, id., ¶ 23, and Defendant organizing further meetings with White House and National Security Council officials, as well as with the then-President himself. Id., ¶ 25.

Around this same time, Defendant's casino business in Macau, a special administrative region of the PRC, also entered the conversation.  Id., ¶ 23.  According to the Complaint, Wynn's lobbying campaign — which was sandwiched between a 2016 decision by the Macau government to significantly limit the number of gaming tables at his casino and an upcoming license renegotiation for those same casinos in 2019, id., ¶ 29 — was motivated all along "by his desire to protect his business interests in the PRC."  Id., ¶ 28.  By October 2017, when it became evident that the PRC's lobbying campaign had failed to elicit the removal of the PRC national and that Wynn could do no more to help, he "gracefully" exited his role as agent, id., ¶ 27, admitting to Sun that he had "exhausted the advantages of [his] position," but that he was "of

**APP. 186**

course . . . anxious to help" if an opportunity arose in the future, and that he "remain[ed] grateful for the privilege of being part of the Macau and PRC business community."  Id., ¶ 28.

     C.  <u>Procedural Background</u>

     Nearly a year after the PRC's lobbying campaign began, the Department of Justice advised Wynn that it believed he was obligated to register under FARA as an agent of Sun and the PRC, giving him thirty days to effect the registration.  Id., ¶ 37.  Wynn, through counsel, disputed this obligation, contending to DOJ that he did not meet the statutory definition to be considered an "agent" of either Sun or the PRC, and that none of his actions was taken "in the interests" of Sun or the PRC.  See ECF No. 11-3 (Wynn Letter); 22 U.S.C. § 611(c)(1).  For the next four years, DOJ and Wynn traded letters, with the Justice Department continuing to insist that he was obligated to register under FARA and noting that its "further investigation into the matter had [only] strengthened" this conclusion.  See Compl., ¶ 37.  Finally, on April 13, 2022, DOJ reiterated this mandate one final time and gave Wynn thirty days to register.  Id  When that request bore no fruit, the Attorney General filed this suit, seeking a permanent injunction under FARA § 612(f) requiring Defendant to register as an agent for the period where he took actions at the request of Sun and on behalf of the PRC.  Id., ¶¶ 39–42.  This is the first affirmative civil suit under FARA in more than three decades.  See Off. of Pub. Affs., <u>Justice Department Sues to Compel a U.S. Businessperson to Register Under the Foreign Agents Registration Act</u>, U.S. Dep't of Just. (May 17, 2022), https://bit.ly/3CjjhFW.

     Meanwhile, for their part in the lobbying campaign, Broidy and Davis — each of whom was present at the initial meeting organized by Low in May 2017 — have since pled guilty to counts related to criminal violations of FARA.  See <u>United States v. Broidy</u>, No. 20-210 (D.D.C. Oct. 20, 2020); <u>United States v. Davis</u>, No. 20-68 (D. Hawaii).  Michel awaits trial on an

APP. 187

indictment that includes multiple counts related to FARA violations.  See United States v. Michel, No. 19-148 (D.D.C.).  DOJ, however, has not initiated a criminal prosecution against Wynn for his 2017 activities.

## II.   Legal Standard

Federal Rule of Civil Procedure 12(b)(6) permits dismissal of a complaint for failure to state a claim upon which relief may be granted.  In evaluating such a motion to dismiss, courts must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'"  Sparrow, 216 F.3d at 1113 (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)).  Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570) — that is, the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555.  The court need not accept as true, then, "a legal conclusion couched as a factual allegation," Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)), nor "inferences . . . unsupported by the facts set out in the complaint."  Id. (quoting Kowal v. MCI Communications Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994)) (internal quotation marks omitted).  And it may consider not only "the facts alleged in the complaint," but also "any documents either attached to or incorporated in the complaint[,] and matters of which [courts] may take judicial notice."  Equal Employment Opportunity Commission v. St. Francis Xavier Parochial School, 117 F.3d 621, 624 (D.C. Cir. 1997).

## III.   Analysis

Although Defendant raises a number of meaty constitutional issues, he principally argues that the Court need look no further than the D.C. Circuit's opinion in United States v. McGoff, 831 F.2d 1071 (D.C. Cir. 1987).  He contends that the Court of Appeals there interpreted FARA's § 612(a) registration obligation to expire upon the termination of an agency relationship.  Because both parties agree that any such relationship between Wynn and the Chinese government ended in October 2017, Defendant's Motion maintains that he is no longer required to file a registration statement and cannot be compelled to do so.  The Government disagrees, arguing that McGoff does not preclude the Attorney General from pursuing civil enforcement to compel compliance with the statute's reporting requirements, even after an agency relationship has terminated.  Although the issue is close, the Court believes that McGoff forecloses the Government's interpretation of the statute and requires dismissal of the suit.  The Court will thus do so without ever considering whether Wynn was a PRC agent or not.

### A.  McGoff's Interpretation of FARA

As McGoff's holding controls here, a close examination of that case is necessary.  The D.C. Circuit there considered the criminal prosecution of John P. McGoff for neglecting to register as an agent of the government of South Africa.  The Government alleged that McGoff had acted as an agent from 1974 through 1979 and charged him with failure to register under FARA § 612(a) and § 618(e), which makes such failure a continuing offense.  Id. at 1072.  The Government did not learn of this relationship until 1979 and filed its criminal Information in 1986, seven years after the alleged agency relationship ended.  Id.  McGoff thus raised the five-year statute of limitations as an affirmative defense.  Id. at 1073; see 18 U.S.C. § 3282 (general statute of limitations for non-capital offenses).  Because the parties recognized that the question

of when the statute of limitations began to run was potentially dispositive of the case, they

sought to resolve it at the outset. McGoff, 831 F.2d at 1073. They therefore stipulated to the

material facts not in dispute, including that McGoff's alleged agency activities concluded in

1979 and never resumed, and that he never effected registration under FARA. Id. The district

court held that the statute of limitations began to run from the last day an individual acts as an

agent for a foreign principal and thus required dismissal. The Government appealed to the D.C.

Circuit. Id. The only question before that court thus was: "[W]hen did the statute of limitations

for failure to file under FARA begin to run?" Id. Is it the last day a person acts on behalf of a

foreign principal, or does it never start running as long as the person has not registered?

The D.C. Circuit concluded that the former was the correct interpretation. Id. at 1071.

To reach that conclusion, it began with FARA § 618(e), which provides that "[f]ailure to file any

such registration statement . . . as is required by either section 612(a) or section 612(b) . . . shall

be considered a continuing offense for as long as such failure exists." The court then reasoned

that because the "statute of limitations as to prosecutions for continuing offenses runs from the

last day of the continuing offense," it was "necessary" to "identify with specificity" when that

offense is "complete." Id. at 1079. As the offense was a violation of § 612(a)'s registration

requirement, the court determined that "the continuing offense terminates when the section

612(a) obligation to file expires." Id. at 1082.

When does that occur? To begin, FARA's § 612(a) registration requirement prohibits

any person from "act[ing] as an agent of a foreign principal unless he has filed with the Attorney

General a true and complete registration statement and supplements thereto." Central to the

question teed up in McGoff, however, was the second half of § 612(a), which attempts to clarify

the scope of that registration obligation.  The operative language of that portion of § 612(a) is as

follows:

> The obligation of an agent of a foreign principal to file a registration
> statement shall, after the tenth day of his becoming such agent,
> continue from day to day, and termination of such status shall not
> relieve such agent from his obligation to file a registration statement
> for the period during which he was an agent of a foreign principal.

22 U.S.C. § 612(a) (emphasis added).  As the court in McGoff recognized, the underlined

language — which was added to § 612(a) in a pair of amendments in 1950 and 1966, McGoff,

831 F.2d at 1090 n.29 — is amenable to two interpretations, depending on how one reads the

concluding clause, "for the period during which he was an agent of a foreign principal."

Specifically, it hinges on what that clause modifies.  See id. at 1100 (Bork, J., dissenting).

Neither reading is entirely satisfactory, and both create undesirable issues of surplusage and

ambiguity that cannot be fully resolved on the text alone.  The Court nonetheless plunges in.

Under what this Court believes is the more sensible reading, which is unfortunately the

one embraced by the McGoff dissent, the concluding clause modifies "registration statement."

In other words, imagine that the word "for" in this clause is replaced by the word "covering."  Id.

(Bork, J., dissenting) (interpreting "for" in this way).  So rewritten, the provision would read:

termination of agency status shall not relieve an agent "from his obligation to file a registration

statement covering the period during which he was an agent of a foreign principal."  The

justification for the inclusion of the concluding clause under this reading would be to describe

the content of the registration statement.  That is, it would clarify that, although registration as an

agent is retroactively required even after the termination of an agency relationship, the

registration statements that a former agent needed to file would have to report information only

from those prior periods during which he was acting on behalf of a foreign principal, as opposed

APP. 191

to indefinitely into the future.  The existence of that concluding clause would thus "indicate Congress' rejection" of an alternative interpretation of the requirement that would "amount to the surveillance of the perfectly legal activities of now-ordinary Americans who were formerly agents . . . [by] restrict[ing] the temporal reach of registration statements to the period during which the agent was an agent."  Id. at 1100.

The benefit of this interpretation is that it comports with the rule of the last antecedent and thus is the "more natural" reading of the text.  Id. at 1083; see id. at 1100 (Bork, J., dissenting); cf. Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts § 20 (1st ed. 2012) (discussing related "nearest-reasonable-referent canon" of construction, which provides that "[w]hen the syntax involves something other than a parallel series of nouns or verbs, a prepositive or postpositive modifier normally applies only to the nearest reasonable referent").  A critic of this interpretation, however, could argue that FARA raises no ambiguity about what period a "registration statement" could refer to because such a statement could logically "relate to no period other than 'the period during which' the individual acted as an agent." McGoff, 831 F.2d at 1083.  If that were the case, then the final clause would amount to pure surplusage.  Id.; see Scalia & Garner, supra, § 26 (discussing the "surplusage canon" of construction, which provides that "[i]f possible, every word and every provision is to be given effect . . . . None should be ignored.  None should be given an interpretation that causes it . . . to have no consequence").

In any event, Judge Bork's reading garnered only his vote.  The majority opinion, which this Court is bound by, offers an alternative interpretation, which reads the concluding clause as modifying instead the word "obligation."  831 F.2d at 1083; id. at 1101 (Bork, J., dissenting).  Rewritten in this way, the provision would read: termination of agency status shall not relieve an

11

APP. 192

agent "from his obligation for the period during which he was an agent of a foreign principal[] to file a registration statement." Id. at 1101 (Bork, J., dissenting) (restyling the statutory language in this way). Under this reading, the final clause of § 612(a) serves an entirely different purpose. Now, rather than specifying what period the registration statement should cover, it explains that termination of an agency relationship does not retroactively excuse that agent's prior obligation to register under FARA. In other words, the concluding clause "ensure[s] that termination of the agency does not provide an affirmative defense for failure to file during the period that one is an agent," Id. at 1083, and means that the Government may still prosecute an individual for failure to register until the statute of limitations expires. Id. at 1101 (Bork, J., dissenting).

But this reading creates its own challenges. First, it imputes to Congress an intent to use the amendments to § 612(a) to solve a problem that only arises from what the dissent contends would be a highly implausible reading of the provision prior to its amendment. That reading requires one to suppose that, absent the language added in the 1950 and 1966 amendments, the statute would have been interpreted to mean that an agent's duty "to file a registration statement . . . might be somehow retroactively excused . . . immediately upon termination of the agency relationship" for purposes of criminal liability. Id. "No criminal statute works this way." Id. But even if this was the true goal of Congress, as the majority insisted the legislative history demonstrates, see id. at 1084–99, it goes about solving that issue in an odd manner. Surely Congress could have amended § 612(a) by simply adding the phrase "termination of such status shall not relieve such agent from his obligation to file a registration statement" without the concluding clause, which both creates the issue of an ambiguous referent and does not seem strictly necessary to ensure that § 612(a) is read in the way the majority desires.

Despite these drawbacks, after examining the (admittedly ambiguous) statutory text and legislative history, the court concluded that this was the most appropriate interpretation, holding that the § 612(a) "obligation to file expires when the agent ceases activities on behalf of the foreign principal." Id. So holding, it disagreed with the Government's proposed interpretation, which would have extended McGoff's obligation to register even after his agency relationship had ended and would have, in the majority's view, effectively eliminated the statute of limitations. Id. at 1093. The Circuit thus upheld the district court's dismissal.

B.  McGoff's Applicability

So where does that leave us?  No matter which of the above interpretations seems more sensible to this Court — which by now should be no mystery to the reader — it is bound by the majority's decision.  Under that interpretation of § 612(a), Wynn's obligation to file a registration statement has years since passed, and the Government cannot now compel him to register, which is the only relief it seeks here.  The Government could still attempt to impose criminal sanctions on him so long as he remains within the statute of limitations.  See McGoff, 831 F.2d at 1094 n.32.  It nevertheless rejoins that this Court need not be constrained by McGoff's discussion of § 612(a) because it was pure *dicta* and, alternatively, that this case is distinguishable because it arises in the civil- rather than criminal-enforcement context.  The Court will address both arguments in turn.

1.  Dicta

The Government first contends that Wynn relies "almost entirely on two pieces of dicta in the majority opinion's analysis" and that "[n]either of these passing references . . . was outcome-determinative or otherwise central to the holding in McGoff."  ECF No. 14 (MTD Opp.) at 10.  On the contrary, "the decisive question in resolving the statute-of-limitations issue

**APP. 194**

. . . turn[ed] on the duration of the registration obligation of section 612(a)."  McGoff, 831 F.2d

at 1081–82.  Had the McGoff court instead embraced the dissent's reading of § 612(a), it could

not have affirmed the district court on the statute-of-limitations issue.  Indeed, much more than

just "two pieces of dicta," that opinion devotes nearly ten pages of a 25-page opinion just to the

question of the registration obligation in § 612(a).

      The necessity of this holding to the decision is also clear in the analytical process the

McGoff majority followed.  The court began with § 618(e), which created a continuous offense

for "such failure," which, the court reasoned, referred to "'[f]ailure to file any such registration

statement . . . as is required by . . . section 612(a).'"  Id. at 1079.  It concluded, consequently, that

"[a] parsing of section 618(e) thus shows that resolution of the [statute-of-limitations] issue . . .

lies in the duration of the obligation to file imposed by section 612(a)" and that, therefore, the

court's "focus . . . must necessarily include the proper interpretation of the latter provision."  Id.

(emphasis added).

      "It is true that a statement not necessary to a court's holding is dictum," In re Grand Jury

Investigation, 916 F.3d 1047, 1053 (D.C. Cir. 2019), and "dictum is not binding circuit

precedent."  Jam v. Int'l Fin. Corp., 3 F.4th 405, 409–10 (D.C. Cir. 2021).  But "a necessary

antecedent to determining" an issue before the court is not dictum, In re Grand Jury

Investigation, 916 F.3d at 1053, and this Court is "bound . . . 'not only [by] the result' of a prior

case, 'but also [by] those portions of the opinion necessary to that result.'"  Int'l Union, Sec.,

Police & Fire Pros. of Am. v. Faye, 828 F.3d 969, 974 (D.C. Cir. 2016) (quoting Seminole Tribe

of Fla. v. Florida, 517 U.S. 44, 67 (1996)).  Although the question presented in McGoff was

"when the statute of limitations for a continuing offense charge under § 618(e) begins to run, not

on whether retrospective civil enforcement actions could be brought," MTD Opp. at 11, the

APP. 195

majority went to great pains to explain the necessity of deciding the temporal scope of § 612(a) to the statute-of-limitations issue.  Whether that interpretation is correct or even the most plausible interpretation of the text is not an appropriate inquiry for this Court, which must follow binding Circuit precedent.

The Government nevertheless insists that, rather than establishing a controlling interpretation of § 612(a), the majority in McGoff stopped short and merely concluded that the provision is "ambiguous" and that the ultimate decision "rested not on its interpretation of the text of § 612(a) but its review of the legislative history for that provision."  MTD Opp. at 10. True enough, the McGoff majority did concede that, although one "reading [of the provision] would strongly be preferred upon consideration of the statutory text alone, . . . since neither can confidently be excluded, we are constrained to conclude that section 612(a) is ambiguous." McGoff, 831 F.2d at 1083.  The court then "turn[ed] to the legislative history" to "discern, if at all possible, Congress' intent on th[e] issue."  Id. at 1084.

Courts, of course, do not examine legislative history in a vacuum.  Rather, as the McGoff majority did, they interpret statutes, and they look to extrinsic materials such as legislative history only to resolve statutory ambiguity.  See Exxon Mobil Corp v. Allapattah Servs., Inc., 545 U.S. 546, 568 (2005) ("Extrinsic materials have a role in statutory interpretation only to the extent they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms."); see, e.g., Milner v. Dep't of the Navy, 562 U.S. 562, 574 (2011) ("Legislative history, for those who take it into account, is meant to clear up ambiguity, not create it."); Bruesewitz v. Wyeth LLC, 562 U.S. 223, 242 (2011) ("[L]egislative history is persuasive to some because it is thought to shed light on what legislators understood an ambiguous statutory text to mean when they voted to enact it into law.").

APP. 196

The <u>McGoff</u> majority explicitly acknowledged that it could not stop at a mere finding of ambiguity, noting instead that it would have to resolve any ambiguities in the text that it encountered.  <u>See</u> 831 F.2d at 1084 n.22 (distinguishing its decision from cases involving <u>Chevron</u> deference where court could defer ambiguity to an agency).  Far from "not embrac[ing]" a particular reading of § 612(a), the majority actually made its interpretation of the statute a central part of its holding.  <u>See</u> MTD Opp. at 10.

Regardless of whether the majority relied exclusively on the statutory text or a combination of the text and the legislative history to reach its conclusion, the end result was a binding interpretation of the duration of the obligation in § 612(a), which this Court is obligated to follow.

     *2. Civil-Enforcement Context*

The Government next asserts that <u>McGoff</u> is inapplicable because that case involved a criminal-enforcement action under FARA § 618(e), whereas this case arises in the civil-enforcement context for an injunction under § 618(f).  <u>See</u> MTD Opp. at 11.  It bolsters this argument by highlighting that the <u>McGoff</u> majority made "references to how its analysis was influenced by considerations specific to the criminal context," <u>id.</u> at 11, including the rule of lenity.  <u>Id.</u> at 12.

As an initial matter, it is not at all clear that the holding in <u>McGoff</u> depends on the rule of lenity.  As the majority noted in its initial discussion of § 612(a), the "ambiguity in the statute alone would appear to suffice in the criminal setting to invoke the time-honored rule of lenity," 831 F.2d at 1084, but the court then refused to end its analysis there and moved on to consider the legislative history of that provision.  <u>See also</u> <u>id.</u> at 1096–97 (noting that although the majority holding "finds solid support . . . in the rule of lenity," "our review of the text of the

**APP. 197**

relevant statutory provisions, the statute as a whole, and the legislative history convinces us that"

this reading of sections 612(a) and 618(e) "is correct").

Even so, the same statutory text cannot bear one meaning in the criminal context and an

entirely different meaning in the civil context. Instead, the Supreme Court has held that "we

must interpret [a] statute consistently, whether we encounter its application in a criminal or

noncriminal context," Leocal v. Ashcroft, 543 U.S. 1, 11 n.8 (2004), and that includes when the

rule of lenity has been applied to that statutory provision. See Kasten v. Saint Gobain

Performance Plastics Corp., 563 U.S. 1, 16 (2011); United States v. Thompson/Center Arms Co.,

504 U.S. 505, 517–18 & n.10 (1992).

The Government responds that even if lenity can be applied to a "statutory provision with

both criminal and noncriminal application," MTD Opp. at 12, this argument has no bearing on

Wynn's case because it involves the civil remedies available to the Government under § 618(f),

which McGoff did not purport to interpret. But this point, too, misses the mark. The

Government is right that McGoff did not attempt to interpret or apply the rule of lenity to

§ 618(f), which has no criminal application. The relevant provision in this case, however — as it

was in McGoff — is not § 618(f) but instead § 612(a), which sets out the duration of the

registration obligation. Section 618(f) merely creates the cause of action, providing that

"whenever any agent of a foreign principal fails to comply with any of the provisions of this

subchapter[,] . . . the Attorney General may make application to the appropriate United States

district court for an order enjoining such acts." 22 U.S.C. § 618(f). The provision that the

Government actually seeks to enforce with its desired injunction, and which it alleges that Wynn

has failed to comply with, is the registration requirement of § 612(a). See Compl., ¶ 1 (seeking

to "compel the Defendant, Stephen A. Wynn, pursuant to 22 U.S.C. § 618(f), to submit a true

**APP. 198**

and complete registration statement, and supplements thereto, to the Attorney General, <u>as required by 22 U.S.C. § 612(a)-(b)</u>" (emphasis added)).  That latter provision was what <u>McGoff</u> interpreted, and to the extent that the majority there applied the rule of lenity in doing so, that interpretation would also control here.  If an interpretation of § 618(f) exists that would allow the Government to compel Wynn to register today notwithstanding <u>McGoff</u>'s interpretation of the registration obligation in § 612(a), the Government does not provide it here.  In fact, it does not engage at all with the text of that provision — or of § 612(a) for that matter — beyond insisting that § 618(f) is the basis for distinguishing <u>McGoff</u> .

Of equal importance, both the majority and dissent in <u>McGoff</u> were keenly aware that the prevailing interpretation of § 612(a) in the criminal context would likely substantially constrain the Attorney General from seeking injunctive relief.  In dissent, Judge Bork criticized the majority's opinion on this ground, warning that a cramped interpretation of § 612(a)'s registration obligation meant also that "the civil injunctive remedy available to the United States for 'any acts . . . [in] violation of[,] . . . or [any failure] to comply with[,] any of the provisions of [the Act],' also now will be unavailable to compel anyone to file a registration statement once his agency has ended."  831 F.2d at 1103 (Bork, J., dissenting) (internal citations omitted) (alterations in original).  He reasoned that if the "obligation to file ends with the termination of the agency relationship, then regardless of what the statute of limitations may be, the United States will be unable to use an injunction to compel registration, since the agent is no longer under any obligation to register."  <u>Id.</u>

To rebut this prescient point, the Government here merely states that the majority "declin[ed] to adopt the dissent's view that the . . . ruling precludes the Government's ability to bring civil enforcement actions."  MTD Opp. at 12.  That is not exactly so since the majority

**APP. 199**

attempted to deflect criticism on this point by noting that if, for the sake of argument, "injunctive remedies would not lie once the individual's agency status has terminated," the Government could still "secure an indictment for the agent's willful failure to register" for five years after the end of the agency relationship.  McGoff, 831 F.2d at 1094 n.32.  That hardly offers much daylight to the Government now.

*       *       *

The Government insists that its aim in this lawsuit — "to compel disclosure to allow government officials as well as the public to evaluate" Wynn's activities as an agent of a foreign principal — is "plainly consistent with the central goal of FARA."  MTD Opp. at 12–13.  The Court does not disagree.  FARA is broad in scope and has as its ambitious purpose the support of the principle that "in modern government[,] public disclosure is needed in order for the public (and, at times, the Government itself) accurately to evaluate such activities," including those undertaken on behalf of a foreign principal.  McGoff, 831 F.2d at 1074; see also Meese v. Keene, 481 U.S. 465, 469–70 (1987) (noting that "comprehensive" nature of FARA's registration requirement applies equally to "friendly, neutral, and unfriendly").  Indeed, the Court does not dispute that even agents who have since ended their agency relationship but who never registered their activities are still in possession of "information that [FARA] says the public needs." McGoff, 831 F.2d at 1099 (Bork, J., dissenting).  While the goals of FARA are laudable, this Court is bound to apply the statute as interpreted by the D.C. Circuit.  And that requires dismissal.

## IV.   Conclusion

For the foregoing reasons, the Court will grant Defendant's Motion to Dismiss.  A contemporaneous Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  October 12, 2022

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ATTORNEY GENERAL OF THE ) 
UNITED STATES OF AMERICA, )
                                     )
         Plaintiff, )
                                      )         Civil Action No. 1:22-cv-1372-JEB
         v. )
                                        )
STEPHEN A. WYNN, )
                                      )
         Defendant. )
_____ )

## NOTICE OF APPEAL

    Notice is hereby given this 9th day of December, 2022, that the Attorney General of the

United States of America hereby appeals to the United States Court of Appeals for the District of

Columbia from the judgment of this Court entered on the 12th day of October, 2022, granting

Defendant's Motion to Dismiss.  *See* Order, ECF No. 20.

    Date:  December 9, 2022                 /s/ *Nathan Michael Swinton*
                                           Nathan Michael Swinton (NY Bar)
                                           Emma Dinan Ellenrieder (D.C. Bar No. 1015108)
                                           U.S. DEPARTMENT OF JUSTICE
                                           National Security Division
                                           Counterintelligence and Export Control Section
                                           950 Pennsylvania Avenue NW
                                           Room 7700D
                                           Washington, DC 20530
                                           Telephone: (202) 353-0267
                                           Telephone: (202) 514-0203
                                           Nathan.Swinton@usdoj.gov
                                           Emma.Ellenrieder@usdoj.gov

                                           *Counsel for Plaintiff*

**APP. 202**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 12th day of May 2023, a copy of the

foregoing Appendix was filed electronically.  Notice of this filing will be

sent to all parties by operation of the Court's electronic filing system.

Parties may access this filing through the Court's system.


/s/ Joseph P. Minta
Joseph P. Minta
Attorney for the Attorney General
of the United States